**EXHIBIT "C"**

**FREEDOM COURT REPORTING**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

ARTHUR EARL CLARK and )
BARBARA E. CLARK, )
    Plaintiffs, )
vs. )
   ) CASE NUMBER:
AMSOUTH MORTGAGE COMPANY,) 1:05-CV-00747-VPM
INC., DOVENMUEHLE )
MORTGAGE, INC., GEOTRAC )
INFORMATION SYSTEM )
SPECIALIST, and EMPIRE )
FIRE AND MARINE )
INSURANCE COMPANY, )
    Defendants. )

DEPOSITION OF ARTHUR EARL CLARK

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy Weldon, am hereby delivering to John David Collins, the original transcript of the oral

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

    A.    Yes.

    Q.    That's what AmSouth had been telling you; correct?

    A.    Correct.

    Q.    In fact, this letter says, enclosed is an application and directions for a LOMA. I don't know if the one you produced had the attachments.

    But you testified earlier you didn't get to the point of actually submitting a LOMA to FEMA; correct?

    A.    No, I didn't.

    Q.    Okay. Did you call -- This letter is written by Marsha Nichols, client service representative. Do you remember calling Marsha Nichols?

    A.    I did.

    Q.    Did you call her in response to this letter?

    A.    I did.

    Q.    Can you tell me about that conversation?

    A.    That's when she told me that she

```
 1   would fax me a copy of the map.
 2        Q.   Okay.
 3        A.   And she did.  And after receiving
 4   the map -- even on her map, I told her to
 5   please draw out which was my home and she
 6   did.
 7             But the only problem was the house
 8   that she had as my house was the one I was
 9   telling you about a while ago was the
10   neighbor's house.
11        Q.   Okay.  And she faxed that shortly
12   after your telephone call?
13        A.   Correct.
14        Q.   Okay.
15        A.   As a matter of fact, she faxed it
16   and I turned around and faxed it back to
17   her.
18             MR. COLLINS:  Let's go off the
19   record for a second.
20             (Whereupon, there was a brief
21   off-the-record discussion.)
22        Q.   The map that was faxed to you from
23   Geotrac had a handwritten notation of where
```

1                I think you had since modified
2    that answer to say that it was around the
3    time you got that first letter in May that
4    you first had any contact with Geotrac; is
5    that right?
6         A.   Correct.
7         Q.   Okay.  So when you answered
8    earlier, you didn't have that letter in
9    front of you and that's why you were having
10   to kind of guess at those dates?
11        A.   Right.
12        Q.   You indicated that once you had
13   some communications with Geotrac, once you
14   found out who they were, that they even
15   existed, you were able to get everything
16   resolved in less than a month; right?
17        A.   Yes.
18        Q.   Was Geotrac responsive to your
19   questions when you called them and talked to
20   them?
21        A.   Yes.
22        Q.   Was everybody cooperative with you
23   and polite?

FREEDOM COURT REPORTING

Page 276

1    A.    Right.

2    Q.    Was there a line on that map that
3 made it appear that this whole big triangle
4 was one parcel instead of two?

5    A.    I can't say if it was divided or
6 not.  I think -- I can't really say.  I
7 don't know if there was a divider in it or
8 not.

9    Q.    But you know on the one you got
10 from FEMA, there was no -- you actually had
11 to draw the dividing line; right?

12    A.    Right.  I did.

13    Q.    So they did not show a dividing
14 line between your property and your
15 neighbor's property, you know that for sure,
16 the FEMA didn't, or else you wouldn't have
17 had to draw it in?

