# EXHIBIT 2

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5    ARTHUR EARL CLARK and   )
6    BARBARA E. CLARK,       )
7       Plaintiffs,  )
8    vs.            ) CASE NUMBER:
9    AMSOUTH MORTGAGE COMPANY,) 1:05-CV-00747-VPM
10   INC., DOVENMUEHLE      )
11   MORTGAGE, INC., GEOTRAC )
12   INFORMATION SYSTEM    )
13   SPECIALIST, and EMPIRE )
14   FIRE AND MARINE        )
15   INSURANCE COMPANY,     )
16      Defendants.  )
17
18      DEPOSITION OF ARTHUR EARL CLARK
19      In accordance with Rule 5(d) of
20   The Alabama Rules of Civil Procedure, as
21   Amended, effective May 15, 1988, I, Cindy
22   Weldon, am hereby delivering to John David
23   Collins, the original transcript of the oral

Page 2

1    testimony taken on the 20th day of February,
2    2006, along with exhibits.
3         Please be advised that this is the
4    same and not retained by the Court Reporter,
5    nor filed with the Court.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5    ARTHUR EARL CLARK and   )
6    BARBARA E. CLARK,       )
7       Plaintiffs,     )
8    vs.            ) CASE NUMBER:
9                   ) 1:05-CV-00747-VPM
10   AMSOUTH MORTGAGE COMPANY,)
11   INC., DOVENMUEHLE      )
12   MORTGAGE, INC., GEOTRAC )
13   INFORMATION SYSTEM    )
14   SPECIALIST, and EMPIRE )
15   FIRE AND MARINE        )
16   INSURANCE COMPANY,     )
17      Defendants.     )
18
19      S T I P U L A T I O N
20      IT IS STIPULATED AND AGREED, by
21   and between the parties through their
22   respective counsel, that the deposition of
23   ARTHUR EARL CLARK, may be taken before Cindy

Page 4

1    Weldon, Certified Shorthand Reporter,
2    Commissioner and Notary Public, at the
3    offices of Clifford W. Jarrett, 424 S. Oates
4    Street, Suite 3, Dothan, Alabama, on
5    February the 20th, 2006 at 10:00 a.m.
6         IT IS FURTHER STIPULATED AND
7    AGREED that the signature to and the reading
8    of the deposition by the witness is waived,
9    the deposition to have the same force and
10   effect as if full compliance had been had
11   with all laws and rules of Court relating to
12   the taking of depositions.
13        IT IS FURTHER STIPULATED AND
14   AGREED that it shall not be necessary for
15   any objections to be made by counsel to any
16   questions, except as to form or leading
17   questions, and that counsel for the parties
18   may make objections and assign grounds at
19   the time of trial, or at the time said
20   deposition is offered in evidence, or prior
21   thereto.
22        IT IS FURTHER STIPULATED AND
23   AGREED that notice of filing of the

1  (Pages 1 to 4)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1  deposition by the Commissioner is waived.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1      I N D E X
2
3  EXAMINATION BY:              PAGE
4  MR. COLLINS          10, 326, 345
5  MR. STOTT              262, 348
6  MR. MARTIN              315, 349
7  MR. JARRETT              342
8
9
10
11      E X H I B I T S
12                  PAGE
13  DEFENDANT'S EXHIBIT NO. 1      54
14  DEFENDANT'S EXHIBIT NO. 2      75
15  DEFENDANT'S EXHIBIT NO. 3      88
16  DEFENDANT'S EXHIBIT NO. 4      92
17  DEFENDANT'S EXHIBIT NO. 5      106
18  DEFENDANT'S EXHIBIT NO. 6      114
19  DEFENDANT'S EXHIBIT NO. 7      129
20  DEFENDANT'S EXHIBIT NO. 8      134
21  DEFENDANT'S EXHIBIT NO. 9      145
22  DEFENDANT'S EXHIBIT NO. 10     146
23  DEFENDANT'S EXHIBIT NO. 11     152

Page 6

1      A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      MR. CLIFFORD W. JARRETT
5      424 SOUTH OATES STREET, SUITE 3
6      DOTHAN, ALABAMA  36301
7
8  FOR THE DEFENDANT:
9      MR. JOHN DAVID COLLINS
10     1901 SIXTH AVENUE NORTH
11     2400 AMSOUTH/HARBERT PLAZA
12     BIRMINGHAM, ALABAMA  35203
13
14     MR. DAVID MARTIN
15     444 SOUTH PERRY STREET
16     MONTGOMERY, ALABAMA  36104
17
18     MR. JOSEPH E. STOTT
19     2450 VALLEYDALE ROAD
20     BIRMINGHAM, ALABAMA  35244
21
22  ALSO PRESENT:
23     MS. BARBARA E. CLARK

Page 8

1  DEFENDANT'S EXHIBIT NO. 12     158
2  DEFENDANT'S EXHIBIT NO. 13     165
3  DEFENDANT'S EXHIBIT NO. 14     179
4  DEFENDANT'S EXHIBIT NO. 15     181
5  DEFENDANT'S EXHIBIT NO. 16     188
6  DEFENDANT'S EXHIBIT NO. 17     196
7  DEFENDANT'S EXHIBIT NO. 18     199
8  DEFENDANT'S EXHIBIT NO. 19     219
9  DEFENDANT'S EXHIBIT NO. 20     224
10  DEFENDANT'S EXHIBIT NO. 21     232
11  DEFENDANT'S EXHIBIT NO. 22     241
12  DEFENDANT'S EXHIBIT NO. 23     273
13
14
15
16
17
18
19
20
21
22
23

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1     ARTHUR EARL CLARK,
2     after first being duly sworn, testified
3          as follows:
4     EXAMINATION BY MR. COLLINS:
5          THE COURT REPORTER:  Usual
6     stipulations?
7          MR. COLLINS:  Sure.
8          MR. MARTIN:  That's fine.
9          Q.  Mr. Clark, would you please state
10    your full name for the record.
11         A.  Arthur Earl Clark.
12         Q.  Mr. Clark, I previously introduced
13    myself.  My name is John David Collins.  I
14    represent the defendants, AmSouth Bank and
15    Dovenmuehle Mortgage, Inc.  Okay?
16         A.  Okay.
17         Q.  And if I refer to Dovenmuehle as
18    DMI, you'll know what I'm referring to.
19    Okay?  Have you ever given a deposition
20    before?
21         A.  Yes, sir.
22         Q.  So you're obviously familiar with
23    the process.  But a couple of ground rules.

Page 10

1     It's important that you give audible
2     responses so that the court reporter can
3     take down what you're saying.  And you
4     realize you're under oath today?
5          A.  Yes.
6          Q.  That your testimony has the same
7     affect as it would before a judge and a
8     jury.  Do you understand that?
9          A.  Yes.
10         Q.  And if you'll let me finish the
11    question before you give your response, it
12    will be easier for her to type it down.  Are
13    you taking any medications today that would
14    affect your ability to testify?
15         A.  No.
16         Q.  Are you taking any medications
17    today?
18         A.  Yes.
19         Q.  What are those, please, sir?
20         A.  Blood pressure, antacid, aspirin.
21         Q.  Okay.  And at any point today you
22    want to take a break, just let me know and
23    I'll be happy to accommodate you.  It's not

Page 11

1     a marathon.
2          You mentioned that you had given a
3     deposition before.  Is that in a prior
4     lawsuit you had against AmSouth Bank?
5          A.  Yes.
6          Q.  Any other depositions that you
7     have given besides in that case?
8          A.  Yes.
9          Q.  Were those in other lawsuits?
10         A.  Yes.
11         Q.  Would you tell me about those,
12    please.
13         A.  Talking about the company?
14         Q.  Yes.  When you -- I assume you
15    were the plaintiff in those lawsuits;
16    correct?
17         A.  Defendant.
18         Q.  Okay.  Which case was that?
19         A.  It was Liberty National.
20         Q.  And who was the plaintiff in that
21    case?
22         A.  Liberty National.
23         Q.  And you were the defendant?

Page 12

1          A.  Uh-huh.
2          Q.  Okay.  What was that lawsuit
3     about?
4          A.  They claimed breach of contract.
5          Q.  Arising out of?
6          A.  Employment, sir.
7          Q.  Could you give me some details and
8     let me know when it was filed, where it was
9     filed and some general background facts?
10         A.  Before going any further, should
11    -- that's been past ten years ago, what
12    we're talking about.
13         Q.  That's fine.  I just want to get
14    some information about it.
15         A.  Redirect your question again.
16         Q.  Just some general background
17    information about your lawsuit with Liberty
18    National, approximately, if you recall, when
19    it was filed, where it was filed, here in
20    Houston County or Federal Court and what the
21    general background facts of the case were
22    and how the case ultimately resolved
23    itself.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1    A.  Basically it was filed here in
2  Houston County.
3    Q.  Okay.
4    A.  And it was just breach of
5  contract.
6    Q.  Okay.  How did that -- What was
7  the allegation?  What contract did you
8  breach, an employment contract?
9    A.  It was an employment contract.
10  But --
11    MR. JARRETT:  Object to the form
12  of the question.
13    Q.  You can answer.
14    MR. JARRETT:  Answer the
15  question.
16    A.  That's sort of a broad question.
17    Q.  They sued you for breach of
18  contract.  I'm just asking you what type of
19  contract -- What type of breach were you
20  alleged to have --
21    A.  They claimed that I had solicited
22  business when I left the employment, sir.
23    Q.  Okay.  So you were a former -- you

Page 14

1  were previously employed by Liberty
2  National; correct?
3    A.  Right.
4    Q.  And you left Liberty National, I
5  assume, to go to another insurance company?
6    A.  Right.
7    Q.  And then Liberty National brought
8  a lawsuit against you for breach of contract
9  relating to -- did you say -- I don't want
10  to put words in your mouth -- contacting
11  customers or business; is that right?
12    A.  That's what they claimed.
13    Q.  Okay.
14    A.  Which I did not do.
15    Q.  Did that case go to trial or did
16  it settle?
17    A.  It went before a judge and -- just
18  the judge trial.
19    Q.  It was a bench trial?
20    A.  Uh-huh.
21    Q.  And what was the result of that
22  trial?
23    A.  They found me guilty.

Page 15

1    Q.  Okay.  Were you required to pay
2  damages or was there an injunction or --
3  What was the relief?  What were you ordered
4  to do in that case?
5    A.  They made a -- what would you call
6  it -- a money amount.  But that was it.
7    Q.  Okay.  So there was a judgment
8  entered against you in a certain amount of
9  money?
10    A.  Yes.
11    Q.  And did you satisfy that judgment?
12    A.  They never asked for it.
13    Q.  Okay.  And we'll get into your
14  employment history in a minute.  But what
15  insurance company did you go to from Liberty
16  National?  What was your next company or
17  your next place of employment?
18    A.  Mutual Savings.
19    Q.  Okay.  Is that where you are
20  today?
21    A.  No, sir.
22    Q.  Other than the deposition that you
23  gave in the Liberty National case and the

Page 16

1  deposition that you gave in the -- in your
2  prior lawsuit against AmSouth Bank, any
3  other depositions?
4    A.  No.
5    Q.  Okay.  What did you do this
6  morning to prepare for this deposition?  And
7  I don't want to know about any conversations
8  with Mr. Jarrett, but did you look at any
9  documents?
10    A.  I didn't look at any documents.
11    Q.  Okay.  Anything else?  Did you do
12  anything to prepare?
13    A.  No.  Nothing other than just --
14    Q.  Talked with your lawyer.  And I
15  don't want to know about those
16  conversations.  Was your date of birth,
17  Mr. Clark?
18    A.  3-27-51.
19    Q.  And what is your present address?
20    A.  8530 South County Road 55.
21    Q.  And that's in Cottonwood?
22    A.  Cottonwood, Alabama.
23    Q.  How long have you lived at that

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  address?
2      A.  Thirty-three years and some odd
3  months.
4      Q.  Is that home a new construction or
5  did you purchase a preexisting home?  Did
6  you build that house or did you buy --
7      A.  We built the home.
8      Q.  And that would have been thirty
9  plus years ago?
10     A.  No.  The home was built in '87.
11     Q.  Okay.  Was there another home at
12  that address?
13     A.  There was a mobile home on it.
14     Q.  In 1998; is that right?
15     A.  '88 was when we completed it.
16     Q.  Okay.  And that's the home that's
17  the subject to the note and mortgage that
18  we're here about today?
19     A.  Yes.
20     Q.  And who else lives with you at
21  that address, the 8530 South County Road 55?
22     A.  My wife.
23     Q.  And she's sitting beside you, Ms.

Page 18

1  Barbara Clark?
2      A.  Yes.
3      Q.  What is your current telephone
4  number?
5      A.  Area 334-691-3283.
6      Q.  And what is Ms. Clark's
7  occupation?
8      A.  She's on disability.
9      Q.  Social security disability?
10     A.  Uh-huh.
11     Q.  And how long has she been on
12  disability?  I can ask her these questions
13  this afternoon, but if you know --
14     A.  I couldn't really say.  Just an
15  approximation.
16     Q.  Okay.
17     A.  Better if you ask her.
18     Q.  Any children?
19     A.  I have three.
20     Q.  Are they all adults?
21     A.  True.
22     Q.  Could you give me their names,
23  please.

Page 19

1      A.  Our daughter is Betty Lynn
2  Morrison.
3      Q.  And let me stop.  Is she married?
4      A.  She's married.
5      Q.  What's her husband's name?
6      A.  Randy.
7      Q.  And what's the last name?
8      A.  Morrison.
9      Q.  Okay.  But they live in Houston
10  County?
11     A.  Houston County.
12     Q.  And your other children?
13     A.  Billy John Mims.
14     Q.  And is he married?
15     A.  He's married.
16     Q.  What's his spouse's name?
17     A.  Amanda.
18     Q.  Okay.  And your third child?
19     A.  Brandy Michelle Brooks.
20     Q.  What is her husband's name, if
21  she's married?
22     A.  Clint.
23     Q.  That's my brother's name.

Page 20

1      A.  Let me clarify one thing.
2      Q.  Sure.
3      A.  The two oldest children are my
4  step-kids.
5      Q.  Okay.
6      A.  But I've had them ever since they
7  was like two and point years of age.  So
8  they are actually not legally mine, but I
9  have raised them with my wife.
10     Q.  Now, I apologize for asking this,
11  but it's a fairly standard question.  Have
12  you ever been convicted of a felony or any
13  criminal background?
14     A.  No.
15     Q.  And what is the -- I want to ask
16  you some questions about your educational
17  background.  What's the highest level of
18  education that you have completed?
19     A.  Twelfth grade.
20     Q.  Okay.  And you graduated from high
21  school?
22     A.  Correct.  Yes.
23     Q.  What was the name of the high

5  (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

```
 1   school?
 2       A.  Louisville High School.
 3       Q.  And where is that?  Is that there?
 4       A.  Louisville, Alabama.
 5       Q.  Any courses taken after high
 6   school either at a junior college or
 7   vocational courses or any type of classes
 8   like that?
 9       A.  Yes.
10       Q.  Could you tell me about those.
11       A.  Business courses in the insurance
12   industry.
13       Q.  Okay.  Let's start with if you can
14   recall after high school where you took the
15   courses, where they were, was it at a junior
16   college or a school.  Just take me through
17   each of those and what type of certificate
18   you received.
19       A.  I can't give you dates and
20   records.  I can just tell you what --
21       Q.  Okay.  Just do the best you can.
22       A.  -- courses I have passed.
23       Q.  Okay.
```

Page 22

```
 1       A.  And that is called life
 2   underwriters training counsel.
 3       Q.  Okay.
 4       A.  I've passed the first, second and
 5   third courses.
 6       Q.  Life underwriting training --
 7       A.  Counsel.
 8       Q.  And what is that?
 9       A.  It's just insurance courses on --
10   they give us pertaining to sales and the
11   knowledge of the business.
12       Q.  Okay.  And where did you take
13   those courses?
14       A.  Some of them was from Wallace
15   Community College and some of them was from
16   Troy State.
17       Q.  And can you give me a general time
18   frame of when you would have taken those
19   courses?
20       A.  Some of them was done in the late
21   '70's.  The others in the late -- early to
22   late '80's.
23       Q.  Okay.  Did you attend school full
```

Page 23

```
 1   time, did you go part-time, did you go at
 2   night?  How was that course given?
 3       A.  Different courses we took at
 4   different times.
 5       Q.  Were you employed during this time
 6   you were taking these courses?
 7       A.  Yes.
 8       Q.  What type of certificate is the
 9   life underwriters training counsel?  Did
10   they give you a certificate of completion
11   for each level, one, two, three?
12       A.  Correct.
13       Q.  So you have one for each of those
14   three levels?
15       A.  Yes.
16       Q.  Do you know when you received your
17   third level certificate?
18       A.  I can't give you specific dates.
19   I just know I got the certificate.
20       Q.  Does that pertain to -- Tell me a
21   little bit about that counsel.  Does that
22   pertain to life, health, disability?  Does
23   it -- Is it limited to a certain type of
```

Page 24

```
 1   insurance product?
 2       A.  It's basically your life, health
 3   and disability.
 4       Q.  Okay.  Does it -- It doesn't go
 5   beyond those three areas?
 6       A.  No.
 7       Q.  Okay.  No property, casualty, none
 8   of that is included in this training course?
 9       A.  Not that one.
10       Q.  Are those licenses required or are
11   those certificates required to sell
12   insurance in the State of Alabama, if you
13   know?
14       A.  Not really.  It's something that
15   the companies put out for you to take to
16   just sort of fill your education in the
17   insurance industry.
18       Q.  So you were in the industry at the
19   time you were taking those courses?
20       A.  Right.  Yes.
21       Q.  Other than the life underwriters
22   training counsel classes you took, have you
23   taken any other post high school courses or
```

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  education courses in insurance or any other
2  area?
3      A.  I took a course in EMT, emergency
4  medical training.
5      Q.  Okay.  Other than EMT and LUTCI,
6  anything else?
7      A.  I can't think of any more at this
8  time.
9      Q.  Okay.  And where are you currently
10  employed?
11      A.  Self-employed.
12      Q.  Okay.  What's the name of your
13  business or company?
14      A.  I'm just an independent agent with
15  -- representing several insurance
16  companies.
17      Q.  Okay.  Is that a -- Is that a
18  proprietorship, is it a corporation?  Have
19  you incorporated?  What type of business
20  entity is that?
21      A.  Just a contract agent with the
22  companies.
23      Q.  Do you have an office?

Page 26

1      A.  At home.
2      Q.  So you work out of your home?
3      A.  Right.
4      Q.  What insurance companies do you
5  sell insurance products through as an
6  independent agent?
7      A.  Allstate Financial Services.
8      Q.  Okay.
9      A.  Colonial Life and Accident.
10      Q.  Any others that you can think of?
11      A.  Foremost.
12      Q.  Foremost.  Currently the insurance
13  products that you sell, are they limited to
14  life, health and disability?
15      A.  Basically that.  Foremost, I do
16  home insurance.
17      Q.  Okay.  Why don't you just tell me
18  the type of insurance products that you're
19  currently -- and I'm not sure if licensed is
20  the right word -- to sell on behalf of those
21  companies.  Just list them out for me, life
22  accident, health.
23      A.  Any of the products that they have

Page 27

1  I'm licensed to sell.
2      Q.  Okay.
3      A.  But basically what I sell is the
4  life, disability, cancer and accident and
5  then, of course, the home insurance.
6      Q.  With Foremost -- Is Foremost the
7  only company that you sell home insurance
8  for?
9      A.  Right.
10      Q.  Do you do any type of automobile
11  or anything like that?
12      A.  No.
13      Q.  I may have asked this previously,
14  but -- and excuse my unfamiliarity with the
15  insurance law in Alabama -- do you have to
16  have any type of license or certificate to
17  sell these insurance products with these
18  companies?
19      A.  Yes.
20      Q.  What type of certificate or
21  license is that?
22      A.  Well, you have to have your
23  insurance license in the State of Alabama.

Page 28

1      Q.  Okay.  Do you take a test to get
2  that?
3      A.  When you start in the business
4  originally, you have to have a license.
5      Q.  And what year did you take that
6  test and receive your license?
7      A.  1971.  When we got married.  1971.
8      Q.  Okay.  And there's no educational
9  background requirements to take the test?
10  You just go and sit and take the test, and
11  if you pass it, you're licensed to sell
12  insurance?
13      A.  Well, you do some pre-studying.
14  You have to do pre-studying.  And then you
15  go before the State and take the test.
16      Q.  Do you take it in Montgomery; is
17  that right?
18      A.  At that time, we took it in -- I
19  can't recall.  I believe we took them here
20  in Dothan --
21      Q.  Okay.
22      A.  -- back in '71.
23      Q.  Is there any continuing

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1   educational courses that you have to take to
2   keep that license or do you have to renew
3   that license by taking courses?
4       A.  Yes, you have to take continuing
5   education every year.
6       Q.  What type of -- How many credits
7   do you have to get?
8       A.  Twelve hours.
9       Q.  And you've gotten that every year
10  since 1971 or since it was required that you
11  --
12      A.  Since it was required, yes.
13      Q.  Fair enough.  If you would, if you
14  would start -- and if I test your memory, I
15  apologize -- but after high school as far
16  back as you can remember, your first jobs.
17      And then take me through your
18  business in the insurance industry from your
19  first insurance job to where you are now as
20  an independent agent.
21      A.  It probably won't be accurate
22  dates on this.
23      Q.  Just do the best you can.