18    A.    Right.

19    Q.    Okay.  Before May, early May,
20 probably that first week of May 2004, had
21 you ever heard of Geotrac?

22    A.    No, sir.

23    Q.    Did you want to say something else

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

1   A.   No.
2   Q.   Anything that Geotrac would have
3   done in relation to your property was either
4   through a contract with AmSouth or some
5   agreement that they had with AmSouth or
6   Dovenmuehle that they were working under or
7   just at your oral request for free; is that
8   correct?
9   A.   More so that.  It was just an oral
10  request I made from them.
11  Q.   Everything that they would have
12  done before May of 2004 would have been
13  pursuant to whatever agreement they had with
14  AmSouth or Dovenmuehle because you weren't
15  involved in it; correct?
16  A.   Correct.
17  Q.   And then after May of 2004, you
18  made an oral request of them and they just
19  did it for free without charging them
20  anything; correct?
21  A.   Correct.
22  Q.   I take it you don't know the terms
23  of any agreement that Geotrac has with

FREEDOM COURT REPORTING

Page 281

```
 1   AmSouth or Dovenmuehle?
 2        A.    I do not.
 3        Q.    At any time, did anyone who works
 4   for Geotrac tell you anything that you
 5   believed was false or untrue?
 6        A.    Not that I can recall.
 7        Q.    I think you indicated that they
 8   explained to you how it was that they put
 9   your structure or put your property in a
10   flood zone; correct?
11        A.    Correct.
12        Q.    They indicated that they thought
13   your neighbor's house was part of your
14   property; isn't that correct?
15        A.    When I got the map faxed to me,
16   this Ms. Smith I believe was the one that
17   showed an arrow and all pointing to my
18   house, which was my neighbor's house.
19             And that's, of course -- When I
20   got the fax, I called her and told her that
21   that was not my house. And she told me to
22   show my house. And I did. I drawed an
23   arrow back to the house and faxed it back to
```

1  her.
2  Q. Would you agree with me that if
3  the FEMA maps showed your land and your --
4  and Ms. Exum's land as one big parcel that
5  was all together and not separated out, that
6  would be incorrect?
7  A. Yes. Because it should be
8  separated.
9  Q. And by the same token, if the FEMA
10 maps showed Ms. Exum's house as being
11 located on the property you owned, that
12 would be incorrect?
13 A. Correct.
14 Q. Okay. And I think you already
15 told me that the FEMA map was wrong?
16 A. Correct.
17 Q. Okay. Because you don't know what
18 the contract is between Geotrac and AmSouth
19 or Dovenmeuhle, I assume you don't know what
20 is, per AmSouth or Dovenmuehle, what is an
21 acceptable method of trying to determine
22 whether something is in a flood zone under
23 that contract?

          A.    I would not.

          Q.    Okay.  And you would agree with me -- and I assume that there are different ways to do it, just from your having to make all these different phone calls.  You know there's a lot of different ways to try to find out whether something is in a flood zone?

          A.    Correct.  Now.

          Q.    If somebody is only charging twenty, thirty, forty dollars to find out if something is in a flood zone, they are going to do something substantially less than, for instance, than Mr. Brannon did for you because he charged you close to nine hundred dollars; right?

          A.    Yes, sir.

          Q.    And I assume you would agree that there's no way a company could do what Mr. Brannon did -- and, of course, Mr. Brannon still couldn't even find out if it was in a flood zone based on what he did, spending nine hundred dollars.

1   If a company is only charging
2   twenty or thirty dollars to do these things,
3   there's no way they could even come out and
4   do what Mr. Brannon did and make a living
5   doing it only charging twenty or thirty
6   dollars?
7       A.   I don't think so.
8       Q.   Okay.
9       A.   Of course, I'm not the expert on
10  that. I don't know what kind of contract
11  they have.
12      Q.   Sure.
13      A.   With whoever.
14      Q.   And whatever it says, it says;
15  right?
16      A.   Yes.
17      Q.   You have sued three different --
18  or four different companies, AmSouth,
19  Dovenmuehle, Geotrac and Empire Fire and
20  Marine Insurance Company.
21      And in your complaint -- and I
22  know you didn't draft the complaint. Your
23  lawyer put it together based on his