Page 30

1       A.  Starting in '71, I was with
2   Southern United.  And I left Southern United
3   somewhere around '76, '77 with Southern Life
4   and Health.
5       Q.  So in 1971, you went -- Let me
6   back up before your employment with the
7   insurance industry.  Did you have any jobs
8   before you became an insurance agent,
9   insurance salesman?
10      A.  When I was in high school, yes.  I
11  worked at the peanut mill.  I plowed a
12  tractor.
13      Q.  Any jobs after high school?
14      A.  Worked with Vanhusen and worked
15  with Sunny Land at that time, a packing
16  company here in Dothan.
17      Q.  What is Vanhusen?  What type of
18  business is that?
19      A.  Garment.
20      Q.  And what was your job there?
21      A.  I installed a conveyor system for
22  them.
23      Q.  Other than Vanhusen and the other

Page 31

1   jobs you mentioned, any jobs you can
2   remember prior to getting in the insurance
3   business?
4       A.  I worked at Price Brothers Gas
5   Company.  These are just jobs that I held
6   during the summer and all, like during the
7   school year that I could work hours and make
8   some money.
9       Q.  What did you do for Price
10  Brothers?
11      A.  Several things.  I installed
12  heaters, cleaned them.  Run gas to the
13  people that were out and pumped gas.
14      Q.  Where is -- Where were they
15  located?
16      A.  Louisville, Alabama.
17      Q.  In 1971, you went to work with
18  Southern United; correct?
19      A.  Correct.
20      Q.  And that's the same year that you
21  took and passed the insurance bar?
22      A.  Correct.
23      Q.  I guess you call it?

Page 32

1       A.  Yes.
2       Q.  Where was Southern United?  Did
3   they have an office here in Dothan or --
4       A.  They are no longer known as
5   Southern United.  They are now Mutual
6   Savings.  Mutual Savings bought them out.
7       Q.  What was your job duties at
8   Southern United from '71 to '76, insurance
9   sales agent?
10      A.  Debit agent.
11      Q.  Okay.  And you sold life,
12  accident, health; correct?
13      A.  Correct.
14      Q.  Any other insurance products that
15  you sold during that time period?
16      A.  Not during that time.
17      Q.  In 1976, you left Southern United
18  and went to --
19      A.  I went to Southern Life and
20  Health.
21      Q.  And tell me about Southern Life
22  and Health.  Are they -- I'm not familiar
23  with them.

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1    A.   They are basically the same as
2   Southern United, a debit company, ran a
3   debit forum.  Sold basically the same
4   products.
5    Q.   Okay.  Did they have a -- Where
6   was their office located?
7    A.   Theirs at the time I was working
8   was here in Dothan.
9    Q.   And the same products, life
10  accident, and health; is that right?
11   A.   That's right.
12   Q.   Any other insurance products you
13  sold for them?
14   A.   I can't recall.  I don't believe
15  that they sold what they call industrial
16  fire.
17   Q.   Right.
18   A.   I can't remember if it was with
19  Southern Life and Health or when I started
20  with Liberty National that we sold the
21  industrial fire.
22   Q.   But at some point, you sold it?
23   A.   Yes.  But I can't remember if it

Page 34

1   was with them or not.
2    Q.   Do you know who your supervisor
3   was at Southern Life and Health?
4    A.   I remember the manager's name.  I
5   can't remember who the sales manager was.
6    Q.   Who was the manager?
7    A.   John Justice.
8    Q.   What was the reason for leaving
9   Southern United to go to Southern Life and
10  Health?
11   A.   More money.
12   Q.   Okay.  You weren't terminated or
13  --
14   A.   No.
15   Q.   How long -- let's see.
16  Approximately 1976, you're at Southern Life
17  and Health.  How long were you there as an
18  employee?
19   A.   Approximately six, seven years.
20   Q.   Okay.  And you left.  That would
21  have been, what, 198 --
22   A.   About '81, I believe.
23   Q.   '81.  Where did you go after that?

Page 35

1    A.   The company I wanted to work with
2   to begin with, which was Liberty National.
3    Q.   Okay.  1981 you went to Liberty
4   National.  Do you remember who your
5   supervisor or manager there was?
6    A.   Mike Stale.
7    Q.   Does he still work there; do you
8   know?
9    A.   No.
10   Q.   And what was your job duties at
11  Liberty National?
12   A.   Debit agent.
13   Q.   Same type?
14   A.   Same type.
15   Q.   Okay.  And you said you may have
16  started selling fire insurance?
17   A.   I know we sold fire insurance with
18  them, what they call industrial fire.
19   Q.   Where was Liberty National's
20  office located at the time you worked for
21  them?
22   A.   Here in Dothan.
23   Q.   Okay.  And what was the reason for

Page 36

1   leaving Southern Life and Health to go to
2   Liberty National?
3    A.   They had an opening which was
4   where I wanted to go to work at.
5    Q.   Okay.
6    A.   And I wanted --
7    Q.   I'm sorry.  I didn't mean to
8   interrupt you.  You wanted to go to work at
9   Liberty National?
10   A.   Yes.  I had been wanting to work
11  with them for years.
12   Q.   What's the reason for that?
13   A.   The company, more pay, more
14  recognizable.  My family and all, we had
15  always had their insurance in our
16  household.
17       So it was just a household word,
18  you know, sort of like who's your favorite
19  pastor, your favor lawyer maybe.  It was a
20  company I wanted to be with.
21   Q.   And you would only sell obviously
22  Liberty National products when you were
23  there; right?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    A.  Right.
2    Q.  And how long were you employed
3  with Liberty National?
4    A.  Approximately nine years.
5    Q.  Okay.  So that would have been
6  until about 1989?
7    A.  Correct.
8    Q.  And we just circled back to what
9  we were talking about earlier.  You left
10  Liberty National.  Where did you go?
11    A.  For a short time with Prudential.
12    Q.  Okay.  And are Prudential offices
13  located here in Dothan as well?
14    A.  They were at that time.
15    Q.  They don't have an office here
16  anymore?
17    A.  Not that I'm aware of.
18    Q.  Okay.  And you talked about this
19  earlier.  After leaving Liberty National to
20  go to Prudential, Liberty National
21  ultimately filed a lawsuit against you;
22  correct?
23    A.  Correct.

Page 38

1    Q.  For breach of contract.  And we
2  talked about that earlier.  And they
3  prevailed in their case and got a judgment
4  against you; correct?
5    A.  Right.
6    Q.  And they didn't collect on it;
7  correct?
8    A.  Right.
9    Q.  Did Prudential defend you in that
10  case?
11    A.  No.
12    Q.  They didn't provide you with a
13  lawyer?
14    A.  No.
15    Q.  How long were you at Prudential?
16  Arriving in 1989, how long were you employed
17  with Prudential?
18    A.  Probably around a year.
19    Q.  Okay.  And again, you sold only
20  Prudential products during that time period
21  obviously?
22    A.  Yes.
23    Q.  Okay.  And again, that would be

Page 39

1  life, accident, disability?
2    A.  Correct.
3    Q.  Any type of property, casualty
4  during that time period?
5    A.  No.
6    Q.  Fire insurance during that fire
7  period?
8    A.  No.
9    Q.  Do you know who your supervisor
10  was at Prudential?
11    A.  Last name is Maddox.  I can't
12  think of his first name.  I just know it was
13  -- David Maddox.  No.  No.  Wait a minute.
14  I'm not clear on that.
15        His brother worked with them,
16  too.  And I think his name was David and
17  this guy's name was -- the manager.  I think
18  it was Paul Maddox.  I'm not sure.
19    Q.  Last name Maddox?
20    A.  Yes.
21    Q.  What was your reason for leaving
22  Liberty National -- I'm sorry -- Prudential?
23    A.  Liberty National terminated my

Page 40

1  contract.
2    Q.  I meant when you were at
3  Prudential, what was your reason for
4  leaving?
5    A.  Liberty National?
6    Q.  Actually you asked the question I
7  should have asked.  Why did you leave
8  Liberty National to go to Prudential?
9    A.  Had a conflict with the manager.
10    Q.  Okay.  Were you terminated?
11    A.  No.  I quit on my own free will.
12    Q.  You went to Prudential and worked
13  with Prudential for approximately one year;
14  correct?
15    A.  Correct.
16    Q.  And how did your employment end
17  there?  Did you quit, were you terminated?
18    A.  That contract was terminated.
19    Q.  Okay.  By Prudential?
20    A.  Correct.
21    Q.  Did they give you a reason for
22  terminating the contract?
23    A.  Not really, a sufficient reason.

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

Page 41

1    Q.  Did they give you any reason at
2  all?
3    A.  They gave me one that said that it
4  was lack of production.
5    Q.  Okay.  I guess that's in -- in
6  industry term, does that mean not selling
7  enough products?
8    A.  True.
9    Q.  Okay.
10    A.  Yes.
11    Q.  And from Prudential where did you
12  go to?  What was your next place of
13  employment?
14    A.  Mutual Savings.
15    Q.  And Mutual Savings, is that here
16  in Dothan?
17    A.  Correct.
18    Q.  Are they still here in Dothan?
19    A.  Yes.
20    Q.  How long were you at Mutual
21  Savings?
22    A.  Until approximately four months
23  ago.

Page 42

1    Q.  Okay.  And the same question with
2  respect to the other insurance companies.
3  What insurance products did you sell?
4    A.  Life, health, accident, cancer and
5  industrial fire.
6    Q.  What is industrial fire?  Is it
7  like the way it sounds, for a company that
8  needs fire insurance?
9    A.  In simple terms, it's just a low
10  ball amount of fire insurance that you can
11  sell without having to have a PFC license.
12    Q.  What was your reason for -- well,
13  let me back up.  Who was your supervisor at
14  Mutual Savings?
15    A.  When I left was Roy Williams.
16    Q.  Okay.  Is he still there?
17    A.  Yes.
18    Q.  What's his position at Mutual
19  Savings?
20    A.  What they call a sales manager.
21    Q.  And what was your reason for
22  leaving Mutual Savings?
23    A.  Started my own agency.

Page 43

1    Q.  Okay.  You weren't terminated, you
2  just resigned?
3    A.  Yes.
4    Q.  Okay.  And what is the name of
5  your -- the insurance agency that you
6  formed?
7    A.  It doesn't really have a name.
8  I'm just -- I contract --
9    Q.  You're an independent agent
10  working out of your home?
11    A.  Correct.
12    Q.  With the four companies -- I guess
13  three companies that you mentioned earlier
14  today?
15    A.  Correct.
16    Q.  That was Allstate, Colonial and
17  Foremost?
18    A.  That's the companies I represent.
19  But they have companies that will also --
20    Q.  Under their umbrella?
21    A.  Right.  That I -- I couldn't tell
22  you who they are.
23    Q.  Okay.  With Foremost, is that the

Page 44

1  first opportunity that you've had to sell
2  home insurance, homeowner's insurance?
3    A.  Property and casualty, right.
4    Q.  And how many policies have you
5  written for Foremost?
6    A.  One.
7    Q.  One.  Okay.  Had you ever worked
8  as a -- during this time period that we've
9  talked about, worked as an independent agent
10  outside of either Southern United, Southern
11  Life and Health, Liberty National,
12  Prudential, Mutual Savings?
13       Is there any time period where you
14  have worked on your own during that -- it
15  looks like a twenty year window of time?
16    A.  Back when I was with Prudential, I
17  also had a license with American Heritage,
18  which, again there, you could have other
19  licenses and they did things that Prudential
20  didn't do.
21    Q.  Okay.
22    A.  Or didn't really do.  I mean, it
23  was sort of like group insurance that they

11  (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 45

1 sold that Prudential didn't.
2    Q. So would you -- While you were --
3    A. That was during the time I was
4 with Prudential.
5    Q. Okay. So when you --
6    A. I meant to tell you that.
7    Q. When you were working with
8 Prudential, you had the ability to write
9 insurances as an independent agent for
10 another company?
11    A. Yes.
12    Q. Did Prudential have a policy that
13 allowed that?
14    A. Yes.
15    Q. Okay. But other than that time
16 period with Prudential, there was no other
17 window of time when you were out on your
18 own, so to speak, as an independent agent?
19    A. No.
20    Q. Okay. Have you had any training
21 in selling property and casualty insurance
22 with Foremost?
23    A. What are you referring to?

## Page 46

1    Q. It gets back to what I was asking
2 about earlier. You told me you took a lot
3 of courses to receive your LUTCI in selling
4 your life, accident and health.
5     I'm just asking, were you required
6 to take some type of course or get a
7 certificate to sell property and casualty
8 insurance?
9    A. Yes. You had to take a P and C
10 course.
11    Q. What is a P and C course?
12    A. Property and casualty.
13    Q. Okay. Is that a continuing
14 education course?
15    A. No. It's to get your license.
16    Q. Okay. So you had to actually sit
17 and take another test?
18    A. Right.
19    Q. Okay. Did you take that in
20 Montgomery or here in Dothan?
21    A. In Montgomery.
22    Q. And you obviously passed that
23 test?

## Page 47

1    A. Yes.
2    Q. And that would have been
3 relatively recently?
4    A. Approximately two, three years
5 ago.
6    Q. Okay.
7    A. Somewhere along in there. I'm not
8 for sure on those dates.
9    Q. And you're still obviously
10 currently required to attend continuing
11 education courses?
12    A. Yes.
13    Q. For all the products that you
14 sell?
15    A. Yes, sir.
16    Q. You mentioned that your wife is on
17 social security and obviously you're an
18 independent agent. Any other sources of
19 income that you have other than from those
20 two areas?
21    A. I also work with the Board of
22 Education.
23    Q. What do you do with the Board of

## Page 48

1 Education?
2    A. What they call utility operator.
3    Q. What is a utility operator?
4    A. When they have a driver that can't
5 drive or something, they call me and I go
6 and run their route for them.
7    Q. Is that like a bus or something?
8    A. Yes.
9    Q. You have a commercial driver's
10 license?
11    A. Yes.
12    Q. Really? When did you obtain that?
13    A. Approximately four months ago.
14    Q. Was that in order to be a fill-in
15 for the Board of Education? Is that the
16 reason for getting your CDL? Is that what
17 it's called?
18    A. CDL, yes.
19    Q. Is that the purpose of getting
20 your CDL?
21    A. Yes.
22    Q. Okay.
23    A. Let me clarify something.

12 (Pages 45 to 48)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

| Page 49 | Page 51 |
|---|---|
| 1   Q.   Sure.<br>2   A.   When you asked me a while ago the<br>3 question how long had I been gone from my<br>4 previous job.<br>5   Q.   Right.<br>6   A.   Okay. I think I said four months.<br>7   Q.   Uh-huh.<br>8   A.   I've only been gone about three<br>9 weeks. It was four months ago when I<br>10 started to work with the Houston County<br>11 Board of Education.<br>12   Q.   Okay.<br>13   A.   Approximately four months ago.<br>14   Q.   But you separated from Prudential<br>15 approximately three weeks ago?<br>16   A.   No.<br>17   Q.   No. Mutual Savings.<br>18   A.   Mutual Savings.<br>19   Q.   Mutual Savings. I'm sorry.<br>20 You're right. Mutual Savings three weeks<br>21 ago. And do you have -- Do you do business<br>22 as Clark Agency or is there any type of<br>23 deviated -- you're currently writing under? | 1   A.   I just call the eight hundred<br>2 number and whoever comes on the line, tell<br>3 them what we're doing.<br>4   Q.   Okay. Did you have to --<br>5 Obviously you had to fill out some sort of<br>6 application or something to be affiliated<br>7 with Foremost to be an independent agent of<br>8 Foremost; correct?<br>9   A.   I had to be licensed and approved<br>10 by.<br>11   Q.   Okay. And you were approved by<br>12 all three of those companies?<br>13   A.   Yes, sir.<br>14   Q.   Other than the Board of Education<br>15 and your independent insurance agency and<br>16 your wife's social security disability<br>17 benefits, any other sources of income that<br>18 we haven't covered?<br>19   A.   As a chaplain, if you want to call<br>20 it income. I do weddings a lot of times.<br>21 Of course, I don't charge, you know. It's<br>22 -- I always tell them it's left up -- if<br>23 they want to give us a love offering or |
| Page 50 | Page 52 |
| 1   A.   No.<br>2   Q.   Like your letterhead just has your<br>3 name on it?<br>4   A.   Well, it hasn't got that advanced<br>5 yet. Most of this -- you know, the<br>6 companies, when you go in, whichever company<br>7 they want to go with, then you just -- I'm<br>8 here on behalf of --<br>9   Q.   Right.<br>10   A.   -- Colonial Life or Allstate<br>11 Financial Services.<br>12   Q.   Who do you report to with respect<br>13 to those three companies? Do you have a<br>14 designated person that you report to or keep<br>15 in contact with?<br>16   A.   You talking about like an agency<br>17 representative over us?<br>18   Q.   No. Like for Foremost, if you're<br>19 going to write a policy for Foremost, who<br>20 would you deal with locally to --<br>21   A.   I don't locally.<br>22   Q.   Who would you deal with<br>23 nationally? | 1 something like that. Some do, some don't.<br>2   Q.   Is that affiliated with a<br>3 particular church?<br>4   A.   No.<br>5   Q.   And your home is -- Is that in<br>6 Houston County or Dale County?<br>7   A.   Houston.<br>8   Q.   And how many acres of land is that<br>9 -- do you own where your house is situated?<br>10   A.   It's sitting on approximately an<br>11 acre.<br>12   Q.   Any other land that you and your<br>13 wife own?<br>14   A.   We have approximately four acres<br>15 at Pansy, Alabama.<br>16   Q.   No home or anything developed on<br>17 it?<br>18   A.   No.<br>19   Q.   Okay.<br>20   A.   It's got fish ponds.<br>21   Q.   And you told me earlier that you<br>22 built your house in 1988. How long have you<br>23 owned the property that you built that house |

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  on?
2      A.  Since 1971.  Approximately '71 or
3  '72.
4      Q.  Okay.  And your lawyer has
5  produced a number of documents related to
6  the AmSouth Mortgage and DMI servicing the
7  mortgage.
8          Do you keep -- Do you obviously
9  maintain a file at your home where you have
10  all of these documents maintained?
11     A.  We try to keep all of them.
12     Q.  And have you given all those
13  documents to your lawyer relating to AmSouth
14  Bank and Dovenmuehle Mortgage?
15         MR. JARRETT:  You answer, not
16  her.
17     A.  All of them that I'm aware of.
18     Q.  Okay.  Fair enough.  And those
19  would be maintained in a file that you have
20  designated as AmSouth Bank or DMI; correct?
21     A.  Yes.
22     Q.  And you have seen the discovery
23  request that the defendants had served

Page 54

1  asking you to produce those documents;
2  correct?
3      A.  Yes.
4      Q.  To your knowledge, you have given
5  your lawyer to give to us all the documents
6  that would fall within that category,
7  mortgage documents?
8      A.  Those that we gave you the other
9  day -- I can't truthfully say yes because
10  that's --
11     Q.  This is one your lawyer gave us
12  this morning, an additional document.
13     A.  That's the one we couldn't find.
14     Q.  Okay.
15     A.  And we found it in the tax
16  records.
17     Q.  But other than this document, any
18  other documents that you're aware of that
19  would pertain to --
20     A.  Not that I'm aware of.
21     Q.  Okay.  Let's see here.
22         (Whereupon, Defendant's Exhibit
23  No. 1 was marked for identification.)

Page 55

1      Q.  I don't know if I've got enough
2  copies for everybody.  Let me show you, Mr.
3  Clark, what I have marked as Defendant's
4  Exhibit 1.  And this, Mr. Clark, reflects an
5  adjustable rate note dated August 24, 1988;
6  correct?
7      A.  Correct.
8      Q.  Okay.  And if you'll flip to --
9  let's see.  If you look at the bottom,
10  there's a Bates stamp that says Dovenmuehle
11  Mortgage slash Clark AmSouth.  Do you see
12  that?
13     A.  Yes.
14     Q.  If I refer to page numbers, for
15  your purposes, I'm referring to the Bates
16  stamp with the numbers that we provided.
17  Okay.  If you'll turn to page twenty-three.
18  Is that your --
19     A.  That's it?
20     Q.  Yes.  Is that your signature on
21  that document?
22     A.  It is.
23     Q.  Okay.  And you recognize your

Page 56

1  wife's signature?
2      A.  Correct.
3      Q.  Okay.  And again, this is the
4  adjustable rate note reflecting the loan you
5  received in the amount of one hundred and
6  fourteen thousand eight hundred dollars;
7  correct?
8      A.  Correct.
9      Q.  Okay.  And the lender on the note
10  is reflected as American Federal Savings
11  Bank of Duval County; right?
12     A.  Yes.
13     Q.  Okay.  I'm not familiar with
14  American Federal Savings.  How did you begin
15  dealing with them?  What's the relationship
16  where you obtained that mortgage from -- or
17  a loan from American Federal?
18     A.  When I had completed my loan -- I
19  mean, I completed building the house, they
20  were the ones that took the mortgage.
21     Q.  Okay.  Did you bank with American
22  Federal Savings?
23     A.  No.