FREEDOM COURT REPORTING

Page 285

1  conversations and consultations with you.
2          But the complaint sort of just
3  lumps everybody together.  And a lot of
4  those different allegations are in there.  I
5  want to ask you if some of those are
6  actually meant to apply to Geotrac.
7          For instance, one of them is for
8  breach of contract.  Do you contend that you
9  had a contract directly with Geotrac?
10     A.   No, I did not have a contract with
11 Geotrac.
12     Q.   And I understand you also have
13 another claim that says you're a third party
14 beneficiary.  And I don't even know if you
15 know what that term means.
16          But in non-legal terms it means
17 that you should have gotten the benefit of
18 the agreement between my client Geotrac and
19 AmSouth or Dovenmuehle.  And that's a
20 separate issue.
21          That doesn't mean you have a
22 direct contract with them.  It just means
23 you're affected by a contract.  Do you

```
 1        Q.   Exhibit 7 is what I'm looking at.
 2        A.   That was the standard flood hazard
 3   determination?
 4        Q.   Right.  I know you don't know.
 5   You don't work at AmSouth.  But assuming
 6   that the reason AmSouth thought your house
 7   was in a flood zone is because they received
 8   this document Exhibit 7 from Geotrac in
 9   response to a request to Geotrac to check it
10   out, they had reason to think your house was
11   in a flood zone; correct?
12        A.   Yes.  According to this document.
13        Q.   Okay.  And, of course, I think
14   we've already agreed that when Geotrac
15   looked at the FEMA map, the FEMA map showed
16   that there was a structure on your lot that
17   was in a flood zone and that map turned out
18   to be wrong.
19        A.   If you're saying that they are
20   saying that both this property and my
21   neighbor's property was on one property,
22   yes.
23        Q.   Okay.
```

FREEDOM COURT REPORTING

Page 289

1          And I think I've already got the
2 answers.  But I just want to make sure.  You
3 said you never paid any money to Geotrac to
4 do anything directly; correct?
5     A.    Correct.
6     Q.    Are you aware that Geotrac has in
7 any way ended up with some of your money?
8     A.    I'm not aware of any contracts
9 between y'all and anybody else that any
10 money would have went to one way or the
11 other.
12     Q.    There's a claim in your count
13 called unjust enrichment and there's also
14 one called conversion.  And both of those
15 have the end result that Geotrac got money
16 that they weren't supposed to get and that
17 it came from you.
18          Are you aware of any of your money
19 -- any money that belonged to you somehow
20 ended up in Geotrac's pocket?
21     A.    Not paid directly.  And again
22 there, I can't really answer that because I
23 don't know the contracts between y'all and

1  AmSouth.
2      Q.   Now, you got mortgage statements
3  from AmSouth at first for quite a while
4  after you changed your set up to a flat rate
5  instead of a variable rate.
6           You would get a statement that
7  says here's how much your principal is and
8  here's how much your interest is.  And then
9  they totalled those two things?
10     A.   Correct.
11     Q.   And then at some point, your
12 statement changed to say principal, interest
13 and an escrow amount for the flood
14 insurance?
15     A.   Correct.
16     Q.   On any of those statements did it
17 ever say here's twenty bucks or forty bucks
18 that we had to pay Geotrac and we want you
19 to pay it?
20     A.   Not that I'm aware of.
21     Q.   Okay.  And nobody with Geotrac
22 ever told you anything that was untrue?
23     A.   Nothing no more than when I got

**FREEDOM COURT REPORTING**

Page 292

```
 1        A.   The only two I talked to was this
 2   lady here Marsha and Ms. Smith.  And they
 3   didn't tell me anything that they didn't do.
 4        Q.   Okay.  All right.  I don't think
 5   this applies to Geotrac, but I just want to
 6   make sure.  This Fair Debt Collection
 7   Practices Act, Geotrac didn't ever try to
 8   collect money from you, did they?
 9        A.   No.
10        Q.   Or put anything on your credit
11   report?
12        A.   Not that I'm aware of.
13        Q.   We've talked about your damages
14   just a little bit.  And the fact that I'm
15   already to damages means I'm almost done.
16   You should be happy.
17             I understand that you indicated
18   that you applied for a Sears card, that they
19   wouldn't change your interest rate or do
20   something like that.  Which Sears was that?
21        A.   The one here in Dothan.
22        Q.   Okay.  And did they tell you why
23   you didn't qualify?
```