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    Q.  How did you come in contact with
2  them?
3    A.  I went to AmSouth first.  And
4  AmSouth would not go along with building
5  stages.  I was going to build the house.  So
6  we had to go through Columbia -- the Bank of
7  Columbia at that time.
8        Then as soon as we got the house
9  built, then American Federal gave us a
10  mortgage on the house.
11    Q.  Okay.  And just to make sure I
12  understand, did you say Colonial Bank?
13    A.  No.
14    Q.  What bank did you first mention?
15    A.  AmSouth Bank.
16    Q.  It sounded like you had a
17  construction loan before you received this
18  loan?
19    A.  We did.
20    Q.  Who was that construction loan
21  through?
22    A.  That was with the Bank of
23  Columbia.

Page 58

1    Q.  Bank of Columbia.  Okay.  And when
2  the construction was completed, you took out
3  a loan from American Federal Savings?
4    A.  Correct.
5    Q.  Okay.  And this is an adjustable
6  obviously interest rate note; correct?
7    A.  It was at that time.
8    Q.  Seven point five percent?
9    A.  Correct.
10    Q.  Okay.  If you'll turn with me to
11  the very next page.  You see paragraph
12  eight, borrower's failure to pay as
13  required?
14    A.  Yes.
15    Q.  And that basically states if the
16  note holder has not received the full amount
17  of any monthly payment by the end of fifteen
18  days after the date it's due, I will pay a
19  late charge to the note holder.
20        And you acknowledge that if a
21  payment is submitted beyond the deadline,
22  that you are subject to a five percent late
23  charge; correct?

Page 59

1    A.  I understand that, yes.
2    Q.  Okay.
3    A.  One question.  Is it late after
4  the fifteen?  In other words, on the
5  sixteenth day is when it's actually late.
6    Q.  Okay.  If that's how you're
7  reading that.  Have you read this document
8  before today?
9    A.  Uh-huh.
10    Q.  Okay.  Did you read it --
11        MR. STOTT:  Is that yes?  You have
12  to --
13    A.  Yes.
14    Q.  When you signed this document, you
15  and your wife both agreed to be bound by its
16  terms; correct?
17    A.  Yes.
18    Q.  Okay.  The provisions in the same
19  paragraph eight, subsection B, says the
20  following:  If I do not pay the full amount
21  of each monthly payment by the date it's
22  due, I will be in default.  Do you see that?
23    A.  Yes.

Page 60

1    Q.  During the time this loan was held
2  by American Federal, had your loan ever been
3  declared to be in default?
4    A.  I can't really answer that because
5  I don't remember if we ever were or not.
6    Q.  You don't recall ever receiving a
7  notice from American Federal that you were
8  in default?
9    A.  Not from American Federal.  I
10  don't recall.
11    Q.  You're not saying it didn't
12  happen, you just don't recall --
13    A.  I don't recall.
14    Q.  -- sitting here today?
15    A.  I don't recall.
16    Q.  Okay.  And if you'll turn a few
17  pages.  The Bates stamp is actually
18  twenty-four.  The adjustable rate rider.
19  Turn one more page.  I just want to make
20  sure you recognize your -- Is that your
21  signature?
22    A.  Yes.
23    Q.  And your wife's signature?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 61

```
1     A.  I can't really answer for her.
2  But it appears to be hers.
3     Q.  Okay.  And again, when you signed
4  this, you agreed to be bound by its terms;
5  correct?
6     A.  Correct.
7     Q.  And the next document -- I've
8  clipped all these together as one composite
9  exhibit -- is the mortgage securing your
10  obligations under the note; correct?
11     A.  It appears to be that, yes.
12     Q.  And have you -- Do you have a copy
13  of this document at your house?
14     A.  Correct.
15     Q.  Okay.  Have you read this before
16  today?
17     A.  If this copy is the one we have,
18  yes.
19     Q.  Why don't you turn to the last
20  page and look at your signature and identify
21  that for me, please.
22     A.  Yes.
23     Q.  Okay.  Does that appear to be your
```

Page 62

```
1  wife's signature as well?
2     A.  It appears to be, yes.
3     Q.  Why don't we go over just a couple
4  of the provisions in the mortgage.  If
5  you'll turn to the second page of the
6  mortgage.  It's Bates stamp number
7  twenty-seven.
8     A.  On the back side?
9     Q.  Yes.  The second page of the
10  mortgage, but twenty-seven of the face of
11  that number.  Yes.  There we go.  You see at
12  the top where it says uniform covenants?
13     A.  Yes, sir.
14     Q.  Okay.  If you'll just read over
15  paragraph two where it states funds for
16  taxes and insurance.  Just take a second and
17  read that, please.
18     A.  Just that one paragraph?
19     Q.  Yes.
20     A.  Yes.
21     Q.  And that's referring to your loan
22  being escrowed; correct?
23     A.  Okay.  But I don't have an escrow.
```

Page 63

```
1     Q.  But at the time this document --
2     A.  At the time it was.
3     Q.  Let me finish my question.  At the
4  time the document was executed, you had an
5  escrow account; correct?
6     A.  Yes.
7     Q.  And that escrow account funded
8  property, casualty insurance and taxes and
9  so forth; correct?
10     A.  Yes.
11     Q.  And you just said now you do not
12  have an escrow account; correct?
13     A.  Correct.
14     Q.  And we'll get to that in a
15  minute.  But you requested that your escrow
16  account be -- that your insurance payments
17  no longer be escrowed and that you take the
18  responsibility for making those payments
19  directly; correct?
20     A.  That's correct.
21     Q.  Okay.  And you made that request
22  to AmSouth Bank; correct?
23     A.  Correct.
```

Page 64

```
1     Q.  And what year was that in; do you
2  recall?
3     A.  I don't recall the year.
4     Q.  Sometime after this note and
5  mortgage transferred to AmSouth Bank?
6     A.  Yes.
7     Q.  If you would, skip down to
8  paragraph five for me where it says hazard
9  insurance.  You see that?
10     A.  Yes.
11     Q.  And that paragraph reads, borrower
12  shall keep the improvements now existing or
13  hereafter erected on the property insured
14  against loss by fire, hazards included
15  within the term, quote, extended coverage,
16  and any other hazards for which the lender
17  requires insurance.
18        This insurance shall be maintained
19  in the amounts and for the periods that
20  lender requires.  The insurance carrier
21  providing the insurance shall be chosen by
22  borrower subject to lender's approval which
23  shall not be unreasonably withheld.  Did I
```

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  read that correctly?
2      A.  Yes, sir.
3      Q.  And you've had property insurance
4  on your home since the mortgage was taken
5  out; correct?
6      A.  Yes.
7      Q.  Who is that with, that hazard
8  insurance?
9      A.  Alfa.
10     Q.  Okay.  And again, it was escrowed
11  up until I guess some point when AmSouth was
12  holding the note?  It was escrowed and Alfa
13  was paid through escrow account; is that
14  correct?
15     A.  Yes, sir.
16     Q.  And you pay them directly now?
17     A.  Yes.
18     Q.  Okay.  And if you'll skip down to
19  paragraph number seven where it says
20  protection of lender's rights in the
21  property, mortgage insurance.  Do you see
22  that?
23     A.  Yes.

Page 66

1      Q.  If borrower fails to perform the
2  covenants and agreements contained in this
3  security instrument, or there is a legal
4  proceeding that may significantly affect
5  lender's rights in the property, such as a
6  proceeding in bankruptcy, probate, for
7  condemnation or to enforce laws or
8  regulations, then lender may do and pay for
9  whatever is necessary to protect the value
10  of the property and lender's rights of the
11  property.  Did I read that sentence
12  correctly?
13     A.  Yes.
14     Q.  Okay.  And you understood and you
15  understand as you sit here today that if you
16  don't have property, casualty insurance,
17  then AmSouth Bank is going to obtain that
18  insurance to protect its interest in the
19  property; correct?
20     A.  Yes.
21     Q.  Has there ever been a time period
22  where property insurance has not been placed
23  on your house and a demand has been made by

Page 67

1  either American Federal or AmSouth or any
2  mortgage holder that insurance will be
3  lender placed if you didn't have it?
4      A.  No.
5      Q.  Okay.  And to your knowledge, you
6  don't recall any -- being in default status
7  when American Federal was holding the note
8  and you don't recall ever being in default
9  when American Federal held the note?
10     A.  No, not that I'm aware of.
11     Q.  Okay.  Now at some point in time,
12  this note mortgage was sold or transferred
13  or was bought by AmSouth Bank.  Do you know
14  when that was?
15     A.  Not the dates.  I just know it was
16  purchased by AmSouth.
17     Q.  Okay.  Do you know if it went
18  directly from American Federal to AmSouth or
19  was there another bank or financial
20  institution that it was with prior to going
21  to AmSouth?
22     A.  I think this note went to Florida
23  Bank.  I'm not for sure if that was the

Page 68

1  proper name of it.  But I knew it
2  transferred one time before AmSouth got it.
3      Q.  Do you know about when it would
4  have transferred to Florida Bank?
5      A.  Without looking at my documents, I
6  couldn't tell you.
7      Q.  And then it transferred from -- or
8  sold from Florida Bank to AmSouth.  And my
9  notes reflect it was sometime in October of
10  '93.  Does that sound accurate?
11     A.  That sounds somewhere along those
12  times, '92, '93.
13     Q.  Okay.  And you currently bank at
14  AmSouth; right?
15     A.  No, sir.
16     Q.  Okay.  I just saw checks that were
17  written in the file.  You obviously had a
18  previous relationship with AmSouth Bank, I
19  guess the banking, checking accounts,
20  savings accounts perspective?
21     A.  Correct.
22     Q.  When did you close those accounts?
23     A.  I don't think -- the checking

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  account is not closed. We're just not using
2  it.
3      Q.  How long have you had that
4  checking account?
5      A.  I have no idea.
6      Q.  A long time?
7      A.  What are we calling a long time?
8      Q.  Five years, ten years? If you
9  can't remember, I assume it's been open a
10 long time.
11     A.  It's been several years.
12     Q.  Okay. Fair enough. Now, you
13 obviously received something from AmSouth
14 and/or Florida Bank telling you, Mr. Clark,
15 your loan is now being held by AmSouth; is
16 that correct?
17     A.  That's correct.
18     Q.  Was that a letter or something you
19 received in the mail?
20     A.  I think it was a letter along with
21 the payment coupon changing where we needed
22 to mail the payments to.
23     Q.  Okay. And do you have a copy of

Page 70

1  that document?
2      A.  We've got them.
3      Q.  If you did, you've given it to me?
4      A.  Y'all should have all those
5  documents.
6      Q.  Okay. Now, after 1993, you -- I
7  guess actually 1996, you had some problems
8  with your loan which was held by AmSouth;
9  correct? You ultimately filed a lawsuit
10 against AmSouth?
11     A.  Okay. I can't really discuss that
12 with you.
13     Q.  Why can't you discuss that with
14 me?
15     A.  Because at the time we settled
16 that, I had to sign a waiver that we could
17 not discuss that.
18     MR. JARRETT: My understanding is
19 as part of the settlement agreement was a
20 confidentiality clause that they weren't at
21 liberty to discuss any of the conditions of
22 that settlement.
23     MR. COLLINS: Do you have a copy

Page 71

1  of that?
2      MR. JARRETT: No.
3      Q.  Do you have a copy of it?
4      A.  Not that I'm aware of. Their
5  lawyer attained it.
6      Q.  Who was your lawyer in that
7  lawsuit?
8      A.  Scooter McCain was the lawyer that
9  represented me.
10     Q.  Okay. And I haven't seen it.
11 There maybe a confidentiality agreement that
12 goes to AmSouth that may not be an issue.
13 It's their confidentiality provision that
14 they put in there for their benefit.
15     But I just want to ask some
16 background facts about it. I don't think
17 the settlement agreement would preclude me
18 from asking what his claims were.
19     MR. JARRETT: Obviously they
20 haven't shared that with me. So I'm not in
21 a position to advise them one way or another
22 as to what that court document required that
23 they not disclose.

Page 72

1      MR. STOTT: Anything that is
2  public record is going to be public records,
3  the allegations. It's the settlement itself
4  that's confidential.
5      We won't ask him questions about
6  the terms of the settlement. But we can
7  certainly ask him what the allegations are
8  because those are filed in court.
9      MR. COLLINS: That's what I was
10 getting at. You certainly hit the nail on
11 the head.
12     Q.  I just want to ask you some
13 general questions. The lawsuit was in 1996;
14 correct?
15     A.  Somewhere around that time, yes.
16     Q.  And the documents I've looked at
17 reflect you had some issues with your escrow
18 account and the posting of payments; is that
19 right?
20     A.  Yes.
21     Q.  Can you tell me a little bit about
22 that?
23     A.  Yes. You can refer back to that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1  paragraph we talked about earlier.
2      Q.  Okay.
3      A.  Where the interest and the taxes
4  and all that was supposed to be figured, one
5  twelfth of the payment and all.
6      Q.  Right.
7      A.  And AmSouth had it screwed up.
8      Q.  Okay.  And tell me about how it
9  was messed up.
10     A.  Well, they were supposed to take
11  the taxes, the interest, the insurance and
12  on the annual renewable date on this
13  mortgage, they were suppose to calculate
14  that all together and then divide it by
15  one-twelfth and add my PMI and that would
16  set my payments for the next year.
17         When they took over the account,
18  they automatically said there was a short
19  spread, which there wasn't nothing mentioned
20  about no short spread, and they went up on
21  my payments about sixty something dollars.
22     Q.  Okay.
23     A.  And I refused to pay it because I

Page 74

1  already had my payment coupons and
2  everything for the next year.  And then
3  AmSouth proceeded to hold my checks that I
4  sent them and did not deposit them for three
5  months, put my credit in jeopardy and was
6  fixing to foreclose.
7      Q.  And in that settlement you just
8  mentioned, that lawsuit resolved by a
9  settlement; correct?
10     A.  Correct.
11     Q.  And that was filed in Houston
12  County?
13     A.  Correct.
14     Q.  And following the settlement, you
15  continued to remit your payments.  Did you
16  have any other questions or problems or
17  issues with your loan after that?
18     A.  Not after that.
19     Q.  I mean, obviously now you do?
20     A.  Yes.
21     Q.  Okay.  In 2001, you entered into a
22  loan modification agreement.  Do you
23  remember that?  You went from a fixed --

Page 75

1  from a variable interest rate to a fixed
2  rate?
3      A.  Correct.
4      Q.  Let me show you what I have marked
5  as Exhibit 2.
6         (Whereupon, Defendant's Exhibit
7  No. 2 was marked for identification.)
8      Q.  Here you go.  This document is
9  entitled loan modification agreement.  It's
10  dated December 10, 2001; correct?
11     A.  Correct.
12     Q.  Is that your signature?  If you'll
13  flip to the second page, does that appear to
14  be your signature?
15     A.  It is.
16     Q.  Okay.  And does that appear to be
17  your wife's signature?
18     A.  To the best of my knowledge, it
19  is.
20     Q.  Okay.  And this document reflects
21  that you had contacted I guess AmSouth and
22  said I want to go from a variable interest
23  rate to a fixed rate; correct?

Page 76

1      A.  Yes.
2      Q.  Okay.  And what was your basis for
3  doing that?
4      A.  Originally on the note, we had a
5  five year window that we could go to a fixed
6  rate.
7      Q.  Uh-huh.
8      A.  This was during the time that
9  AmSouth took the mortgage.  And when I made
10  the request then to put it on fixed rate,
11  the next year when it come time, they went
12  up on my payments.
13         And that's when I found out they
14  never changed it during that time that I had
15  the option.  And I talked to one of the loan
16  officers with this and he went ahead and
17  agreed to exercise my option then.
18     Q.  Okay.
19     A.  Because I, you know, obviously was
20  paying a lot more in interest and everything
21  than what I should have been if they had of
22  took my verbal agreement over the phone and
23  changed it to a fixed rate back within that

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  five year window.
2      Q.  So you made a request I guess
3  orally to AmSouth to change it.  The five
4  year window had closed.  And then someone at
5  AmSouth went back and let you convert to a
6  fixed rate even though the five year window
7  had closed?
8      A.  Correct.
9      Q.  Do you know who you talked with or
10 dealt with at AmSouth Bank?
11     A.  Not really.
12     Q.  Okay.  And I assume -- Did you
13 ever lock in a better interest rate?  The
14 six eight seven five is certainly better
15 than a seven point five.  Is that part of
16 the reason the interest rates were lower?
17     A.  Well, this was better than the
18 original one.
19     Q.  Right.
20     A.  But at the time that I wanted to
21 change it, it was a little less than this.
22     Q.  Right.  That's a good point.
23 AmSouth acquired it in 1993.  I think we

Page 78

1  already discussed that; right?
2      A.  Uh-huh.
3      Q.  And we can go back and look at the
4  note again.  The five year window to
5  convert, did that five year time frame run
6  from the date you had executed the note and
7  mortgage in 1988 or did it run from the time
8  AmSouth Bank acquired it?
9      A.  From '88.  What I understood was
10 '88.
11     Q.  Okay.  So AmSouth allowed you to
12 convert in 2001?
13     A.  Yes.
14     Q.  Which would have been eleven,
15 twelve years after the note was executed?
16     A.  Repeat your question.
17     Q.  You just testified that the five
18 year window would have closed five years
19 after the note and mortgage was executed in
20 1988; correct?
21     A.  Correct.  That's when I made the
22 request to put it on fixed rate.
23     Q.  Did you make that request to

Page 79

1  American Federal Savings Bank?
2      A.  No.  It was made to AmSouth.
3      Q.  Okay.
4      A.  They had just taken the note over
5  on that fifth year.
6      Q.  Okay.  So they took the note over
7  in the fifth year and you made the request
8  orally.  I guess it would have been -- What
9  year would that have been, 1996?
10     A.  No.  It would have been --
11     Q.  I'm going to have to ask y'all --
12     A.  Hold on.  That would have been
13 somewhere in '92, '93 that the five years
14 would come into play.
15     Q.  And AmSouth --
16     A.  And AmSouth --
17     Q.  Okay.  AmSouth acquired in '93 as
18 well?
19     A.  Okay.
20     Q.  So you would have made the request
21 in '93.  And I guess the confusion is this
22 document is dated December of 2001?
23     A.  Correct.

Page 80

1      Q.  So that goes back to you making an
2  oral request to someone at AmSouth to
3  convert to a five year window sometime in
4  1993?
5      A.  '93.
6          MR. STOTT:  To convert to a fixed
7  rate.
8      Q.  Convert to a fixed rate.  And in
9  December of 2001, you -- they allowed you to
10 convert to a fixed rate even though that
11 window had closed, I guess, what, six, seven
12 years earlier?
13     A.  Correct.
14     Q.  Okay.  And what was the
15 explanation that AmSouth gave you that they
16 would allow you to convert even though the
17 time window had closed?
18     A.  The person I talked to, when I
19 explained to them that I had made that
20 request --
21     Q.  Right.
22     A.  -- the following year when the
23 payments changed and everything and when I

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  talked with AmSouth, they said, oh, you had
2  to send that in writing. And the contract
3  didn't say nothing in writing.
4      It just said to make the request
5  to AmSouth. So after the other problem we
6  had with them, then I had tried to get this
7  mortgage financed somewhere else.
8      And with the way that my credit
9  had been messed up with AmSouth, I couldn't
10 get anybody to give me a decent rate on it.
11 So I was still bound by AmSouth.
12    Q. Okay. And in your --
13    A. So when I talked to the guy about
14 fixing the rate, I said at least y'all owe
15 me that courtesy because I can't go anywhere
16 without having to pay more.
17    Q. Okay. And you're talking about --
18 that was your prior lawsuit that you're
19 talking about with AmSouth?
20    A. Correct.
21    Q. The lawsuit that resolved in '96?
22    A. Yes.
23    Q. You contacted someone at AmSouth

Page 82

1  and told them about your prior dispute with
2  AmSouth and that you had made an oral
3  request to convert?
4      A. That's right.
5      Q. And the document didn't say it had
6  to be in writing. And this person at
7  AmSouth approved the conversion several
8  years outside of the window; correct?
9      A. Correct. We paid the hundred
10 dollars like we should have paid --
11     Q. In '93?
12     A. -- in '93.
13     Q. Okay.
14     A. And then go ahead and pay a
15 hundred dollars if you exercised it then.
16     Q. But you didn't send anything in
17 writing in '93; correct?
18     A. Correct.
19     Q. Did you send in a check for a
20 hundred dollars in '93?
21     A. Sure did.
22     Q. I think your wife just said no.
23 Do you recall one way or another if you sent

Page 83

1  a check to them for a hundred dollars in
2  '93?
3      A. We paid the hundred dollars I
4  believe.
5      Q. Okay. You're not certain as you
6  sit here today?
7      A. I'm not.
8      Q. Okay. Were you pleased that
9  AmSouth allowed you to convert six or seven
10 years outside of the conversion window?
11     A. I was pleased to know that they
12 were trying to -- maybe in some way I felt
13 that they was doing the right thing with
14 what I had been through with them.
15     Q. Okay. You don't remember who you
16 spoke with, who approved this?
17     A. All I know it was a man.
18     Q. Okay.
19     A. A loan officer.
20     Q. Okay. And it reflects in this
21 modification agreement that your monthly
22 payment P and I is seven eighty-three
23 ninety-one; is that right?

Page 84

1      A. That's correct.
2      Q. Is that the amount of your current
3  monthly payment?
4      A. That's correct.
5      Q. Okay. I'm assuming that based on
6  this current payment, that you had already
7  eliminated your escrow at this point in
8  time; correct?
9      A. That's correct.
10     Q. And how do you keep AmSouth or
11 Dovenmuehle Mortgage advised that your
12 insurance and taxes are paid, your insurance
13 is in place for the property, casualty?
14     A. The insurance is once a year sent
15 to them, notification from Alfa to them.
16     Q. So your insurance company handles
17 that?
18     A. Right.
19     Q. We've talked about your prior
20 dispute with AmSouth. And I'm looking at
21 your complaint now in this case filed on
22 June 22, 2005. And the very first paragraph
23 states nature of the action.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1    It says this action is for damages
2  arising out of the forced placing of flood
3  insurance on plaintiff's property allegedly
4  under a mortgage indebtedness between
5  plaintiffs and defendants AmSouth Mortgage,
6  Inc., and Dovenmuehle Mortgage, Inc.
7    Is that what this lawsuit is
8  about, that flood insurance being purchased
9  on your behalf for your property located at
10  8 -- what was it -- 8535 Wood --
11    A.  8530 South County Road 55.
12    Q.  And if you would, at the outset,
13  if you'll just tell me, is that what that --
14  this lawsuit is about?
15    A.  That's correct.
16    Q.  Okay.  Now, do you know, Mr.
17  Clark, the -- you've obviously dealt or
18  spoken with people at Dovenmuehle Mortgage
19  and with AmSouth Bank.
20    Do you understand that Dovenmuehle
21  is the servicer, the loan servicer for
22  AmSouth?  Do you know what that means?
23    A.  Not really.

Page 86

1    Q.  Okay.  When you would contact or
2  telephone someone at AmSouth and they would
3  put you in touch with someone in the service
4  center, how would they identify themselves?
5  Would they say Dovenmuehle servicing on
6  behalf of AmSouth?
7    A.  When I dialed the eight hundred
8  number, it would always come on welcome to
9  AmSouth Mortgage.
10    Q.  Okay.
11    A.  And if you know your party
12  extension, if not, then you'd go through the
13  telephone chain of command then you'd
14  usually get whoever came on the line, you
15  know.
16    Q.  Okay.
17    A.  I'd go into a customer service or
18  something like that.
19    Q.  Right.  And you've obviously named
20  Dovenmuehle and AmSouth in the case.  You've
21  recorded certain telephone conversations.
22  We can look at those later today.
23    But you knew that you were dealing

Page 87

1  with a servicing company who was servicing
2  on behalf of AmSouth Bank?
3    A.  Not really.
4    Q.  Fair enough.  You also have --
5  Currently you have a home equity loan with
6  AmSouth; is that right?
7    A.  Yes.
8    Q.  You don't have any claims or
9  disputes regarding your separate home equity
10  line, do you?
11    A.  No.
12    Q.  That's not an issue in this
13  lawsuit?
14    A.  No.
15    Q.  Okay.  Now, we just looked at the
16  loan modification agreement which is marked
17  as Exhibit 2.  Would it be fair to say from
18  I guess -- I'm just picking an arbitrary
19  point in the past -- December 2001 through I
20  guess June of '03 you're making your monthly
21  payments, no late charges, no complaints; is
22  that a fair statement?

Page 88

1    A.  Yes.
2    Q.  In June of 2003, why don't you
3  tell me what calls came about to cause you
4  to have a dispute with AmSouth and/or DMI.
5    A.  What caused the dispute was the
6  forced placing of flood insurance.
7    Q.  Okay.  Let me show you what I'm
8  going to mark as Defendant's Exhibit 3.
9    (Whereupon, Defendant's Exhibit
10  No. 3 was marked for identification.)
11    Q.  And this is a letter, Mr. Clark,
12  that you produced to me in connection with
13  our document request.  This is a June 10,
14  2003 letter.  It's on AmSouth letterhead;
15  correct?
16    A.  Correct.
17    Q.  Okay.  This is one of the
18  documents that you would have kept in your
19  home file; right?
20    A.  Correct.
21    Q.  Okay.  It reflects loan number
22  3003072091; correct?
23    A.  Correct.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1    Q.  And that's the loan that we're
2  here about today; right?
3    A.  Correct.
4    Q.  If you would, just take a second
5  to read that letter.
6    A.  Okay.
7    Q.  And AmSouth is asking you to
8  provide evidence of flood insurance;
9  correct?
10    A.  Correct.
11    Q.  What did you do when you received
12  this letter?
13    A.  Well, first off, you'll notice the
14  paragraph says we are in the process of
15  updating your flood insurance files.
16    Q.  Okay.
17    A.  I did not at that time have flood
18  insurance or aware of the fact that I needed
19  flood insurance.  So this was all new to
20  me.
21    Q.  Okay.  And they're asking you to
22  forward a copy of your current flood
23  insurance policy to AmSouth?

Page 90

1    A.  Correct.
2    Q.  Okay.  What did you do in response
3  to this letter?
4    A.  Called AmSouth in reference to the
5  letter to find out what was going on.
6    Q.  Okay.  Do you remember who you
7  spoke with?
8    A.  The best I can recall, the girl's
9  name was either Rose Mary or better known as
10  Rose.
11    Q.  Do you know if she was employed
12  with AmSouth or DMI or do you know?
13    A.  When I called the eight hundred
14  number, that's who I got to talk with in
15  customer service.
16    Q.  It's got a web site here that you
17  can click on.  Do you have internet access
18  at your home?
19    A.  At that time, no.
20    Q.  Okay.  I mean, you just mentioned
21  that you never had flood insurance and
22  didn't believe you needed flood insurance.
23  What is that based on?  Was that just --

Page 91

1    A.  I've never been told we was in a
2  flood area.
3    Q.  Okay.  And are you saying at the
4  time you -- in 1998 when your loan was
5  originated, you weren't told that you were
6  in a flood area?
7    A.  We were not.
8    Q.  Have you ever had a -- well,
9  ultimately you had a surveyor come out.  Did
10  you have anyone prior to the time this
11  letter was written look at your land,
12  examine your land or make a determination as
13  to whether you were in a flood zone?
14    A.  No.
15    Q.  Okay.  And when you called Rose or
16  someone at DMI or AmSouth, what was the
17  nature of that conversation, if you recall?
18    A.  Not verbatim.  But when I talked
19  with -- and I'm going to say Rose.  She was
20  the first one that I notified.  When I
21  explained to her that I was not in a flood
22  area and that I had not been notified I was
23  in a flood area, she told me not to do

Page 92

1  nothing until I heard from her.
2    Q.  Okay.  And what did you do,
3  nothing?
4    A.  I didn't do nothing.
5    Q.  Okay.
6    A.  At that point.
7    Q.  Okay.  Let me show you what I'm
8  marking as Defendant's Exhibit 4.
9      (Whereupon, Defendant's Exhibit
10  No. 4 was marked for identification.)
11    Q.  Take a minute and read that,
12  please.
13    A.  Okay.
14    Q.  Okay.  This is a letter dated
15  6-17-03 from AmSouth to you and Ms. Clark.
16  It's got your loan number at the top;
17  correct?
18    A.  Correct.
19    Q.  Okay.  And it says flood zone A,
20  FEMA map panel.  It's got a map panel
21  number.  Do you see that?
22    A.  Correct.
23    Q.  What does that mean to you?

23  (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1    A. I have no idea.
2    Q. At the very top, it says flood
3  insurance warning notice. Do you see that?
4    A. Correct.
5    Q. Okay. And the letter essentially
6  advises you that AmSouth received notice
7  that your flood insurance has cancelled or
8  expired and they have not received a flood
9  insurance policy covering the property shown
10 above. And, of course, your property is
11 shown above; correct?
12   A. Correct.
13   Q. And it also informs you of the
14 Flood Disaster Protection Act in 1973 that
15 required flood insurance to be purchased and
16 maintained on certain mortgage loans.
17     The law applies to loans securing
18 buildings, which at any time during the term
19 of the loan, are located in special flood
20 hazard areas, SFHA, as shown on maps
21 published by the Federal Emergency
22 Management Agency and in a community which
23 participates in the National Flood Insurance

Page 94

1  Program. Have you ever heard of the
2  National Flood Insurance Program before?
3    A. I have.
4    Q. What did you know about the
5  National Flood Insurance Program prior to
6  receiving this letter?
7    A. Nothing no more than it was like
8  on a pool that -- for flood areas.
9    Q. Okay. And you believed at this
10 time you were not in a flood zone; correct?
11   A. Correct.
12   Q. Or in a special flood hazard area;
13 correct?
14   A. Correct.
15   Q. Do you know what a special flood
16 hazard area is?
17   A. Not their definition.
18   Q. Okay. Do you know -- Do you have
19 a definition for it?
20   A. No.
21   Q. Okay. Now, this is one week --
22 approximately one week after Exhibit 3, the
23 letter we just looked at. What did you do

Page 95

1  in response to receiving this letter?
2    A. Before I proceed, let me get some
3  dates straight here.
4    Q. Okay.
5    A. Is this June the 10th, 2003, the
6  first letter that AmSouth sent me? I don't
7  have my records here. I don't remember if
8  this is the first letter that they sent me
9  stating I had to get flood insurance,
10 because after we didn't pay for it, the next
11 year it came renewed, then they sent this
12 letter or a letter out stating that we had
13 not paid it or it had been cancelled.
14     So I need to know if this is the
15 original or the first letter that was mailed
16 regarding to us having flood insurance.
17   Q. Well, I --
18   A. I don't have the records. So I
19 don't know.
20   Q. Right. I don't think that's what
21 I'm asking. I mean, these are documents
22 that you've produced to me. I just noticed
23 that these are within a consecutive week of

Page 96

1  each other. I'm not certain if that's the
2  first letter you received.
3    A. I don't think this letter -- I
4  might be wrong. I don't think this is the
5  first letter that we got from AmSouth
6  stating we had to have flood insurance.
7    Q. Okay.
8      MR. STOTT: Identify for the
9  record what that is.
10     MR. COLLINS: I'm sorry.
11   Q. You're referring to Exhibit 3,
12 Defendant's Exhibit 3.
13   A. Yes.
14   Q. The June 10, 2003 letter.
15   A. And I don't have my records. So
16 I'm not aware. This seems like a letter
17 later that they sent about the annual
18 insurance renewables after they had already
19 forced placed the flood insurance on us.
20   Q. I think you may have your years
21 confused. I'm looking at paragraph thirteen
22 of your complaint. Well, you say prior to
23 June 10, 2003 --

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1    A.  Right.
2    Q.  But that very well could have been
3  the first letter that you received; correct?
4    A.  I don't think this is the first
5  letter that we received from AmSouth stating
6  that we had to purchase flood insurance.
7    Q.  To the best of your recollection,
8  when did you become aware of the fact that
9  AmSouth was requiring you to purchase flood
10  insurance?  Was it sometime in June of '03?
11    A.  Maybe it was.
12    Q.  It's in this same time frame;
13  correct?
14    A.  Same time.
15    Q.  But Exhibit 3 may not be the very
16  first letter you received.  But it's within
17  this general time frame?
18    A.  Seemed like maybe that we got
19  something prior stating that we had -- and
20  this may be the letter.  Like I said, I need
21  to look at --
22    Q.  Sure.
23    A.  -- my records to see.

Page 98

1    Q.  Sure.
2    A.  But for the record, we'll say this
3  is the letter because it was after this
4  letter I believe is when I called Rose.
5    Q.  Okay.
6    A.  But like I said, I just want to be
7  correct on it.
8    Q.  I understand.  We're going to go
9  through a lot of letters.  And if it trips
10  your memory and you remember something
11  different, just let me know.
12       And you mentioned after receiving
13  this letter, you made a few phone calls
14  stating that you were not aware that you --
15  you never had flood insurance in the past
16  and you didn't believe you needed flood
17  insurance; correct?
18    A.  Correct.
19    Q.  And then you received a second
20  letter; correct?
21    A.  Correct.
22    Q.  Which states flood insurance
23  warning notice in the second -- I guess the

Page 99

1  last paragraph it states, if you do not
2  provide necessary flood insurance
3  information for this property, we have the
4  right to purchase flood insurance coverage
5  to protect our interests.  You see that?
6    A.  Yes.
7    Q.  And we've talked about this
8  earlier today in the context of property,
9  casualty.  You understand that if you don't
10  have property, casualty insurance, AmSouth
11  is going to go out and purchase that
12  insurance to protect its interest in your
13  property; correct?
14    A.  Correct.
15    Q.  And you would admit, you would
16  agree that if hypothetically you were in a
17  flood zone, AmSouth has a right to purchase
18  flood insurance if you will not get it for
19  yourself; correct?
20    A.  If I'm in a flood zone, correct.
21    Q.  It's your position you're not in a
22  flood zone?
23    A.  Right.

Page 100

1    Q.  And this letter goes on to tell
2  you that if AmSouth obtains this insurance
3  on your behalf, it's going to be higher than
4  the insurance that you could obtain
5  yourself; correct?
6    A.  Correct.
7    Q.  And that the insurance may not be
8  as beneficial to you if AmSouth obtains it
9  as opposed to if you get a personal
10  insurance for yourself; correct?
11    A.  That's correct.
12    Q.  Okay.
13       (Whereupon, a short recess was
14  taken.)
15    Q.  Mr. Clark, you wanted to correct
16  one statement for the record?
17    A.  Yes.  When the question was asked
18  earlier about when I paid the hundred
19  dollars, it was not in 2003.  It was when we
20  actually made the change over on the fixed
21  rate.
22    Q.  In December of 2001?
23    A.  Was that it?

25  (Pages 97 to 100)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1    Q.  Yes.
2    A.  Okay.  Yes.  2001.
3    Q.  So the fee for the conversion was
4  paid in '01 and not paid previously in '93?
5    A.  In '93, right.
6    Q.  Thank you.  Mr. Clark, we were
7  looking at what I have marked as Defendant's
8  Exhibit No. 4.  It's the letter you received
9  from AmSouth.
10        And again, we're not certain if
11  this is the first or second letter or third
12  letter, but it's in the proximity of the
13  first time you became aware of AmSouth's
14  request or demand that you have flood
15  insurance on your home; correct?
16    A.  That's correct.
17    Q.  In this June 2003 time frame.  The
18  second page of that letter, if you'll turn
19  the page, the second paragraph, any premium
20  charges for flood insurance may be added to
21  your escrow.
22        If you do not have an escrow
23  account, we may establish an escrow account

Page 102

1  in accordance with the terms of your loan
2  documents.
3        You will be responsible to pay the
4  premium and any fees which result from our
5  purchase of this flood insurance.  Did I
6  read that correctly?
7    A.  Correct.
8    Q.  At this point in time, you did not
9  have an escrow account?
10    A.  Correct.
11    Q.  So AmSouth in this situation was
12  advising you that we will set up and create
13  an escrow account and advance that money for
14  flood insurance in the event you don't
15  purchase it; correct?
16    A.  Correct.
17    Q.  Is that how you understand this?
18    A.  Correct.
19    Q.  And what did you do in response to
20  receiving this letter?
21    A.  Again, I called AmSouth.
22    Q.  Okay.
23    A.  To speak with Rose again because

Page 103

1  she had assured me that she would handle
2  this.
3    Q.  Okay.  So in early June sometime,
4  around the June 10 time frame, you initially
5  called Rose, explained to her that you did
6  not need flood insurance, you had never had
7  flood insurance?
8    A.  Correct.
9    Q.  And that you were not in a flood
10  zone?
11    A.  Correct.
12    Q.  And she advised you that I will
13  look into it and get back with you?
14    A.  Yes.
15    Q.  In the interim, you received
16  another letter which states that AmSouth is
17  going to proceed with purchasing flood
18  insurance if you don't obtain it yourself;
19  correct?
20    A.  Correct.
21    Q.  And you called Rose back.  Tell me
22  about that conversation.
23    A.  I didn't get a response.  Got a

Page 104

1  recording.  And I'd have to have my notes.
2  But I made several other calls to her.
3  Either she was away from her desk --
4    Q.  Okay.
5    A.  And I'd leave her a message to
6  call me back.  I never received a call back
7  from her.
8    Q.  Okay.  Were you concerned at that
9  point in time that insurance was going to be
10  purchased and an escrow account created if
11  you didn't get this -- if this issue wasn't
12  resolved expeditiously?
13    A.  Yes.  According to this letter, it
14  was.
15    Q.  Okay.  And you called Rose and
16  couldn't get in touch with her.  Did you try
17  to call anybody else?
18    A.  I spoke with some more people.
19    Q.  Okay.
20    A.  At AmSouth.
21    Q.  And this is in the June '03 time
22  frame; correct?
23    A.  Somewhere in that vicinity, right.

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    Q.   Okay.  And do you recall anything
2  about those conversations?
3    A.   They would just refer it to Rose.
4    Q.   Okay.  She was looking into it?
5    A.   She was supposed to be looking
6  into it.
7    Q.   And you mentioned a minute ago
8  that you had to look at your notes.  Do you
9  have any handwritten notes about your
10  conversations with AmSouth or DMI?
11    A.   Y'all have copies of all and any
12  of these letters.
13    Q.   Right.
14    A.   Usually on the back would be the
15  response to the letter that I would write
16  who I talked to and what -- a little bit in
17  detail what they had told me.
18    MR. COLLINS:  I don't have a copy
19  of any of those, I assume.  On the back of
20  the letters?  If you'll double-check.
21    Q.   I see some handwriting on -- I see
22  some handwriting on the front of some of
23  these.  But there's no remarks as to your

Page 106

1  conversations.
2    A.   It's not on all of them.  There's
3  just maybe one or two.
4    Q.   Okay.
5    A.   I was supposed to have like the
6  dates and names when I kept it in the file
7  at the top of it.
8    Q.   You'd write on the back of the
9  letter?
10    A.   Right.
11    MR. COLLINS:  If you'll just
12  double-check and see.
13    MR. JARRETT:  I'll check and see
14  if I overlooked copying the back of some of
15  them.
16    MR. COLLINS:  Okay.
17    (Whereupon, Defendant's Exhibit
18  No. 5 was marked for identification.)
19    Q.   I'm showing you what I have marked
20  as Defendant's Exhibit 5, Mr. Clark.
21    MR. JARRETT:  This is No. 5?
22    MR. COLLINS:  Yes.
23    Q.   Mr. Clark, this is a letter dated

Page 107

1  July 17, '03, one month after the
2  Defendant's Exhibit No. 4 that we just
3  looked at.  And again, it's the flood
4  insurance provided from AmSouth and it
5  states -- it has your loan number at the
6  top; correct?
7    A.   Correct.
8    Q.   And has flood zone A; correct?
9    A.   Correct.
10    Q.   And a FEMA map panel number;
11  correct?
12    A.   Correct.
13    Q.   And again, AmSouth is advising you
14  that -- had previously notified you that it
15  had not received proof of flood insurance
16  for the property at 8530 South County Road
17  55?
18    A.   Correct.
19    Q.   And had not received proof of
20  insurance; correct?
21    A.   Correct.
22    Q.   Okay.  And they are advising they
23  have an obligation to protect its interest

Page 108

1  in the property and to comply with Federal
2  law?  You see that?
3    A.   Correct.
4    Q.   Okay.  And they tell you that if
5  insurance -- proof of insurance is not
6  provided immediately, it will obtain lender
7  placed flood insurance to protect its
8  interest; correct?
9    A.   Correct.
10    Q.   At this point in time, you hadn't
11  obtained your own insurance policy; correct?
12    A.   Correct.
13    Q.   And again, are you familiar with
14  the Flood Disaster Protection Act of 1973?
15  Is this the first time you had ever became
16  aware of it or had reason to think about it?
17    A.   Correct.
18    Q.   Do you know or do you know as you
19  sit here today that that law requires
20  Federal lenders to obtain flood insurance on
21  properties in designated flood zones?
22    A.   I had never had any reason to --
23    Q.   Okay.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 109

1    A.  -- to be advised with that
2  knowledge.
3    Q.  And again, you agree that if a
4  home -- if your home is in a flood zone,
5  AmSouth has a right to protect its interest
6  by obtaining a flood insurance policy;
7  correct?
8    A.  Correct.
9    Q.  Okay.  And your position is that
10  you're not in a certain designated flood
11  zone; right?
12    A.  Correct.
13    Q.  What did you do in response to
14  this letter?
15    A.  As before, I called AmSouth again
16  to try to encourage them.  And again, I'd
17  have to look on my notes on -- that Rose get
18  in touch with me.
19    Q.  Okay.
20    A.  Because I knew this was getting
21  serious here, that something was about to
22  happen.
23    Q.  Hold on a second.  And I've got --

## Page 110

1  I produced this to your lawyer -- a notes
2  log that reflects dates of conversations
3  that you've had with DMI or AmSouth.
4      And the first date I see in here
5  for Rose is 6-30-03.  Do you recall calling
6  her before that date?  Actually -- let's
7  see.  It may not be in this log.
8      But some of the documents, either
9  -- it's either the recorded conversation
10  that you produced or the notes log indicate
11  that you contacted Rose on June 30.
12    MR. JARRETT:  Are we going to
13  enter it as a document?
14    MR. COLLINS:  We can.  I was just
15  seeing if he could remember.  I'm trying to
16  refresh his memory as to when he may have
17  first called AmSouth.  Okay.  I don't think
18  we need to mark this.
19    Q.  Here's a recorded telephone
20  conversation.
21    MR. JARRETT:  I'm going to object
22  to reading something into the record that's
23  not been entered into evidence.

## Page 111

1    MR. COLLINS:  Okay.  Well, I mean,
2  this is a transcribed version.  I guess we
3  can introduce the tapes into evidence.  But
4  I just want to ask him a couple of questions
5  to try to refresh his memory.
6    MR. JARRETT:  Well, let him read
7  it instead of it being read into the record.
8    MR. COLLINS:  Sure.  He can read
9  it.  I don't have a problem with that.
10    Q.  If you'll look right here, Mr.
11  Clark, just the first sentence.
12    A.  (Witness complied.)
13    Q.  Okay.  Do you recall talking with
14  Rose before June 30th of '03?
15    A.  Without my records, I couldn't
16  say.  But I remember talking with her.
17    Q.  Okay.  I'm still confused.  What
18  records are you talking about?
19    A.  Where I made my notes where I
20  called her --
21    Q.  Okay.
22    A.  -- on the phone.
23    Q.  And those would be in the

## Page 112

1  documents that you have given to your
2  lawyer?
3    A.  Yes.
4    Q.  And I may have asked this
5  question, but Defendant's Exhibit No. 5, you
6  would have made another phone call -- is
7  that what your testimony is -- to Rose or
8  someone at AmSouth?
9    A.  It would be to AmSouth.
10    Q.  Okay.  And what was their response
11  to you?
12    A.  Again, without my notes, I can't
13  really say.
14    Q.  Okay.  Is there a reason why you
15  didn't purchase the flood insurance until
16  this issue could be resolved?
17    A.  Well, I've always been told when
18  someone tells you something, that their word
19  is supposed to be good.
20    Q.  Right.
21    A.  My understanding with Rose was,
22  she was going to check this out and tell me
23  what I needed to do to get it resolved.

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1    Q.  Okay.
2    A.  And I never heard no more from
3  her.  And I kept calling and calling and
4  then it got into the situation it was.
5    Q.  Okay.  And you still didn't
6  purchase the flood insurance, though, after
7  receiving the second or third or fourth
8  letter; right?
9    A.  Correct.  Because I had never been
10  told I was in a flood area.
11    Q.  But these letters told you that
12  you were in a flood area; right?
13    A.  That's right.  And I asked the
14  question what documents did they have
15  stating that I was in a flood area.
16    Q.  Right.
17    A.  Because that was something they
18  had that I didn't have.
19    Q.  And what was their response from
20  AmSouth?
21    A.  There wasn't any.  That's what I
22  was waiting on.  I was waiting on the proof.
23    Q.  So at this point, July --

Page 114

1    A.  This point.
2    Q.  -- you were still waiting on some
3  proof because you needed proof that you were
4  in a flood zone before you would get flood
5  insurance; correct?
6    A.  Yes.
7    Q.  Did the insurance agency that you
8  worked for at this time sell flood
9  insurance?
10    A.  I'm not aware of it if they do.
11    Q.  And that would have been
12  Prudential; is that right?  No.  Mutual
13  Savings?
14    A.  Right.  And Mutual wouldn't.
15    Q.  They did not?
16    A.  No.  They don't sell flood
17  insurance.
18    Q.  I'm going to show you what I'm
19  going to mark as Defendant's Exhibit 6.
20        (Whereupon, Defendant's Exhibit
21  No. 6 was marked for identification.)
22    Q.  Take a minute and look at that
23  letter, please.  Okay.  Mr. Clark, this is a

Page 115

1  August 5th, '03 letter from AmSouth to you.
2  The top right-hand corner says flood policy
3  notice; correct?
4    A.  Correct.
5    Q.  It has your loan number and the
6  property location for your home; correct?
7    A.  Correct.
8    Q.  And it's got the same identifying
9  information we talked about earlier, flood
10  zone A and it has a FEMA map panel number.
11  You see that?
12    A.  Correct.
13    Q.  And you don't know what that means
14  or didn't know what that meant at the time
15  you received this letter?
16    A.  Correct.
17    Q.  And this document reflects that at
18  your expense, AmSouth has purchased
19  insurance to protect its interest in the
20  property; correct?
21    A.  Correct.
22    Q.  And this is approximately two
23  months after you received the first notice

Page 116

1  that AmSouth was requiring flood insurance;
2  right?
3    A.  Correct.
4    Q.  And up until this point in time,
5  you hadn't purchased insurance because you
6  had notified Rose with AmSouth that you
7  didn't -- in your belief didn't need
8  insurance, was not in a flood zone and you
9  hadn't purchased insurance because you were
10  waiting for further direction from Rose;
11  correct?
12    A.  That's correct.
13    Q.  And again, this letter, similar to
14  the other letters, references the Flood
15  Disaster Protection Act; correct?
16    A.  Correct.
17    Q.  And it advises you that if you
18  have purchased insurance, you need to
19  immediately forward a copy to AmSouth.  Do
20  you see that?  It's on the first page.
21    A.  Correct.
22    Q.  Okay.  And you hadn't purchased
23  insurance; correct?

29 (Pages 113 to 116)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1    A.  Correct.
2    Q.  And again, similar to the other
3  letters, it advises you that the premium for
4  insurance that AmSouth was obtaining may be
5  considerably higher than insurance you could
6  purchase; correct?
7    A.  Yes.
8    Q.  And you didn't go and purchase
9  flood insurance after getting this letter
10 either, did you?
11   A.  No.
12   Q.  Is there any reason why you
13 didn't?
14   A.  Still no documentation that I was
15 in a flood area.
16   Q.  So you had to have documentation
17 that you were in a flood area before you
18 were going to obtain flood insurance?
19   A.  Well, again, back to Rose, waiting
20 for the documents or something to be sent to
21 me that we were in a flood area.
22   Q.  Okay.  And after you received this
23 letter -- and it's got attached I guess a

Page 118

1  certificate of insurance -- what did you do,
2  just call AmSouth back?  Did you call Rose?
3    A.  Without my notes, I can't really
4  say.  I know I made a phone call back
5  because, you know, again, still this is
6  being done against my wishes or knowledge to
7  have -- or why I need the insurance.
8    Q.  Okay.  And it's stating that if
9  you don't have an escrow account, we may
10 establish an escrow account.  So you didn't
11 have an escrow account; correct?
12   A.  No.
13   Q.  So at this point in time, was it
14 your understanding that AmSouth had set up
15 an escrow account for you and advanced
16 monies to purchase an insurance policy?  Is
17 that your understanding of this letter?
18   A.  Yes.
19   Q.  Okay.  And it states in the last
20 paragraph, we encourage you to contact your
21 agent or insurance company to obtain your
22 own insurance policy.
23      And, again, you previously

Page 119

1  answered this.  You didn't obtain your own
2  insurance policy because, number one, you
3  were not in a flood zone to your knowledge
4  and, number two, you were waiting on further
5  direction from AmSouth; right?
6    A.  Correct.
7    Q.  If you'll turn to the
8  certificate.  See that document?  And at the
9  very top left-hand corner it states Empire
10 Fire and Marine Insurance Company; correct?
11   A.  Correct.
12   Q.  Okay.  It's got your loan number,
13 has you named as an additional insured and
14 then lists AmSouth Bank as the name insured
15 mortgagee; correct?
16   A.  Correct.
17   Q.  And the amount of this premium is
18 eight hundred and eight dollars; correct?
19   A.  Correct.
20   Q.  Okay.  Insurance has now at this
21 point in time been purchased for -- on
22 behalf of AmSouth to protect its interest in
23 your property.  What did you do when you

Page 120

1  received this letter?
2    A.  Again, I'm pretty sure I called
3  AmSouth.
4    Q.  Okay.  Do you recall anything
5  about that conversation?
6    A.  I think -- Without my notes, I
7  really can't answer that.
8    Q.  Okay.
9      MR. COLLINS:  We may need to stop
10 and get his notes if there's -- because I
11 don't see if we're being productive if
12 there's notes on -- because this letter has
13 the front and the back copy and there's no
14 notes on it.
15     MR. JARRETT:  Do you think all of
16 these have the front and back?
17     MR. COLLINS:  Yes.  All of them
18 has the front and back and there's no
19 notes.  And I just want to make sure that
20 we're not going to have two days of
21 deposition and have to do this over again if
22 your notes come up later.
23   A.  Well, I want to be fair.  But I

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  can't really attest to something that I'm
2  not for sure that -- I'm pretty sure I
3  called back. But now, that's all I can
4  attest to.
5       MR. COLLINS: If the notes turn up
6  that have -- that have significantly, you
7  know, detailed information, then we reserve
8  the right to ask him about those after this
9  deposition.
10      MR. JARRETT: Fair enough. Do you
11  understand what he's saying? Once we get
12  the notes and provide them copies of the
13  notes, then they are reserving the right to
14  call you back and ask more questions based
15  on what information is discovered in those
16  notes.
17      MR. COLLINS: Off the record.
18      (Whereupon, there was a brief
19  off-the-record discussion.)
20      MR. COLLINS: I'm going to try to
21  piece some of the time period here together
22  with these contact history notes. We can
23  mark them as an exhibit if you want to.

Page 122

1       They are not as detailed obviously
2  as your recorded conversations. But I think
3  they generally reflect the date and time
4  that phone calls came in as well as a
5  summary of --
6       MR. JARRETT: Well, if you haven't
7  provided them already, you know I'm going to
8  ask.
9       MR. COLLINS: Well, I produced it
10  to you.
11      MR. JARRETT: So you might as well
12  go ahead and -- you know, I don't have an
13  objection to them being put in for what they
14  are.
15      MR. COLLINS: Right.
16      MR. JARRETT: You know, as far as
17  whether or not they are accurate or
18  accurately reflect the conversation, of
19  course, we are not here to decide. Just the
20  fact that those were the notes you were
21  taking in the course of business.
22      MR. COLLINS: Fair enough. I'm
23  just trying to get the dates and the times

Page 123

1  down and to the extent this refreshes his
2  memory as to the telephone conversations and
3  times.
4       A.  And I want to answer them
5  truthfully to you.
6       Q.  I understand.
7       A.  But there were so many calls that
8  I made to AmSouth, that I can't sit here and
9  tell you that I talked to Rose on 3-20 at
10  2:45 or anything like that. And I don't
11  want to mislead y'all.
12      Q.  I appreciate that. Let me just
13  look at a few notes. These are documents
14  again I produced to your lawyer. There's an
15  8-19-03 note, which is around the same time
16  period that we're talking about.
17      In fact, I think Exhibit 6 is
18  dated August 5th. So this would be
19  approximately a few weeks later. Branch
20  called to ask about the flood insurance.
21      The homeowner is going to see if
22  he can locate a flood zone map to show us
23  that he is not in a flood zone. Do you

Page 124

1  recall ever trying to obtain a flood zone
2  map around this time frame?
3       A.  Around that time frame, I did go
4  and look to see what was classified as a
5  flood zone.
6       Q.  And where did you go to look to
7  get that? You don't recall?
8       A.  I can't remember if it was the
9  court house or where -- the EMS office.
10      Q.  Right.
11      A.  Somewhere anyway.
12      Q.  Did you obtain a copy of a flood
13  zone map?
14      A.  I did.
15      Q.  Do you know the name -- strike
16  that. Do you know the title or the name of
17  that particular map? Was it called a flood
18  insurance rate map? Do you recall?
19      A.  No, I don't.
20      Q.  Okay. What did you do with that
21  document?
22      A.  Got a copy of it. Told her I got
23  a copy of the map.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1    Q.  Did you send that to someone at
2  AmSouth or did you send it to -- What did
3  you do with it?
4    A.  I can't recall if I sent it to
5  them or maybe that was during the time that
6  Geo sent me their copy.
7    Q.  Okay.  Just tell me generally what
8  it looked like.  Was it a map of a property
9  with zones in it?  Just generally describe
10  what you obtained.
11    A.  Just a map with a gray area
12  calling I reckon a flood zone.
13    Q.  Okay.  And you don't recall if you
14  provided that to AmSouth or anybody else?
15    A.  Like I said, again, that may have
16  been the map that I got from Geo because
17  they sent me a copy of what they had stating
18  it was in a flood area.
19    Q.  Okay.  Let me read this note to
20  you, September 22 '03.  Homeowner states was
21  working with Rose.  We talked about Rose
22  earlier.  Has left message with her today.
23    States although he is in a flood

Page 126

1  zone, his house is built up.  Doesn't think
2  he should have to have flood insurance.
3  Telephoned Rose.  Will have someone in the
4  insurance department call him.
5    Do you recall telling Rose that
6  although you're in a flood zone, your house
7  is built up, September of '03?
8    A.  I recall the conversation with
9  her.  But now, I think when we was talking
10  about the flood zone, it was after we looked
11  at that map.
12    Somebody had told us something or
13  another about the flood zone.  See, it
14  didn't go into my property.  It was next to
15  us.
16    Q.  Okay.
17    A.  And it's really -- I don't know if
18  it's a flood zone or not.  There's no creek,
19  there's no body of water or nothing there.
20  It's just a little ole ditch where water
21  runs off the field.
22    Q.  And you're not an engineer, are
23  you?

Page 127

1    A.  No.
2    Q.  And you're not a surveyor?
3    A.  No.
4    Q.  You just looked at this map that
5  you're talking about?
6    A.  Right.
7    Q.  Did you just generally say my
8  house is here or in your mind you could
9  identify where your home was relative to
10  that zone?
11    A.  The map that Geo sent me --
12    Q.  Right.
13    A.  -- had a line drawn to my house or
14  what they was calling my house, which it was
15  not.
16    Q.  Okay.
17    A.  It was the neighbor's house.
18    Q.  Okay.  And I think I have that
19  document.  We can look at it in a minute.
20  But at this point in time, September of '03,
21  you weren't certain as to whether you were
22  in a flood zone or not, were you?
23    A.  Correct.

Page 128

1    Q.  You didn't know one way or the
2  other?
3    A.  Not really.
4    Q.  Okay.  And again, even though you
5  didn't know for certain whether you were in
6  a flood zone, you nevertheless didn't
7  purchase the flood insurance policy, did
8  you?
9    A.  No.
10    Q.  Because you were waiting on proof
11  from either AmSouth or Geotrac or someone
12  proving to you that you were in a flood
13  zone; right?
14    A.  Waiting on notification that I was
15  in a flood area.
16    Q.  Okay.  And the map that you
17  obtained or you looked at yourself, did that
18  not convince you that you were in or not in
19  a flood zone?
20    A.  The one that I received from Geo
21  did not put me in what they was calling a
22  flood zone.
23    Q.  I think we'll go through a few

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

### Page 129

1  more exhibits and maybe that will help us
2  clarify. I'm going to show you what I'm
3  marking as Defendant's Exhibit 7.
4      (Whereupon, Defendant's Exhibit
5  No. 7 was marked for identification.)
6      Q. Again, this is a document that you
7  produced to me. So obviously this was in
8  your home file. And it's entitled Federal
9  Emergency Management Agency, Standard Flood
10 Hazard Determination. Do you see that?
11     A. Yes.
12     Q. Okay. And it lists Dovenmuehle
13 Mortgage, Inc., under the lender's name and
14 address. Do you see that?
15     A. Yes.
16     Q. And it has your name and your
17 address as the pertinent property; correct?
18     A. Correct.
19     Q. And the loan identification
20 number, that's the AmSouth loan number;
21 right?
22     A. Correct.
23     Q. Okay. And you can skip down to

### Page 130

1  Subsection B, National Flood Insurance
2  Program Data. Do you see that?
3      A. Okay. Yes, sir.
4      Q. It has a map number and a -- If
5  you go to the right, it has a flood zone
6  letter A. Do you see that?
7      A. Correct.
8      Q. Okay. And that's the same
9  information that was on the letters that
10 were being sent to you by AmSouth
11 previously; correct?
12     A. Yes.
13     Q. Okay. And under Subsection C, it
14 states -- it's got a check box -- a check
15 mark in the box Federal flood insurance is
16 available; correct?
17     A. Correct.
18     Q. And in the large bold type is
19 building slash mobile home, special flood
20 hazard area and the box is checked yes. Do
21 you see that?
22     A. Yes.
23     Q. Okay. And at the bottom right, it

### Page 131

1  states date of determination, 7-7, 2003. Do
2  you see that?
3      A. Yes.
4      Q. Okay. And that would have been
5  approximately I guess one month prior to the
6  first letter that we've looked at today from
7  AmSouth asking you to provide proof of flood
8  insurance; right?
9      A. Correct.
10     Q. Okay. Apparently I don't know my
11 date well, but the 7-7-03 date is a month
12 after the first letter; correct? The
13 AmSouth -- Exhibit 2 I guess we looked at or
14 Exhibit 3 -- is that Exhibit 3?
15         Yes. Exhibit 3, the June 10, 2003
16 letter is inquiring about flood insurance
17 and whether you have a current policy in
18 place; correct?
19     A. Correct.
20     Q. And this determination was issued
21 approximately a month after that?
22     A. Correct.
23     Q. Okay. And under prepares

### Page 132

1  information, it states Geotrac, 3900 looks
2  like Laylin Road, Norwalk, Ohio. You see
3  that?
4      A. Correct.
5      Q. How did you come about receiving
6  this document?
7      A. I really have no idea.
8      Q. Okay. During the August,
9  September time period, you were asking for
10 proof as to whether you were in a flood
11 zone; correct, or in a -- let me correct
12 that because I'm using that term very
13 loosely -- a special flood hazard area;
14 correct?
15     A. Correct.
16     Q. And at some point in time, you
17 received this document. Do you know when
18 you received it?
19     A. No.
20     Q. Okay. And you don't know who
21 provided it to you?
22     A. Not to my knowledge.
23     Q. Okay. You mentioned earlier that

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1 you had received some information from
2 Geotract or with respect to Geotrac.
3     What time period had you had
4 conversations with Geotrac? Are we in
5 September, October '03 or after?
6     A. I can't really say.
7     Q. Okay. Have you ever seen a
8 document like this before, before this
9 dispute came about been?
10     I mean, you obviously had this in
11 your file. But are you familiar with it?
12 Have you ever seen this before?
13     A. This would be the first one I ever
14 seen.
15     Q. Do you understand that it does
16 designate your home as being in a special
17 flood hazard area?
18     A. According to this document, it
19 does.
20     Q. Do you know what you did when you
21 received this document? Do you know what
22 you did? Did you call anybody? Did you try
23 to figure out why you were in this special

Page 134

1 flood zone area?
2     A. Like I said, I don't really recall
3 who sent this to me, if it was AmSouth or
4 Geotrac.
5     Q. And you don't know when you
6 received it either?
7     A. No, I don't.
8     Q. Okay. Let me show you what I'm
9 marking as Defendant's Exhibit 8.
10     (Whereupon, Defendant's Exhibit
11 No. 8 was marked for identification.)
12     Q. There you go. Again, this is a
13 letter dated September 25, '03 from AmSouth
14 to you; correct?
15     A. Correct.
16     Q. It has your loan number and
17 property address and, again, has the flood
18 zone A designation; correct?
19     A. Correct.
20     Q. And this one also has a panel
21 number and a community number; correct?
22     A. Correct.
23     Q. And the map date is 7-7-03.

Page 135

1 That's the same date as the determination
2 that we just looked at, Defendant's Exhibit
3 No. 7; correct?
4     A. Correct.
5     Q. Okay. And this letter, Mr. Clark,
6 states, again, Federal law requires lenders
7 to ensure that flood insurance is obtained
8 and maintained for properties located in a
9 special flood hazard area.
10     It goes on to tell you that as a
11 result of a recent flood map revision of
12 your community, it has been determined that
13 your property is now located in a SFHA,
14 special flood hazard area. Do you see
15 that? It's the first sentence of the second
16 paragraph.
17     A. Yes. And this come from AmSouth.
18     Q. Okay. Do you recall receiving
19 this?
20     A. I recall receiving a letter of
21 this.
22     Q. Once again, this is similar to the
23 other three or four letters that we've gone

Page 136

1 over explaining to you that your property
2 has been designated as being in a special
3 flood hazard area; correct?
4     A. Correct.
5     Q. And this document actually has it
6 looks like handwriting on it. But I can't
7 read it. Would that be your notes at the
8 top right-hand side in the margin on the
9 left-hand side? Does that appear to be your
10 handwriting?
11     A. I couldn't tell without seeing the
12 original one.
13     Q. Okay. But that's -- That would be
14 your practice, would be to write notes on
15 the side or the back of the letter; is that
16 right?
17     A. On most of them, yes.
18     Q. So the original may very well
19 allow us to ascertain what that says; right?
20     A. Right.
21     Q. But you don't recall sitting here
22 today by looking at those two notations what
23 you may have written there?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1    A. No, I don't.
2    Q. If you'd look at the bottom of
3  that first page of the letter it states, if
4  you disagree with the determination that
5  your property is located in an SFHA, you may
6  contact FEMA. Did you call FEMA?
7    A. I did.
8    Q. Okay. Do you recall who you spoke
9  with?
10    A. Not really. I'm pretty sure I've
11  got it written down somewhere or another.
12    Q. Okay. And this would be the end
13  of September, September 25, '03. You don't
14  recall the name of any person you spoke with
15  at FEMA?
16    A. Not at this point I don't.
17    Q. Do you recall what you -- that
18  conversation was about and what you had
19  asked FEMA?
20    A. I think two questions was asked.
21  Number one was, why wasn't I informed that I
22  was in a flood zone and then how was the
23  flood zone determined.

Page 138

1    Q. And what were the answers to those
2  questions?
3    A. I don't recall exactly what they
4  said. But they was talking about a
5  reporting agency or something like that and
6  the flood of '99 or something like that.
7    Q. Uh-huh.
8    A. Whatever that meant. I mean, I
9  didn't know.
10    Q. I'm sorry. Could you say that --
11  I didn't follow you. And I apologize.
12  Could you say that again? What did FEMA --
13    A. They said the way that flood areas
14  come about was -- and how we got put into a
15  flood area was because of the flood of '99.
16    Q. Okay.
17    A. Which I didn't know what that
18  meant.
19    Q. Okay. Did they tell you that the
20  maps were revised and property that's not in
21  a special flood hazard area could in the
22  future be deemed to be in a special flood
23  hazard area?

Page 139

1    A. Probably something along that
2  magnitude in the conversation came up where
3  they revised it.
4    Q. To your knowledge, has FEMA ever
5  made an official determination as to whether
6  -- regarding the location of your property
7  relative to the special flood hazard area?
8    A. Not that I'm aware of.
9    Q. Okay. And this last sentence
10  states, if you disagree, you may contact
11  FEMA. And it goes on to say FEMA will
12  request written factual evidence as to why
13  you feel this determination may be
14  inaccurate.
15    This evidence can come from a
16  community official, surveyor or registered
17  engineer. And it goes on to talk about
18  should FEMA subsequently determine your
19  property is not in an SFHA, FEMA will issue
20  you a letter of map amendment or a letter of
21  map revision.
22    Did you go through the process of
23  asking for a letter of map revision or a

Page 140

1  letter of map amendment? Did you initiate
2  that process with FEMA?
3    A. I can't really recall if it was
4  with them or the Geotrac on how to get it,
5  you know, resolved because I didn't know.
6    Q. Okay. Do you recall filling --
7  strike that. But you don't as we sit here
8  today recall asking FEMA for a -- or filling
9  out an application for a letter of map
10  amendment or a letter of map revision? Do
11  you recall doing that?
12    A. The only thing I can recall is
13  that -- and I don't know if it was FEMA or
14  AmSouth that said that I would have to hire
15  a surveyor to survey the property.
16    Q. Okay. And this is the end of
17  September. So insurance is in place --
18  lender placed insurance has been purchased
19  on your behalf at this point in time;
20  correct?
21    A. Not on my behalf. I mean, AmSouth
22  purchased it.
23    Q. Right.

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1    A.  Yes, sir.
2    Q.  And the last sentence says, please
3  send proof of flood insurance coverage to,
4  and it has the address from AmSouth.  Again,
5  you didn't have your own insurance and you
6  didn't send any proof of coverage; correct?
7    A.  Right.
8    Q.  And at this point in time, you're
9  still awaiting proof or trying to determine
10  whether you're in a flood zone?  Is that why
11  you didn't purchase your own insurance?
12      MR. JARRETT:  Objection. Can you
13  define what time you're referring to?
14      MR. COLLINS:  Yes.  This September
15  25, '03.
16      MR. JARRETT:  On that date?
17      MR. COLLINS:  Well, during this
18  time frame.  He doesn't have insurance.
19  It's been forced placed.
20    Q.  And I'm asking, are you waiting on
21  additional information or additional
22  evidence to prove or disprove you're in a
23  flood zone?

Page 142

1    A.  I think I was still waiting on
2  Rose's reply on what I needed to do --
3    Q.  Okay.
4    A.  -- to prove otherwise.
5    Q.  Okay.  And we've gone over all
6  three of these letters which state, you
7  know, we're looking -- we need proof of
8  insurance and then a letter saying we're
9  going to obtain insurance and another letter
10  saying we are going to obtain insurance.
11      Is there any reason why you didn't
12  act upon those letters?  I know you said you
13  were waiting on a phone call from Rose
14  indicating that this insurance will be
15  purchased, and, in fact, was purchased on
16  your behalf to ensure the property that you
17  owned.
18    A.  The main reason I hadn't done
19  anything, other than the fact waiting on
20  Rose, was the fact that I'm -- had not been
21  told or notified that I was in a flood area
22  from FEMA or any what I would say
23  authorities on this.

Page 143

1    Q.  Okay.  We just looked at a special
2  flood hazard determination.
3    A.  Uh-huh.
4    Q.  You didn't have this Defendant's
5  Exhibit No. 7 at this period of time?
6    A.  When this came -- and I'm not for
7  sure on this.  I believe that this came from
8  AmSouth to me.  I'm not for sure.  I'd have
9  to look on my records to see.
10    Q.  Okay.
11    A.  Because they furnished me with
12  this.  But --
13    Q.  Go ahead.  I'm sorry.
14    A.  But again, I can't attest to that
15  because I don't know if it came from Geotrac
16  or if it came through AmSouth.  But still my
17  question was, how did they know I was in a
18  flood area before I did.
19    Q.  Okay.  So you have the standard
20  flood hazard determination.  AmSouth has
21  obtained lender placed insurance and you
22  were not willing to obtain insurance or
23  purchase your insurance because you

Page 144

1  disagreed with this determination?
2      Is that a fair statement?  Or you
3  had received information from FEMA?  What
4  were you waiting on?
5    A.  Well, first off, I would have
6  figured that if I was in a flood area, that
7  FEMA, if they are the ones that put me in a
8  flood area, would have notified me.
9    Q.  And what do you base that on, that
10  FEMA notifies persons that they are -- a
11  special notice that --
12    A.  If you're sitting there with a
13  piece of property and it's never been
14  designated as a flood area --
15    Q.  Right.
16    A.  -- and then all of a sudden you
17  get a document or a letter from your
18  mortgage company stating you're in a food
19  area --
20    Q.  Right.
21    A.  -- you know, my question was and
22  was to Rose, how come I haven't been
23  notified from whoever notified them that I

36  (Pages 141 to 144)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 145

1  was in a flood area.  And I even made a
2  request to her to send me the documents that
3  they had stating that I was in a flood area.
4      Q.  And you ultimately got Defendant's
5  Exhibit 7; correct?
6      A.  I'm assuming.  And I may be
7  wrong.  But like I said, the records
8  indicate that this may have been where it
9  came, either from AmSouth or either Geotrac.
10     Q.  Okay.  And even when you got this,
11 you still disagreed with the fact that you
12 were in a special flood zone area; correct?
13     A.  I disagreed with them.  And I
14 believe that's when I asked them to send me
15 maps or whatever they had showing that I was
16 in this flood area.
17     Q.  Okay.  Let's see.  I'm showing you
18 what I'm marking as Defendant's Exhibit 9.
19         (Whereupon, Defendant's Exhibit
20 No. 9 was marked for identification.)
21     Q.  This is, again, a document you
22 produced to defendants.  If you'll just
23 identify for me -- Tell me how you came

Page 146

1  about obtaining it.
2      A.  I'm not for sure.  But either
3  after I spoke with Geotrac or whoever it was
4  that said that the Federal Emergency
5  Management had a copy of all this or they
6  gave me the number and I called them and
7  made the request to send me a copy of what
8  they had showing that this was a food area.
9      Q.  So this came directly from FEMA;
10 correct?
11     A.  According to this letter, yes.
12     Q.  Okay.  I'm going to get back --
13 I'm kind of getting out of order some.  I'll
14 put this aside and we'll get back to it in
15 one second.
16         I'll ask you a few more questions
17 about it in a second.  Let me show you what
18 I'm marking as Defendant's Exhibit 10.
19         (Whereupon, Defendant's Exhibit
20 No. 10 was marked for identification.)
21     Q.  Kind of stay in the order of
22 time.  This is an October 28, '03
23 handwritten letter from you which I assume

Page 147

1  was mailed to AmSouth?
2      A.  Correct.
3      Q.  Okay.  Is that a fair statement,
4  you mailed this to AmSouth?
5      A.  Correct.
6      Q.  Okay.  And you state, to whom it
7  may concern, when I was first contacted
8  about buying flood insurance, I called
9  AmSouth Mortgage and talked with Rose.
10         She told me not to do anything
11 about this until she called me back.  It
12 goes on to state that you're not in a flood
13 area and that, therefore, you're submitting
14 a check for principal and interest only;
15 correct?
16     A.  Correct.
17     Q.  Okay.  Would it be fair to assume
18 that this letter was written in response to
19 the exhibit that we just looked at which
20 includes the certificate of insurance which
21 would be Defendant's Exhibit No. 6
22 indicating that an escrow account had been
23 set up and a premium of eight oh eight had

Page 148

1  been advanced to purchase flood insurance?
2      A.  Correct.
3      Q.  And I don't want to put words in
4  your mouth, but I assume you received a
5  statement and your payment had increased.
6  Is that a fair statement?  Your payment had
7  increased because an escrow account had been
8  established?
9      A.  She pays the bills for me.  So I
10 --
11     Q.  Okay.  Well, I'm looking at --
12     A.  I'm trying to see if it was at
13 that time.  I'm not sure --
14     Q.  Sure.
15     A.  -- what time it was that the
16 payments went up.
17     Q.  Well, at some point in time, the
18 payments went up; right?
19     A.  Correct.
20     Q.  You don't know that the payments
21 went up?
22     A.  Correct.
23     Q.  And they went up because of the

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  escrow created to purchase the flood
2  insurance?
3      A.  Yes.
4      Q.  And this letter -- and I assume --
5  you tell me if I'm wrong -- future payments,
6  you only submitted your seven eighty-three
7  ninety-one, which is your P and I payment;
8  right?
9      A.  Correct.
10     Q.  You did not send in an additional
11  amount requested or demanded by AmSouth to
12  cover the escrow that they had created;
13  correct?
14     A.  Correct.
15     Q.  Do you know what the amount was
16  they were requesting that you pay each
17  month?
18     A.  I sure don't.
19     Q.  Did it go up eighty dollars or a
20  hundred dollars?
21     A.  Without looking, I couldn't really
22  say.
23     Q.  Okay.  Again, you didn't submit

Page 150

1  the increased payment because you felt like
2  you shouldn't have -- that the flood
3  insurance shouldn't have been purchased;
4  right?
5      A.  Correct.
6      Q.  And you weren't convinced at this
7  point in time that you were in a flood zone;
8  right?
9      A.  Correct.
10     Q.  You just didn't know one way or
11  the other; right?
12     A.  That I was or wasn't?
13     Q.  Was or wasn't.
14     A.  I wasn't convinced I was in a
15  flood area.
16     Q.  Until you were convinced, you were
17  going to send in your regular payment;
18  right?
19     A.  Correct.
20     Q.  Do you know looking at this check
21  what month this was intended to cover?  Was
22  this the month of October or November?  Or
23  the question may be better phrased, did you

Page 151

1  have a habit of paying your payments early
2  or paying them -- or sending in your monthly
3  payment late?
4      A.  No, it wasn't late.
5      Q.  Okay.
6      A.  This was for the next month, I
7  believe.
8      Q.  Okay.  For the month of November?
9  And I think we've asked --
10     A.  To try to get it before the first
11  of the month.
12     Q.  And I think I've asked for these.
13  Do you keep copies of your cancelled checks?
14     A.  Yes.
15     Q.  Okay.  Could you provide those to
16  your lawyer, your cancelled checks just for
17  the AmSouth mortgage payments?
18     MR. JARRETT:  That's already been
19  provided to you.
20     MR. COLLINS:  Really?  I don't
21  know if I got those.  I'll go back and
22  look.
23     MR. JARRETT:  I sent them.

Page 152

1      (Whereupon, there was a brief
2  off-the-record discussion.)
3      Q.  And, Mr. Clark, this is the only
4  letter that you've produced that I've -- or
5  that I have seen that you've actually
6  written correspondence to AmSouth or DMI
7  regarding this flood insurance dispute; is
8  that correct?
9      A.  Yes.
10     Q.  Do you recall writing any other
11  letters?
12     A.  None that I can recall.
13     Q.  If you had, they would be in your
14  file that you provided to your attorney?
15     A.  Right.
16     Q.  Okay.  Let me show you what I'm
17  marking as Exhibit 11.
18     (Whereupon, Defendant's Exhibit
19  No. 11 was marked for identification.)
20     Q.  Again, this is similar to the
21  document we looked at earlier, the standard
22  flood hazard determination; correct?
23     A.  Correct.

38  (Pages 149 to 152)

## FREEDOM COURT REPORTING

**Page 153**

1 Q. Okay. And it reflects your loan
2 number; right?
3 A. Correct.
4 Q. Okay. And it has the same NFIP
5 map number and flood zone A that we talked
6 about earlier and that's reflected in the
7 earlier correspondence from AmSouth;
8 correct?
9 A. Correct.
10 Q. And again, a box is checked
11 indicating that your home is in a special
12 flood hazard area. You see that?
13 A. Correct.
14 Q. And under the map tech comments it
15 states, reevaluation done with no change to
16 flood certification. It's dated 12-26-03.
17 You see that?
18 A. Correct.
19 Q. Okay. Do you know how you came
20 about obtaining this document?
21 A. I don't recall if it come from
22 AmSouth or if came from Geotrac.
23 Q. Is it fair to state that this

**Page 154**

1 document reflects that the location of your
2 property, vis-a-vis the special flood hazard
3 area, was reevaluated and again noted that
4 your property does indeed fall in the SFHA?
5 A. According to the document, yes.
6 Q. Okay. Again, you don't know when
7 you received this; right?
8 A. No.
9 Q. Okay. It's got at the bottom
10 preparer's information Geotrac with a one
11 eight hundred number. Do you know the first
12 time you called to contact Geotrac?
13 A. I don't recall the date. But I
14 recall my conversation with them.
15 Q. Can you narrow the month down? We
16 talked about you became aware of the flood
17 insurance issue in June of '03. Dealt with
18 AmSouth in July and August.
19 Lender placed insurance was
20 purchased in August and you were still
21 awaiting information as to whether -- or
22 information that would convince you that you
23 were in a flood zone.

**Page 155**

1 A. Not without my notes. But I'm
2 going to say probably a couple of months
3 later.
4 Q. Okay. So sometime in October,
5 November, December?
6 A. Somewhere along that line. I'm
7 just --
8 Q. Fair enough.
9 A. Okay.
10 Q. During this time period, your -- I
11 assume you're receiving your monthly
12 statements from AmSouth; correct?
13 A. Correct.
14 Q. And you're continuing to pay your
15 P and I payment; right?
16 A. Correct.
17 Q. And you're not paying any overs to
18 cover the escrow advances for flood
19 insurance; right?
20 A. Correct.
21 Q. And you're not paying that because
22 still in October, November, December you're
23 not convinced you're in a flood zone;

**Page 156**

1 correct?
2 A. Right.
3 Q. And until you were convinced
4 you're in a flood zone, you had in your mind
5 that you weren't going to pay for that
6 insurance; right?
7 A. Correct.
8 Q. Okay. Were you aware that AmSouth
9 was being provided with information that you
10 were in a flood zone?
11 A. Was I -- Repeat that question.
12 Q. I said you're aware during this
13 time period that your bank or your mortgage
14 company had been provided with information
15 that you were in a flood zone?
16 MR. JARRETT: I'm going to object
17 to the form of the question.
18 MR. COLLINS: Okay.
19 A. I wasn't aware of what.
20 Q. Well, you had several
21 conversations with AmSouth; right?
22 A. Correct.
23 Q. At some point, they told you that

39 (Pages 153 to 156)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1 we have been informed that your property,
2 the property we have a secured interest in,
3 is in a flood zone; correct?
4    A.  Correct.
5    Q.  You just didn't know where that
6 information had come from?
7    A.  That's correct.
8    Q.  Fair enough.  Because you were not
9 submitting an additional payment for escrow
10 for the flood insurance, you fall behind on
11 your mortgage; correct, according to AmSouth
12 records?
13    A.  According to the records.  But I
14 kept paying the principal and interest.
15    Q.  Kept paying what you thought you
16 should have had to paid; right?
17    A.  Correct.
18    Q.  You didn't submit any amount to
19 cover the flood insurance?
20    A.  Correct.
21    Q.  So at some point, end of December,
22 January of '04, you got -- your statements
23 started reflecting that you were falling

Page 158

1 behind; correct?
2    A.  Yes.
3    Q.  And you had some late charges and
4 stuff; right?
5    A.  Correct.
6    Q.  And that arose out of or was
7 related to the purchase of the flood
8 insurance; right?
9    A.  Correct.
10    Q.  Okay.  I'm going to show you what
11 I'm marking as Exhibit 12.
12      (Whereupon, Defendant's Exhibit
13 No. 12 was marked for identification.)
14    Q.  Take a second to look at that,
15 please.  Mr. Clark, this is a March 8, 2004
16 letter to you from AmSouth.  The subject
17 line is notice of default.  Do you see that?
18    A.  Correct.
19    Q.  That's your loan number; correct?
20    A.  Yes.
21    Q.  Okay.  And this letter informs you
22 that you have breached the contractual
23 obligation of the deed of trust slash

Page 159

1 mortgage, in that you failed to make your
2 monthly payments required by the note.  Your
3 loan is now in default; correct?
4    A.  That's what it says.
5    Q.  And it's got provisions regarding
6 the way you can cure the default and avoid
7 foreclosure proceedings.  Do you see that?
8    A.  Yes.
9    Q.  Okay.  Now again, this goes back
10 to what we talked about just a minute ago.
11 This was a result of the escrow account
12 being set up on your behalf and an advanced
13 was made for insurance; correct?
14    A.  With the force placing of the
15 flood insurance, yes.
16    Q.  Right.  And your payment went up.
17 You didn't submit the increased payment.
18 You submitted your typical P and I payment;
19 right?
20    A.  Correct.
21    Q.  What did you do when you received
22 this letter?
23    A.  I'm pretty sure I called AmSouth

Page 160

1 again.
2    Q.  And you would have continued to
3 discuss the flood zone issue; right?
4    A.  Correct.
5    Q.  And you would have told AmSouth
6 that you didn't believe you were in a flood
7 zone; right?
8    A.  Correct.
9    Q.  Did you expect AmSouth to follow
10 your statement or your telephone
11 conversation telling them that you're not in
12 a flood zone?
13      Did you expect AmSouth to adhere
14 to your opinion or your determination as to
15 where your house was located vis-a-vis the
16 special flood hazard zone?
17    A.  I was thinking that Rose was still
18 going to either send someone or somebody was
19 going to do something and let's get this
20 resolved, this issue resolved.  I don't know
21 exactly when Geotrac furnished me with the
22 map that resolved it.
23    Q.  Okay.  Well, this is in March of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 161

1   '04. And --
2        A.   I don't know.  I said when they
3   sent that map.
4        Q.   Okay.  And you had your first
5   conversation with Rose I think you said in
6   June of '03?
7        A.   Correct.
8        Q.   This is seven or eight months
9   later and you still haven't purchased the
10  insurance, you haven't submitted the
11  increased P and I payments and AmSouth is
12  obviously not willing to cancel the policy
13  without -- with the information they had
14  that you were currently in a flood zone.
15       And my question was, were you
16  expecting AmSouth just to go by your oral
17  statement that this is where my property is
18  located?
19       A.   I would have thought that they
20  would have showed that I had a little
21  credibility to have sent someone for us to
22  try to resolve this matter rather than just
23  sending me letters stating what they were

Page 162

1   going to do if I didn't do these things.  So
2   --
3        Q.   Is it your opinion --
4        A.   -- I was trying to get it
5   resolved.
6        Q.   Right.  And you don't believe that
7   AmSouth was trying to get it resolved?
8        A.   According to their letters, all
9   they were doing was just sending documents
10  out and no one was making contact on how we
11  could resolve it.
12       Q.   Do you know one way or the other
13  whether AmSouth has discretion to not obtain
14  that flood insurance based on the
15  information they had obtained that you were
16  in a flood zone?
17       A.   I think they would have had the
18  courtesy to have listened to their
19  customers' complaint or compliance and try
20  to get with them and resolve it.
21       Q.   Right.  And you've produced
22  numerous recorded telephone conversations
23  that I've looked at.  Wouldn't you agree

Page 163

1   that AmSouth was trying to work with you to
2   resolve it?
3        A.   All I kept getting was documents
4   of what they was going to do if I didn't do
5   that.
6        Q.   But you also had numerous
7   telephone conversations with people trying
8   to get to the bottom and helping you resolve
9   this situation; right?
10       A.   I made a lot of phone calls and
11  all I got was transferred to this person and
12  that person.  They was going to get back to
13  me and tell me what and nobody would ever
14  call back.
15       Q.   Right.  But didn't consistently in
16  those conversations the individuals advise
17  you to -- that the insurance needed to be in
18  place until the issue was resolved?
19       A.   I don't recall a conversation like
20  that.
21       Q.   You don't recall someone from
22  AmSouth or DMI advising you that flood
23  insurance was required to be in place and

Page 164

1   that you needed to have that insurance and
2   you should purchase it and leave it in
3   place, and when the issue was resolved, then
4   you could deal with the refund issue?  You
5   don't recall having any of those
6   conversations?
7        A.   I might have had a conversation of
8   that magnitude.
9        Q.   Okay.  But you were not willing to
10  advance money for flood insurance until you
11  had proof that you were in a flood zone?
12       A.   Well, it was two things.  Number
13  one, I didn't have it.  And number two was,
14  I didn't feel that I owed it.  And no one
15  had really --
16       Q.   Proven that to you?
17       A.   -- cared enough to come and check
18  and see.  I even invited them to come to
19  look at the property.
20       Q.   Right.
21       A.   And no one came.  A simple request
22  just to come look at a piece of property.
23       Q.   Right.  And your position is, the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  determination could be made from the map
2  itself?
3      A.  Well, the map was incorrect.
4      Q.  We're going to look at that in one
5  second.  Okay.  And it refers to foreclosure
6  proceedings.  Your house never was
7  foreclosed upon; right?
8      A.  No.
9      Q.  Okay.  I'm going to show you what
10  I'm going to mark as Defendant's Exhibit
11  13.
12         (Whereupon, Defendant's Exhibit
13  No. 13 was marked for identification.)
14      Q.  Mr. Clark, this is a April 2, 2004
15  letter from AmSouth to you; correct?
16      A.  Correct.
17      Q.  Regarding loan number -- it's your
18  correct loan number; right?
19      A.  Correct.
20      Q.  All right.  It reflects that you
21  owe two thousand nine hundred and four
22  dollars and twenty-three cents for the dates
23  of February 1, '04 through April 1, '04;

Page 166

1  correct?
2      A.  Correct.
3      Q.  Okay.  And again, this is -- I
4  don't mean to restate the -- ask the same
5  question over and over, but it's your
6  position that you're behind in that amount
7  because of the escrow created for the
8  advancement of the forced placed insurance;
9  right?
10      A.  I was not behind on my payments
11  because I continued making the payments.
12      Q.  Right.
13      A.  And sending in P and I.
14      Q.  AmSouth's records reflect that
15  you're behind on your payments because of
16  the escrow account; correct?
17      A.  Escrow, correct.
18      Q.  Okay.  But you continued to send
19  in just your P and I payment; right?
20      A.  Correct.
21      Q.  And again, in response to this
22  letter, would you have called AmSouth?
23      A.  Again, I'm pretty sure I did.

Page 167

1      Q.  Okay.  And still --
2      A.  Trying to resolve it.
3      Q.  Still trying to resolve the
4  location of your house relative to the flood
5  zone?
6      A.  Correct.
7      Q.  Okay.  I'm going to look at this
8  contact history.  Do you recall ever having
9  a conversation -- or do you know who Mark
10  Pool is, the county engineer?
11      A.  Yes.
12      Q.  Tell me about your dealings with
13  Mark Pool about the location of your
14  property relative to the flood zone.
15      A.  He's the county engineer.  I
16  contacted Mark on how to go about
17  determining if I was in a flood area or not.
18      Q.  Right.  And this note is dated
19  April 27, '04.  Is that about the time you
20  would have talked to him?
21      A.  Somewhere along that time.
22      Q.  Okay.  Did he come out and look at
23  your land?

Page 168

1      A.  No.  Because that's not when --
2  what he would be involved in.  He's just the
3  county engineer.
4      Q.  Did he tell you that you needed to
5  get a LOMA or some exception from FEMA?
6      A.  He had told me that -- about that
7  some of the areas around were reported as
8  flood areas that were not flood areas and
9  that I need to check it out to see if that's
10  what had happened.
11      Q.  Okay.  And I noticed that in some
12  of the calls that you had recorded with
13  AmSouth.  There seemed to be some confusion
14  in the area where you live.  I guess a new
15  FEMA map or something had come out and there
16  was some confusion as to whether these
17  people were in or not in a flood area; is
18  that right?
19      A.  Correct.
20      Q.  And you talked to Mark Pool about
21  that?
22      A.  Correct.
23      Q.  What do you recall about that

42 (Pages 165 to 168)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  conversation?
2      A.  He just told me that either FEMA
3  or whoever was reporting it, that they were
4  having some issues, that some of the land
5  was wet land.
6      Q.  Right.
7      A.  Was being declared as flood land
8  and it was not flood areas.  It was just wet
9  land.
10     Q.  Okay.  Did he tell you about -- Is
11  that near where your property is located?
12     A.  That's what -- There's a piece of
13  land on the other side of ours that's -- is
14  what you would classify as a wet area.
15     Q.  Okay.
16     A.  But it was -- that's it.
17     Q.  Did he give you any advice or tell
18  you what to do to try to get it corrected or
19  to get a specific determination as to where
20  your property was located?
21     A.  To get in touch with FEMA.
22     Q.  Okay.  And we may be now to the
23  letter you received, which I previously

Page 170

1  marked as Exhibit -- was it Exhibit 10?
2  Exhibit 10.
3      MR. JARRETT:  It's not 9?
4      Q.  Yes.  Exhibit 9.  Which is a
5  letter that you produced to us which is
6  April 13 of 2004 to you from FEMA.
7      Was this in response to a
8  telephone conversation you had or did you
9  write him a letter?
10     A.  I think I made a phone call and
11  then they supplied me with this document.
12     Q.  Okay.  It states, Dear Mr. Clark,
13  you requested FEMA Map Assistance Center to
14  send this information regarding the FEMA
15  National Flood Insurance Program rate map.
16     Enclosed is a package of the
17  following documents including detailed
18  information and forms, MT-EZ.  Okay.
19     Now, if you turn the page, there's
20  some handwriting and drawings on here.  Is
21  this -- Did you write on this when FEMA
22  supplied it to you?
23     A.  I did.

Page 171

1      Q.  Okay.  Tell me what the zone A
2  area is in your handwriting and just help me
3  understand what that is.
4      A.  Zone A is what's classified as --
5  according to FEMA -- a flood area.  If
6  you'll notice, the arrow that's drawed up to
7  that black dot outside of the black area,
8  that's my home.
9      Q.  The black square?
10     A.  The little black square that's
11  outside the black area, which is what they
12  call the flood area.
13     Q.  Did you put that black square
14  there or is that -- is this on the map?
15     A.  That's on the map.
16     Q.  Okay.  And then it says neighbor's
17  house.  And I can't see what it's pointing
18  to.
19     A.  There's a neighbor's house that's
20  in that black area.
21     Q.  Okay.  That is in zone A?
22     A.  Correct.
23     Q.  And that's your handwriting on

Page 172

1  here?
2      A.  That's correct.
3      Q.  Okay.  If you turn the page,
4  there's similar -- looks like a larger
5  picture of the same area.
6      A.  Okay.
7      Q.  And you say that's your
8  handwriting.  My house in white area; is
9  that right?
10     A.  That's correct.
11     Q.  What does the other notes on the
12  left reflect?
13     A.  The neighbor's house sits probably
14  right in there (indicating).  This is the
15  city limit sign here of Cottonwood.  My
16  house is just outside the city limits.
17     And if you'll notice, they've got
18  8530 indicating that.  That's my property
19  line.  This right here is my property line
20  back into here.  That's my home.
21     That comes from the FEMA map or
22  whoever wrote that.  And the neighbor's
23  house is sitting along in here in that black

# 367 VALLEY AVENUE
# (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  area (indicating).
2      MR. STOTT:  Can we use something
3  to identify that on the record as to what
4  the property line is?  Do you have a red pen
5  or something?
6      MR. COLLINS:  Okay.
7      MR. STOTT:  Would you just circle
8  the line that you indicated are property
9  lines?
10     A.  Okay.  The property line of mine
11 is this right here (indicating).  And that,
12 of course, is the city limit.  It goes up
13 through there and back.
14     MR. STOTT:  You've circled a
15 triangle.  Is your lot a triangle shape?
16     THE WITNESS:  Yes, sir.
17     MR. STOTT:  So that triangle
18 that's drawn inside that circle is your
19 property line?
20     THE WITNESS:  That's correct.
21     MR. STOTT:  Did you draw any of
22 those lines into that map or were they all
23 there?

Page 174

1      THE WITNESS:  That -- Now that, I
2  may have dotted out across there.
3      MR. STOTT:  The one that's not a
4  straight -- I'm sorry.  The one that's not a
5  straight line, the one that's dotted, has a
6  little bit of a curve to it.  That's what
7  you drew in?
8      THE WITNESS:  That's my property,
9  the divided line, because the next line in
10 there is the neighbor.
11     MR. STOTT:  But just to make sure
12 we're clear, that line was not present on
13 the FEMA map that you received, that's
14 something you drew?
15     THE WITNESS:  That's the one that
16 I drew stating my home and locale.
17     MR. STOTT:  Okay.
18     Q.  How did you make a determination
19 as to where that line is?
20     A.  Because my neighbor's house is
21 right there on this map and my land comes
22 right down there (indicating).  There's a
23 ditch that crosses over down in here and my

Page 175

1  land comes right here where the driveway
2  goes into her house.
3      Q.  I guess I'm confused because if I
4  had to draw a line around mine, I wouldn't
5  know exactly where to put it.  This isn't a
6  science, is it?  You're just --
7      A.  No.  It's just a guesstimated line
8  through there.  It's not --
9      MR. JARRETT:  Let's go off the
10 record for just a second.
11     (Whereupon, there was a brief
12 off-the-record discussion.)
13     Q.  If you turn to the next page, it's
14 kind of a larger overview of the same
15 picture; correct, zone A?
16     A.  Yes.  That's an --
17     Q.  An arrow --
18     A.  -- aerial shot.
19     Q.  And the arrow points again to your
20 house; correct?
21     A.  Right.
22     Q.  Okay.
23     A.  On down in there.

Page 176

1      Q.  Did you draw that square?
2      A.  No, sir.
3      Q.  That was already there?
4      A.  Correct.
5      Q.  And to the back of this document,
6  the last two pages -- let's see.  I'm not a
7  FEMA expert, but it appears to be an
8  application for an exception; is that
9  right?
10     MR. COLLINS:  Do you know, Joe?
11     MR. STOTT:  I haven't read this.
12 I'd have to look.  Yes, it is.
13     Q.  Did you fill this out or have
14 someone complete it for you?
15     A.  No.  We never did get to this
16 point.
17     Q.  Okay.  So you received this letter
18 in April and you never got to the point of
19 actually requesting an exception or a LOMA
20 from FEMA; right?
21     A.  Right.  Because at that time,
22 somewhere along there, we had hired
23 Polyengineering to do the survey.

44  (Pages 173 to 176)

# FREEDOM COURT REPORTING

Page 177

1    Q.   Okay.
2    A.   And to do all of this before we
3    filled it out to determine if I was in a
4    flood area.
5    Q.   Okay.  You would acknowledge that
6    during this time frame, there were certainly
7    some confusion on your part and apparently
8    the county engineer's as to whether your
9    home was or was not in a flood zone; right?
10   A.   There wasn't no confusion.  I was
11   well aware that my house was not in what I
12   would call a flood zone because of what you
13   think of flooding.
14   Q.   Okay.  But that's just based on
15   your own experience and your perception;
16   right?
17   A.   Right.  And for my home to have
18   been flooded, Cottonwood would have been
19   under water.  I mean, that's -- this was
20   just apparently from all indications one of
21   those undetermined flood areas rather than
22   wet areas.
23   Q.   What are you calling a -- When you

Page 178

1    look at this map, what are you calling a wet
2    area?
3    A.   This land right here, all this
4    property here --
5    Q.   Let me make sure I know where
6    you're talking about.
7    A.   Where our house is at, this area
8    is actually no more than a drain field.  All
9    the water off the fields around just comes
10   right into there.  It's not a creek.
11        There's not any body of water
12   around it.  It's just a wet area that when
13   it rains, the water comes in there and runs
14   under the road.
15   Q.   And you're referring to the wet
16   area zone A?
17   A.   What they are calling this right
18   here zone A.
19   Q.   Okay.  So you're saying you
20   disagree that that's a special flood hazard
21   area?  You don't know what a special flood
22   hazard area is; right?
23   A.   Right.

Page 179

1    Q.   You're just telling me what it
2    looks like when it rains really bad?
3    A.   Well, you think of a flood area as
4    being where water is going to get out of the
5    banks of a creek or a lake or something like
6    that and it's going to engulf you.
7    Q.   Well, that's your personal view of
8    what a flood area is; right?  Isn't that
9    right?  That's your belief or perception as
10   to what a flood area is?
11   A.   Well, I would think that most
12   everybody would sort of see along that
13   line.  Well, if you ain't ever been in a
14   flood area --
15   Q.   Right.  Well, do you know how a
16   special flood hazard area is defined by
17   FEMA, how they came up with those
18   calculations?
19   A.   Not really.
20   Q.   Okay.  Let me show you what I'm
21   marking as Exhibit 14.
22        (Whereupon, Defendant's Exhibit
23   No. 14 was marked for identification.)

Page 180

1    Q.   This is a May 4, 2004 letter from
2    AmSouth.  And again, it's similar to the
3    previous exhibit we looked at.
4         It's reflecting that you're behind
5    on your payments in the amount of two
6    thousand nine hundred and forty-nine dollars
7    and ninety-four cents for the months of
8    April -- I'm sorry -- March 1 through May 5,
9    2004.  Do you see that?
10   A.   Correct.
11   Q.   Okay.  And as you testified
12   earlier, you were sending in your P and I
13   payments; right?
14   A.   Yes.
15   Q.   And that's the amount that you
16   believed were due and owing each month;
17   right?
18   A.   Yes.
19   Q.   And this increased amount, the
20   amount that AmSouth was demanding that you
21   pay to prevent foreclosure, was due to the
22   escrow account being created to purchase the
23   flood insurance for your property; correct?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1    A.  Correct.
2    Q.  Okay.
3    A.  Of course, the late penalties and
4  late charges and all that was all added to
5  it.
6    Q.  All that added up to this number;
7  right?
8    A.  Yes.
9    Q.  And again, AmSouth didn't
10  foreclose and sell your house, did they?
11    A.  They just threatened.
12    Q.  Okay.  Let me show you what I'm
13  marking as Defendant's Exhibit No. 15.
14      (Whereupon, Defendant's Exhibit
15  No. 15 was marked for identification.)
16    Q.  You ready?
17    A.  Yes.
18    Q.  This is a letter again that you
19  produced.  It's a May 4, 2004 letter from
20  Geotrac to you.  And before we start -- I
21  asked this earlier -- do you know when you
22  started having communications with Geotrac?
23    A.  Not the exact date.  But I knew it

Page 182

1  was after I had talked with AmSouth and they
2  said -- because I was trying to clarify
3  where they got their information from.
4    Q.  Right.
5    A.  And they kept telling me they got
6  it from FEMA.  Well, when I finally found
7  out, AmSouth had got it from Geotrac.
8    Q.  Okay.  Was that from the special
9  -- these standard form -- standard flood
10  hazard determinations?
11    A.  I don't know who it came from.
12  Like I said, again, it was someone in
13  AmSouth that got it or customer service.
14    Q.  So sometime before May of '04, you
15  became aware that --
16    A.  That Geotrac was the one that had
17  gave them the information.
18    Q.  That you were in a special flood
19  hazard area?
20    A.  Right.
21    Q.  And do you recall your
22  communications -- Did you telephone Geotrac?
23    A.  I did.

Page 183

1    Q.  Tell me about that.
2    A.  I called them and asked them would
3  they please send me a map and determine how
4  -- showing me where they were saying I was
5  in a flood zone.
6    Q.  And did they send you a map?
7    A.  They did.
8    Q.  I'm not sure if I have seen this.
9  Maybe it will be in my -- we'll get to
10  that.  Okay.  And this letter states,
11  occasionally situations arise where a
12  structure is shown as being in a federally
13  defined special flood hazard area even
14  though the structure is, in fact, elevated
15  above the one hundred year elevation.  Do
16  you see that?
17    A.  Yes.
18    Q.  And it sets out the process for
19  obtaining a LOMA or an exception from FEMA.
20  Was this letter written in response -- Was
21  this letter written to follow up on a
22  telephone conversation you had about the
23  determination that had been made that you

Page 184

1  were in a flood zone?  I'm trying to get an
2  idea.  What was this written in response to?
3    A.  This letter I believe -- I recall
4  that was a response to when I asked them to
5  send me information that they had and how
6  they obtained that I was in a flood zone.
7    Q.  Did the map you mentioned, was it
8  attached to this letter?
9    A.  I think I got the letter and then
10  I called and asked them could they furnish
11  me the map.
12    Q.  Okay.  And they said yes?
13    A.  Yes.
14    Q.  And they did ultimately send it to
15  you?
16    A.  They faxed it to me.  Wasn't it
17  faxed?  Yes, it was faxed to me.
18    Q.  It states, until the map is
19  changed through a legal process, lenders are
20  bound by the information shown on the
21  Federal Insurance Administration maps and
22  cannot make a determination contrary to the
23  in-force map.  Do you see that?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 185

1    A.  Yes.
2    Q.  That's what AmSouth had been
3  telling you; correct?
4    A.  Correct.
5    Q.  In fact, this letter says,
6  enclosed is an application and directions
7  for a LOMA.  I don't know if the one you
8  produced had the attachments.
9       But you testified earlier you
10  didn't get to the point of actually
11  submitting a LOMA to FEMA; correct?
12    A.  No, I didn't.
13    Q.  Okay.  Did you call -- This letter
14  is written by Marsha Nichols, client service
15  representative.  Do you remember calling
16  Marsha Nichols?
17    A.  I did.
18    Q.  Did you call her in response to
19  this letter?
20    A.  I did.
21    Q.  Can you tell me about that
22  conversation?
23    A.  That's when she told me that she

Page 186

1  would fax me a copy of the map.
2    Q.  Okay.
3    A.  And she did.  And after receiving
4  the map -- even on her map, I told her to
5  please draw out which was my home and she
6  did.
7       But the only problem was the house
8  that she had as my house was the one I was
9  telling you about a while ago was the
10  neighbor's house.
11    Q.  Okay.  And she faxed that shortly
12  after your telephone call?
13    A.  Correct.
14    Q.  Okay.
15    A.  As a matter of fact, she faxed it
16  and I turned around and faxed it back to
17  her.
18       MR. COLLINS:  Let's go off the
19  record for a second.
20       (Whereupon, there was a brief
21  off-the-record discussion.)
22    Q.  The map that was faxed to you from
23  Geotrac had a handwritten notation of where

Page 187

1  your property -- where they had deemed your
2  property to be located?  Is that what you're
3  saying?
4    A.  Yes.  Ms. Marsha had drawed it
5  out.
6    Q.  And an arrow was pointing into
7  zone A; correct?
8    A.  Yes.  The flood area, what they
9  were calling the flood area.
10    Q.  But that document would be in your
11  files; correct?
12    A.  Yes.
13    Q.  And again, this letter states,
14  while awaiting a LOMA -- which you didn't
15  apply for -- you would be required to carry
16  Federal flood insurance.  Do you see that?
17    A.  Correct.
18    Q.  In fact, AmSouth had flood
19  insurance on your home during this entire
20  time period; correct?
21    A.  Yes.
22    Q.  Against your wishes?
23    A.  Correct.

Page 188

1    Q.  Okay.
2       (Whereupon, Defendant's Exhibit
3  No. 16 was marked for identification.)
4    Q.  Showing you what I have marked as
5  Defendant's Exhibit No. 16.  This is a
6  document entitled Federal Emergency
7  Management Agency Elevation Form, Mr.
8  Clark.
9       It's a document that you produced
10  in this litigation.  Could you tell me what
11  this is?
12    A.  This is where -- when I hired
13  Polyengineering to do the elevation for
14  flood area.
15    Q.  Okay.
16    A.  Of course, the person that did it
17  was James R. Brannon, Polyengineering.  And
18  he states there that -- where he contacted
19  FEMA to determine the flood -- base flood
20  elevation and there were none available in
21  our area.
22       And it also states down there that
23  the floor elevation of structure is one

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  hundred and seventy-five point zero two
2  feet. They had to go all the way over to 84
3  and work an elevation back to our house to
4  determine that we were not in a flood area.
5      Q. And we've looked at a number of
6  letters from AmSouth and some correspondence
7  from Geotrac. And you made the decision to
8  call Polyengineering, Inc.
9      Do you know about what time you
10  contacted Mr. Brannon to come out and do an
11  elevation sheet?
12     A. It was after I had talked with --
13  again, with someone in AmSouth that said
14  that if I disputed this, that it was my
15  responsibility to prove otherwise. So
16  that's why I hired them, to prove my point.
17     Q. Okay. So someone at AmSouth had
18  told you that the insurance was going to
19  remain in place --
20     A. Yes.
21     Q. -- until you established
22  otherwise? Okay. They wouldn't rely upon
23  your statements that you weren't in a flood

Page 190

1  zone, they wanted something more definitive;
2  correct?
3      A. True.
4      Q. This is dated 5-17-04. Do you
5  know when you first contacted James Brannon?
6      A. Probably just -- Again, I don't
7  even know if I have it documented. But
8  somewhere probably around a month prior to
9  that.
10     Q. Okay. And is there any reason why
11  you elected to hire a surveyor to do an
12  elevation sheet rather than requesting it go
13  through the FEMA process and request an
14  exception?
15     A. Nothing no more than I was told I
16  was going to have to get -- and what I
17  believe -- I'm not for sure on this. When I
18  talked to FEMA, they said that this is one
19  of the first things I would have to do,
20  would be to hire someone to do a flood
21  elevation.
22     Q. Okay. And FEMA told you they
23  couldn't prepare an exception or a LOMA

Page 191

1  without having some type of elevation sheet?
2      A. Correct. So I hired this
3  organization. And they was going to take
4  care of doing whatever was necessary to file
5  it back with FEMA.
6      Q. Okay. Let's see. And you read
7  contacts were made to FEMA to determine base
8  flood elevation, none were available. And
9  you read the floor elevation of structure
10  equals one seventy-five oh two. I don't
11  know what that means. Do you know what that
12  means?
13     A. I'll explain what Mr. Brannon told
14  me.
15     Q. Okay.
16     A. And that was that when he
17  contacted FEMA to determine where a base
18  flood area was at in our area, there was
19  none available.
20     Q. What does that mean?
21     A. Wasn't no flood elevations
22  available in my area.
23     Q. Well, you're not saying that

Page 192

1  doesn't mean there can't be a flood zone
2  because there's no elevation?
3      A. There was no elevation
4  established.
5      Q. Okay. And then the floor
6  elevation of structure is one seventy-five
7  oh two.
8      A. That means that the water would
9  have to rise a hundred and seventy-five foot
10  from the river in order for us to be under
11  water.
12     Q. Okay.
13     A. That's what I understood now.
14     Q. That's what Mr. Brannon told you?
15     A. Correct.
16     Q. Okay. And the second page of this
17  document, there's I guess a map attached?
18     A. Correct.
19     Q. And you did this earlier, but
20  would you circle on this in red your -- Is
21  your property in the gray area? Is that
22  your property?
23     A. This is mine right in here, which

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 193

1  this right here comes across now because my
2  land comes across this area (indicating).
3  Do you want me to draw it out?
4      Q.  Yes.  That would be great.
5      A.  (Witness complied).  This is the
6  city limits.
7      Q.  Okay.  So your area is in the
8  triangle?
9      A.  Right.
10     Q.  Okay.  Where is -- If you would,
11 where is your home located relative to -- on
12 that parcel?
13     A.  Just guesstimating, if I was
14 drawing it in -- Do you want me to just sort
15 of roughly draw it in?
16     Q.  Yes.  Draw where you think your
17 house would be.
18     A.  (Witness complied).  That could be
19 give or take.  But that's about the center
20 point.
21     Q.  And it's got 8530 and an arrow
22 drawn in.  Is that supposed to be pointing
23 towards your house?  Is that your

Page 194

1  handwriting or is that the surveyor's?
2      A.  That must have been their's.  It's
3  not mine.
4      Q.  What is the 8530?
5      A.  That's the house location.
6      Q.  Okay.  Were you out there when Mr.
7  Brannon did the survey?
8      A.  No, I wasn't.
9      Q.  So you didn't talk with him while
10 he was doing the process?
11     A.  No.
12     Q.  Do you know how long it took?
13     A.  Took him from what he explained to
14 me a pretty good while because they had to
15 go back over to 84 and come down the road
16 surveying, whatever surveyors do to try to
17 establish this point.
18     Q.  Okay.  Did you have a conversation
19 with him after he finished this survey and
20 completed this document?
21     A.  No more than him explaining to me
22 that I wasn't in a flood area.
23     Q.  So he just explained to you what

Page 195

1  it was.  Did he fax this to you or mail it
2  to you?
3      A.  I went by and picked it up.
4      Q.  Did he say -- So he left it in
5  your hands to send this to FEMA or AmSouth
6  or whoever you wanted to; correct?
7      A.  I think this was just my copy --
8      Q.  Okay.
9      A.  -- that he had gave me, that he
10 would report it or whatever he had to do
11 with this himself.
12     Q.  So did he report this to FEMA?
13     A.  I have no idea.
14     Q.  Did you ask him to?
15     A.  That was part of the conversation
16 up front, was I was trying to get it
17 rectified.  That's why I figured that he --
18 when he sent this to FEMA -- if he sent it
19 to FEMA.  And I'm not sure because I didn't
20 ask him.
21     Q.  So he gave you a copy and you
22 don't know whether or not he sent this to
23 FEMA?

Page 196

1      A.  Right.
2      Q.  Okay.
3          (Whereupon, Defendant's Exhibit
4  No. 17 was marked for identification.)
5      Q.  Let me show you what I'm marking
6  as Defendant's Exhibit No. 17.  It appears
7  to be a -- I guess a fax or a letter from
8  Geotrac to you, Mr. Clark, from Suzi Smith
9  at Geotrac?
10     A.  Yes, sir.
11     Q.  Okay.  Tell me about this letter.
12 Was this written in response to a telephone
13 call?  Did you send this flood elevation
14 information to Geotrac?
15     A.  This was Ms. Smith's response back
16 after she had sent the maps.
17     Q.  Right.
18     A.  And had showed that -- the error
19 that they had on the map pointing to my
20 neighbor's house, not my house.
21     Q.  Okay.
22     A.  And I faxed it back to her.
23 That's when she made this assumption then

49  (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 197

1  that they had the wrong home.
2      Q.  When did you fax that information
3  back to her?  Did you draw on the map
4  yourself and say this is where my house is?
5      A.  They had drawn on the house -- I
6  mean, on the map pointing to the house that
7  they was calling my house.
8      Q.  Right.  And you drew and corrected
9  it and said this --
10     A.  I corrected it and faxed it back
11  to her.
12     Q.  And do you know about what date
13  that would have been?  Was that close to
14  this date and time?
15     A.  Yes.  Pretty close.
16     Q.  So she's faxing you a letter on
17  May 28, '04 stating that your structure is
18  just outside of SFHA in zone CX?
19     A.  Correct.  That's what it says
20  there.
21     Q.  It says I have called and resent
22  to Dovenmuehle Mortgage an updated flood
23  zone determination saying no flood insurance

Page 198

1  required?
2      A.  Correct.
3      Q.  Okay.  And attached to this
4  document is another copy of the standard
5  flood hazard determination; correct, similar
6  to the two that we've looked at earlier
7  today; right?
8      A.  Correct.
9      Q.  And under map tech comments, it
10  says SFHA zone A extremely close to
11  structure.  Structure location based on map
12  provided.  Redetermination due to additional
13  research and/or information.
14     Is the additional information, is
15  that the map that you faxed back to your
16  knowledge?
17     A.  That's correct.
18     Q.  Did you send anything else other
19  than that map?
20     A.  That's all I sent to them.
21     MR. COLLINS:  Can we take a
22  break.
23     (Whereupon, a short recess was

Page 199

1  taken.)
2      (Whereupon, Defendant's Exhibit
3  No. 18 was marked for identification.)
4      Q.  Mr. Clark, I have shown you a
5  letter dated May 28, '04 from AmSouth to
6  you.  If you'll take a second and just look
7  at that.  Okay.
8      And again, this May 28 date is the
9  same date as Defendant's Exhibit No. 17;
10  correct, May 28, '04?
11     A.  Yes, May 28, '04.
12     Q.  Is that a yes?
13     A.  Yes.
14     Q.  This letter states -- This letter
15  is to inform you that your property does not
16  lie in a special flood hazard area.  You're
17  not required to carry flood insurance at
18  this point in time.
19     Therefore, we have cancelled the
20  flood insurance requirement and/or any
21  forced placed coverage.  Did I read that
22  correctly?
23     A.  Yes.

Page 200

1      Q.  So would it be a fair statement
2  that immediately after you received
3  information from Geotrac that you were
4  outside of the SFHA, the very same day,
5  AmSouth informed you that they were
6  cancelling coverage; correct?
7      A.  Correct.
8      Q.  And your position, as you stated
9  earlier today, is that you never should have
10  had the flood insurance placed in the first
11  instance; right?
12     A.  Correct.
13     Q.  Okay.  And the letter also says,
14  please sign the enclosed release of
15  liability and return it to us at the address
16  listed below with a written request to
17  delete your flood insurance escrow.  Do you
18  see that?
19     A.  Correct.
20     Q.  Okay.  Turn to the second page.
21  You didn't sign that and send it back in,
22  did you?
23     A.  No.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 201

1    Q.   Any reason why you didn't do that?
2    A.   Again, going back and I found I
3  didn't need it from the word get go and even
4  after -- something to correct, too. Even
5  Jacqueline King, which is a loan officer,
6  had informed us that we didn't need the
7  flood insurance.
8    Q.   Say that one more time. Who
9  informed you of that?
10   A.   Jacqueline King.
11   Q.   And she is with who?
12   A.   AmSouth.
13   Q.   And she informed you after
14  receiving this letter?
15   A.   No. Back before, I had went in
16  and talked with her about all this that was
17  going on.
18   Q.   Right. And what did she say?
19   A.   She was trying to work on getting
20  it resolved, too.
21   Q.   Right.
22   A.   And she talked with -- got a
23  document -- a guy up there at AmSouth and

Page 202

1  where they admitted that they had forced
2  placed insurance on us. And -- so somewhere
3  in this same time frame.
4    Q.   So you -- let me make sure I
5  understand correctly. But you didn't -- I'm
6  sorry. I think I lost your answer that you
7  gave.
8       I think my question was, is there
9  any reason why you didn't sign and send this
10  back in acknowledging your flood zone XC and
11  releasing AmSouth, hold them harmless for
12  not maintaining flood insurance on your
13  property?
14   A.   I just refused to sign it because
15  I didn't feel that I needed to.
16   Q.   Okay.
17   A.   This is a release. Because I
18  wasn't the one that bought the insurance or
19  -- you know, this was forced placed on me.
20  And so I didn't feel that I needed to
21  release them of nothing that they had done.
22   Q.   Okay. If you look at the last
23  sentence, the release language, in the event

Page 203

1  this property has damage due to flood while
2  under the terms of our mortgage, did you
3  read that as AmSouth wanting you to release
4  them for not requiring you to have insurance
5  in the event your home is damaged and you
6  look back to AmSouth and say, why didn't you
7  have insurance on my home? How do you
8  interpret that?
9       MR. JARRETT: Let me interject.
10  He did not sign this and return it on advice
11  of counsel due to the first sentence.
12       MR. COLLINS: Okay.
13       MR. JARRETT: That he was not in a
14  position to acknowledge.
15       MR. COLLINS: Okay. And that
16  first sentence says, we the undersigned
17  borrowers do hereby understand that the
18  above mentioned property is located in a
19  flood zone XC.
20       MR. JARRETT: Correct. Which is
21  totally contradictory to the other documents
22  saying that he was not in a flood zone.
23       MR. COLLINS: Okay. Well, I think

Page 204

1  there may be a misunderstanding. I'm not a
2  FEMA expert, but flood zone XC is different
3  than a flood zone A.
4       And I think there's a distinction
5  between a special hazard flood area and a
6  zone that's outside of that area.
7    Q.   But is it your position, Mr.
8  Clark, that you're not even -- and we can
9  look back at Exhibit 17 where Geotrac
10  advised you that SFHA zone A is extremely
11  close to the structure.
12       Let's see. Yes. Structure
13  location based on map provided.
14  Redetermination due to additional research
15  and/or information.
16       As we sit here today, do you know
17  if you're in flood zone XC? Do you have any
18  opinion or any knowledge as to whether
19  you're in flood zone XC?
20   A.   I have no knowledge of what I'm in
21  because this is from Geotrac.
22   Q.   Right.
23   A.   This does not reflect what

51  (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1  Polyengineering done stating the elevation.
2  And also I don't know how they would
3  determine --
4      Q.  Right.
5      A.  -- from the elevation that was
6  shot on this versus what they had on the
7  information here to determine if any of us
8  in that area would ever be subject to a
9  flood area.
10      MR. JARRETT:  Our legal position,
11  we were not going to acknowledge that.
12      MR. COLLINS:  Okay.
13      MR. JARRETT:  He was in a flood
14  zone of any type.  But if he was, it was for
15  somebody else to determine.
16      MR. COLLINS:  Okay.
17      Q.  And you don't know based on that
18  flood elevation -- on that elevation sheet
19  done by the surveyor whether you're in any
20  flood zone at all right now, you have no
21  idea?
22      A.  I'm not an expert in that area.
23      Q.  Okay.

Page 206

1      A.  I couldn't really say because I
2  don't know.
3      Q.  Okay.  We looked earlier at the
4  mortgage document that you signed.  I read
5  paragraph five to you.  And that says in
6  part, borrower shall keep the improvements
7  now existing or hereafter erected on the
8  property insured against loss by fire,
9  hazards included within the term extended
10  coverage and other hazards which lender
11  requires insurance.
12      MR. JARRETT:  Are you back to
13  document No. 1?
14      MR. COLLINS:  Yes.  I'm sorry.
15      Q.  That's Exhibit No. 1.
16      A.  Where are you at?
17      Q.  Paragraph five of the mortgage.
18  It's Bates stamp number -- it looks like
19  twenty-seven.  Keep turning.  That's it.
20  Paragraph five, hazard insurance.  Do you
21  see that?
22      A.  Uh-huh.  Yes.
23      Q.  Is it your position as we sit here

Page 207

1  today that if AmSouth determined that you
2  are extremely close to a flood zone and they
3  want to protect their interest, security
4  interest in your home, would you take
5  exception if they asked you to get insurance
6  right now?
7      A.  Flood insurance?
8      Q.  Flood insurance.  I'm sorry.
9      A.  Are you asking me if they --
10  redirect the question.
11      Q.  And my question is, we've looked
12  at these documents.  You were initially in
13  flood zone A according to the records we
14  looked at.  A map was faxed to you.  You had
15  a survey done.
16      You drew up on the map where your
17  house was located.  And that determination
18  was changed in Exhibit 17 from flood zone A
19  to flood zone XC.
20      And I know you're not admitting --
21  you don't know whether you're in a flood
22  zone or not because you're not a surveyor,
23  you're not an engineer.

Page 208

1      But what I'm saying is, if AmSouth
2  under your mortgage, they said, Mr. Clark,
3  we want you to obtain insurance to protect
4  our interest in your home at 8530 South
5  County Road 55, would you take exception
6  with that?
7      A.  I really can't answer that.
8      Q.  Okay.
9      A.  Because, you know, there's no
10  proof that I'm either in or out of a flood
11  zone.
12      Q.  Okay.
13      A.  From both of these two, one is
14  stating, according to their findings, that,
15  you know, I'm not in a flood area, so to
16  speak.  The other one is saying I'm in XC.
17      Q.  Flood zone XC.  But you don't know
18  the distinction between a flood zone A and a
19  flood zone XC, do you?
20      A.  No.
21      Q.  And as we sit here, you don't know
22  what that means and you don't dispute that,
23  but you don't agree with it one way or the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 209

1  other; right? The XC determination, you
2  don't even know what it means; right?
3      A.  No, I sure don't.
4      Q.  Okay.  Would you agree that
5  AmSouth -- and we talked about this earlier
6  -- has a right to protect its interest in
7  your property?  You'd agree with that;
8  right?
9      A.  Yes.
10      Q.  Okay.  And this paragraph that we
11  just read -- and the mortgage allows the
12  borrower to -- excuse me -- the lender to --
13  let's see -- to require the borrower to have
14  -- to maintain insurance for hazards,
15  hazards included within the term extended
16  coverage and any other hazards which lender
17  requires insurance.
18          And if the lender requires
19  insurance because you're close to a flood
20  zone, wouldn't you agree that that's
21  consistent with this note mortgage?
22      A.  If I am determined by the proper
23  authorities that I am, in fact, in a flood

## Page 210

1  -- or close to a flood zone, then it meets
2  the stipulations of this contract.
3      Q.  Okay.  And you agree you're bound
4  by the contract?
5      A.  Right.
6      Q.  And what proper authorities are
7  you referring to as far as making
8  determinations to the location of your house
9  relative to a flood zone?  Is FEMA the
10  authorities that you deem to be the final
11  authority of that issue?
12      A.  Well, according to AmSouth, this
13  is where they got their information, was
14  from FEMA.  And FEMA stands to be corrected
15  here apparently, according to Geotrac and
16  also to Polyengineering, what I see now.
17      Q.  Okay.
18      A.  Again, I'm not no expert on it.
19      Q.  And you think that that's AmSouth
20  or Dovenmuehle Mortgage's fault?  They
21  shouldn't have had that insurance in place
22  until it was determined definitively whether
23  you were in or out of a flood zone; is that

## Page 211

1  your position?
2      A.  I can't really answer that because
3  I feel that AmSouth should have showed me
4  the courtesy -- and I'm going back to Rose
5  now -- of getting me the proper information
6  that she needed or get someone down here for
7  us to go through the channels of why or why
8  I wasn't in a flood zone.
9      Q.  Right.  And let me just stop you
10  there while we're on the subject.  Is it
11  your habit to record telephone
12  conversations?  What was the purpose of
13  recording all your telephone conversations
14  with AmSouth?
15          MR. JARRETT:  Objection to form.
16      Q.  You can answer.  Is it something
17  that you ordinarily do or is this something
18  uncommon for you to record telephone
19  conversations?
20      A.  After I had made as many phone
21  calls to AmSouth as I had made and gotten
22  the same reply every time, that someone
23  would either call me back or either they

## Page 212

1  would pass me on to someone else, that I
2  felt that I had to start doing like they
3  were doing and record the conversations to
4  where if this did come to pass, that I'd
5  have something as proof that I had tried to
6  resolve this problem.
7      Q.  Right.  And we talked about this
8  earlier.
9          MR. COLLINS:  You had an objection
10  making this part of the record or me reading
11  these into the record?
12          MR. JARRETT:  Reading it into the
13  record without making it part of the record.
14          MR. COLLINS:  Okay.  We might end
15  up making some of these part of the record.
16      Q.  We talked about this earlier.  The
17  people you spoke with at AmSouth and DMI
18  were trying to help you; correct, you just
19  didn't get the answer that you were looking
20  for?
21      A.  I don't really feel they was
22  trying to help me.
23      Q.  They got you in touch with -- they

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 213

1  provided you the information for Geotrac,
2  didn't they?
3      A.  Way after the fact.
4      Q.  They told you where they got the
5  information and they gave you the contact
6  information; right?
7      A.  No.  Now, they told me originally
8  that they got the information from FEMA.
9      Q.  Okay.
10     A.  When I contacted FEMA, FEMA said
11 they did not contact AmSouth Mortgage.
12     Q.  Okay.  Are you saying the
13 representative at AmSouth mislead --
14 intentionally mislead you by telling you
15 that FEMA sent it to them?
16     A.  Somebody did.  And it was
17 AmSouth's number I was talking to.
18     Q.  And ultimately AmSouth told you
19 no, it was provided by Geotrac; right?
20     A.  After I finally got back in touch
21 with them, after they told me that FEMA
22 reported this to them.
23     Q.  Right.

Page 214

1      A.  Now, I don't know who the person
2  was told me no, this information came from
3  Geotrac.
4      Q.  Right.  So there could have been
5  confusion with the first person who told you
6  that it was from FEMA; right?  And the
7  second person you told, they said no, it
8  wasn't from FEMA, it was from Geotrac?
9      A.  Like I said, I spoke to so many of
10 them up there.
11     Q.  Okay.
12     A.  I think they all was confused.
13     Q.  Okay.  But reading this and
14 listening to the tape, at the time of your
15 considerations, they certainly were not
16 unfriendly to you, were they?  They were
17 trying to be helpful?
18     A.  I think they were frustrated with
19 me because I was trying to resolve the
20 problem.
21     Q.  And they wanted you to have the
22 insurance in place first and then resolve
23 the problem second; is that right?

Page 215

1      A.  I don't know if that's what they
2  was trying to do or not.
3      Q.  Well, the insurance was in place;
4  right?
5      A.  Correct.
6      Q.  And you were calling wanting the
7  lender placed insurance taken off before the
8  flood -- before the flood determination
9  issue was resolved; correct?
10     A.  Correct.
11     Q.  You wanted AmSouth to cancel the
12 insurance and then resolve the question of
13 whether you were in a flood zone or out of a
14 flood zone; isn't that right?
15     A.  I just wanted them to get the
16 record straight.
17     Q.  Right.  To cancel the insurance
18 and then figure out whether you were in a
19 flood zone or not in a flood zone?
20     A.  That was the whole objective from
21 the get-go, was to not let it go that far.
22     Q.  Right.  Your objective -- That was
23 your objective?

Page 216

1      A.  And if Rose had of returned my
2  call of what to do, it never would have went
3  that far.
4      Q.  Okay.
5      A.  But I go back to Rose.  She never
6  returned my calls.
7      Q.  But, Mr. Clark, wouldn't you
8  acknowledge -- and you just mentioned you
9  spoke with a lot of people.  You spoke with
10 Rose I think you said in June of '03.
11         If you look at these recorded
12 conversations, you talked with Antoinette,
13 Felice, Karen, a number of people.  Are you
14 saying that Rose is the only person who
15 could have helped you?
16     A.  Well, my conversation with Rose
17 was that she would handle this, that she
18 would get back with me.
19     Q.  Right.
20     A.  And every time I'd call AmSouth,
21 when I'd try to speak to Rose, I'd either
22 get her voice mail or either one of them
23 would tell me she's away from the phone --

54  (Pages 213 to 216)