## FREEDOM COURT REPORTING

| Page 217 | Page 219 |
|---|---|
| 1    Q.  Right. | 1    Q.  Let me show you what I have marked |
| 2    A.  -- or either we can help you.  And | 2  as Defendant's Exhibit 19. |
| 3  I'd say that I need to talk to her.  Well, | 3      (Whereupon, Defendant's Exhibit |
| 4  we can take care of that for you.  So I'd | 4  No. 19 was marked for identification.) |
| 5  start with that person and I'd get the same | 5    Q.  This is entitled confirmation of |
| 6  results every time. | 6  cancellation of lender placed insurance. |
| 7    Q.  And those results would be -- | 7  You see that?  It's kind of cut off at the |
| 8    A.  Nowhere. | 8  top. |
| 9    Q.  -- we've been informed that you | 9      MR. JARRETT:  Do you have copies |
| 10  are in a flood zone and we're going to leave | 10  of that? |
| 11  the insurance in place; right? | 11      MR. COLLINS:  Sure. |
| 12    A.  Nobody was helping me. | 12    Q.  The date is 6-4-04.  You see that? |
| 13    Q.  But they did ultimately send you | 13    A.  Right. |
| 14  Geotrac's contact information; right? | 14    Q.  Okay.  The insurance AmSouth Bank |
| 15    A.  Way after the fact. | 15  has placed on the property shown above is |
| 16    Q.  How long is way after the fact? | 16  cancelled effective 6-10-03 for the |
| 17    A.  We've got it right here.  It's | 17  following reason:  Other insurance coverage |
| 18  that letter we had from Geotrac. | 18  provided.  Any unearned insurance premium |
| 19    Q.  Okay.  In April? | 19  paid will be refunded to your escrow |
| 20    A.  May of 2004 I believe.  On this | 20  account. |
| 21  document.  Yes.  May of 2004 is when I was | 21      Okay.  And the records I have -- |
| 22  contacted by Geotrac.  And amazing, on May | 22  and I've produced them to your attorney -- |
| 23  the 28th is when we got it resolved, just a | 23  indicate that, in fact, the insurance |

| Page 218 | Page 220 |
|---|---|
| 1  few days afterwards. | 1  advance was refunded to your account.  Do |
| 2    Q.  Right.  And we've been over those | 2  you have any evidence to dispute that? |
| 3  letters, Exhibit 17 and 18; right? | 3    A.  I don't understand. |
| 4    A.  Right. | 4    Q.  That the -- This letter is |
| 5    Q.  And it's your understanding as you | 5  reflecting that the premium that had been |
| 6  sit here today that Geotrac provided that | 6  advanced on your behalf which has caused |
| 7  information to AmSouth as to the location of | 7  you, you testified earlier, to fall behind |
| 8  your property; is that your understanding? | 8  on your mortgage -- to fall behind on your |
| 9    A.  Correct. | 9  mortgage -- strike that. |
| 10    Q.  Okay. | 10      I'm getting distracted with your |
| 11    A.  And if AmSouth had of gave me this | 11  wife passing you messages.  Let me start |
| 12  information up front where they obtained the | 12  back over.  The records I provided to your |
| 13  information, this could have been resolved. | 13  attorney reflect -- I know you may not have |
| 14  Didn't take twenty days to resolve it. | 14  these or reviewed them, but the advance that |
| 15    Q.  So they provided you with | 15  AmSouth made -- they advanced money on your |
| 16  Geotrac's information and you think it was | 16  behalf and that caused you to fall a little |
| 17  delayed? | 17  bit behind on your loan; right? |
| 18    A.  After all we went through, the | 18      They took a payment -- that you |
| 19  stress, the heartaches, the telephone calls | 19  sent in for payments and they applied it |
| 20  and everything.  If they had of just told me | 20  towards escrow; right? |
| 21  up front that Geotrac reported this to us | 21    A.  Whatever they did. |
| 22  and let me have contacted Geotrac, they | 22    Q.  Right.  And we looked at those |
| 23  could have helped me solve this problem. | 23  amounts that showed you being behind two |

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

## Page 221

1 thousand nine hundred dollars?
2    A.  Right.
3    Q.  The records that I have and have
4 produced to your lawyer indicate that those
5 amounts were refunded and the late fees that
6 you were charged were refunded.
7        Do you have any evidence to
8 dispute that all the payments that were
9 submitted for insurance that were paid for
10 late fees that were assessed for other
11 charges were not reimbursed to your
12 account?  You were given credit for those
13 amounts?
14    A.  I can't really answer that
15 truthfully because I'm not aware of what all
16 --
17    Q.  Okay.
18    A.  -- they said above and beyond our
19 payments that they had charged us that came
20 into that --
21    Q.  Let me ask --
22    A.  -- two thousand nine hundred
23 dollars there.

## Page 222

1    Q.  Let me ask it this way.  You're
2 currently up to date on your mortgage;
3 right?
4    A.  Right.
5    Q.  You paid seven eighty some odd
6 dollars?
7    A.  Seven eighty-one ninety or
8 whatever.
9    Q.  Okay.  And you're currently up to
10 date; right?
11    A.  Right.
12    Q.  And you never paid the two
13 thousand nine hundred dollars; right?
14    A.  I did.
15    Q.  You paid two thousand nine hundred
16 dollars?
17    A.  I'm not exactly -- the amount or
18 -- When I was down at AmSouth bank, Ms.
19 Jacqueline King, I told her I had to get
20 this thing out of the hands of being
21 foreclosed on and to call and find out what
22 I had to pay.
23    Q.  Right.

## Page 223

1    A.  And whatever that amount was,
2 that's what I sent AmSouth that day.
3    Q.  Okay.  And do --
4    A.  I don't recall what that amount
5 is.  I'd have to look on my notes.
6    Q.  And what I just asked is, do you
7 have any evidence with you that the amounts
8 for insurance and for fees were not refunded
9 to you?  You just don't know sitting here
10 one way or the other?
11    A.  I can't really say that all of
12 those have been refunded or not because when
13 I paid that amount --
14    Q.  Right.
15    A.  -- I don't know how they did all
16 the money.
17    Q.  Do you recall --
18    A.  If they got it all back.
19    Q.  Do you recall getting a check --
20 any check from AmSouth for any amount?
21    A.  I think there was a check returned
22 to us at that time.  I gave it to my
23 attorney.

## Page 224

1    Q.  Okay.
2    A.  So they followed up on what to do
3 with it.
4    Q.  Okay.  And the documents will
5 reflect what refunds and everything you
6 got.  But as you're sitting here today, you
7 know you got some refunds.  But you don't
8 know whether you were fully reimbursed or
9 not; right?
10    A.  Correct.
11    Q.  But your account right now is in
12 good standing, you're up to speed, you're
13 making your P and I payment; right?
14    A.  Correct.
15    Q.  Okay.
16        (Whereupon, Defendant's Exhibit
17 No. 20 was marked for identification.)
18    Q.  Let me show you what I have marked
19 as Defendant's Exhibit 20.  This is a
20 letter, Mr. Clark, dated September 1, 2004.
21        It's from James Brannon with
22 Polyengineering.  I believe it's the Mr.
23 Brannon that we talked about earlier who did

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 225

1 the elevation sheet of your property?
2    A. It is.
3    Q. Okay. And attached to this letter
4 is an invoice. And it states, engineering
5 services in connection with surveying and
6 certifications to FEMA to remove property
7 from one hundred year flood plain.
8    And this goes back to my earlier
9 question. Do you know one way or the other
10 if Mr. Brannon submitted this to FEMA?
11    A. I have no idea.
12    Q. You haven't received any
13 documentation from FEMA in response to this,
14 have you?
15    A. No.
16    Q. Have you had any contact with FEMA
17 since they sent you I guess a map or some
18 information?
19    A. The only thing we got from FEMA
20 was that. Like I said, we never got
21 anything originally stating we was in a
22 flood zone.
23    Q. They just sent you a map?

Page 226

1    A. Right. When we requested it.
2    Q. Okay. And you paid this invoice
3 directly to Polyengineering?
4    A. Eight thirty-nine fifty-five.
5    Q. I'm just going to quickly ask you
6 a couple of questions about your complaint.
7 Before I do that, let me ask you this
8 question.
9    When you first received notice
10 from AmSouth -- I think it was June of '03,
11 July of '03 -- that they had learned you
12 were in a flood zone and you needed to
13 obtain flood insurance, you knew at that
14 point in time that you weren't in a flood
15 zone? It was your opinion then that you
16 were not in a flood zone?
17    A. One way or the other.
18    Q. You didn't know one way --
19    A. I didn't know.
20    Q. Okay.
21    A. I didn't have any documents or
22 nothing stating it.
23    Q. One of your claims in your

Page 227

1 complaint is a violation of the Fair Credit
2 Reporting Act. You state that defendants
3 failed to investigate credit transactions
4 which have been disputed by the Clarks.
5    I don't recall -- and correct me
6 if I'm wrong. You've identified one letter
7 that you wrote to AmSouth regarding your
8 payments and you were going to submit a P
9 and I payment only because the flood
10 insurance issue hadn't been resolved.
11    Are there any other letters you
12 wrote disputing the application of your
13 payments?
14    A. No.
15    Q. So is this referring to phone
16 conversations? When you say that you --
17 that defendants failed to investigate the
18 credit transactions which have been
19 disputed, were those disputes oral disputes
20 you made?
21    A. You're referring to my credit
22 claim?
23    Q. Yes. The credit transactions

Page 228

1 which -- I'll just read the paragraph.
2 AmSouth and Dovenmuehle violated provisions
3 of the Fair Credit Reporting Act and that
4 said defendants failed to investigate the
5 credit transactions which have been disputed
6 by the Clarks.
7    I'm asking you -- I haven't seen
8 any letters where you disputed any credit
9 transactions.
10    A. When we pulled our credit history,
11 it had showed that AmSouth had showed a -- I
12 think a thirty, sixty, ninety day delinquent
13 on our account. Again, that was when I went
14 to Ms. King, Jacqueline King, and shared
15 with her that it was on our credit report,
16 that we needed them to clear my credit
17 report.
18    Q. Okay.
19    A. Pay this money here on
20 Polyengineering.
21    Q. So this is after -- Let me stop
22 you. This is after the insurance had been
23 cancelled and your account was in the

57 (Pages 225 to 228)

# FREEDOM COURT REPORTING

Page 229

1 process of being straightened out? That's
2 when you spoke with Jacqueline King? I
3 guess it would have been after --
4    A. I believe that's correct.
5    Q. After June of '04?
6    A. I believe that's correct. I'd
7 have to look on my notes and see.
8    Q. When you obtained this credit
9 report, did you make a dispute directly to
10 the credit reporting agency or did you just
11 take that to AmSouth?
12    A. I took it I think just to AmSouth.
13    Q. Okay. You don't recall filing
14 anything with TransUnion or anybody like
15 that; right?
16    A. No. I was hoping that in our
17 conversation when they found out that they
18 -- from Geotrac and gotten it resolved --
19 when I talked to them at AmSouth, that they
20 was going to correct all that because I told
21 them that there's two things that I was
22 wanting.
23        And that was to clear up my credit

Page 230

1 report and refund me any money that they
2 owed me. And I would like a letter of an
3 apology for putting me all through this
4 undue hardship.
5    Q. Didn't they -- Didn't AmSouth
6 correct your -- did any negative reporting
7 on your credit report?
8    A. Not at that time.
9    Q. And we'll look at the credit
10 reports that you produced. Didn't AmSouth
11 refund or reimburse your account for any
12 late charges and fees and assessments?
13    A. They have not refunded me for
14 Polyengineering's survey that I had to do or
15 I'm not aware that they have even settled up
16 all the money that I paid out through all
17 this and credited it back to my account.
18    Q. But you haven't done any analysis
19 or had anybody look at your payment history
20 to see if all that money has been credited
21 back?
22    A. I'd have to ask my attorney.
23    Q. Well, I'm asking if you know.

Page 231

1    A. It's supposed, I think, to be
2 done. Am I correct on that, Mr. Attorney?
3    Q. But as we sit here today, your
4 account could have been credited, you just
5 don't know one way or the other?
6    A. Right.
7    Q. What about your credit history
8 being correct? As we sit here today, do you
9 know one way or the other whether that has
10 occurred?
11    A. I don't know if it's been
12 straightened out or not.
13    Q. Okay.
14    A. Because the last one I pulled just
15 -- it's got little X's under it, the
16 mortgage for those three months. I don't
17 know what the little X's stand for.
18    Q. Okay. Well, let's look at that
19 real fast. Because I'll represent to you in
20 the documents that I've produced to your
21 attorney, there's three or four reports that
22 were negative during the time period when
23 you were not submitting an increased payment

Page 232

1 because you were not submitting -- you
2 refused to pay for the forced placed
3 insurance.
4        And we've talked about that
5 earlier today. And there was some negative
6 reporting to the credit reporting agencies.
7 But the documents I produced -- and I know
8 you haven't had an accountant or an attorney
9 look at them -- reflect that those amounts
10 have been refunded and that the credit
11 history has been corrected. Let me show you
12 --
13        MR. JARRETT: I'm going to object
14 to your testimony.
15        MR. COLLINS: Okay. Well, I'm
16 saying it's reflected in the records.
17        (Whereupon, Defendant's Exhibit
18 No. 21 was marked for identification.)
19    Q. I'm showing you, Mr. Clark, a
20 TransUnion credit transaction report that
21 was printed out on October 27, '05. And
22 I've just tabbed the page with the AmSouth
23 mortgage loan.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 233

1    If you'll look at it with me. It
2    has your transaction history. First of all,
3    is that the correct credit line number,
4    3003103003072091.
5    A. That's it.
6    Q. Okay. Now, if you'll look at this
7    document, it reflects your payment history
8    dating from October of -- let's see -- '03
9    through September of '05; is that correct?
10    A. Correct.
11    Q. Okay. And in this left box, it
12    has late payments thirty, sixty, ninety. Do
13    you see that?
14    A. Correct.
15    Q. And it's got zero, zero, zero in
16    all three categories; correct?
17    A. Correct.
18    Q. And your problems or your problems
19    you were having with your mortgage loan were
20    between I guess, what, June of '03 and you
21    resolved it, what, in April of '04;
22    correct? Is that April of '04?
23    MR. JARRETT: It's close.

Page 234

1    Q. If you look at that with me, it
2    states okay in every box up until April, May
3    and June of '04; correct?
4    A. Correct.
5    Q. And you don't know what these X's
6    mean, do you?
7    A. No.
8    Q. You testified earlier that those
9    X's were negative. Do you know that one way
10    or the other or is that just your
11    assumption?
12    A. Well, because of the report that
13    we got before that was put in there shows
14    that they are delinquent.
15    Q. Do you have a copy of that report?
16    A. That's the one that we provided.
17    Q. Okay. The one you gave us this
18    morning?
19    A. Yes.
20    Q. Well, just for the record, the X
21    in those boxes reflect -- let's see where
22    the key is -- reflects unknown; isn't that
23    correct? It's not saying that you're thirty

Page 235

1    days or sixty days or ninety days late, but
2    unknown; is that right?
3    A. That's what it's saying on that
4    paper.
5    Q. And again, this document is
6    October 27, '05. And as of September of
7    '03, through the present, there's no
8    negative reporting on your credit
9    transaction report, is there?
10    MR. JARRETT: What is the date of
11    that credit report, please?
12    MR. COLLINS: October 27, '05.
13    MR. JARRETT: 2005?
14    MR. COLLINS: Yes.
15    Q. And it goes back to September --
16    at least September of '03. It goes back
17    actually until October of 2002 actually. So
18    from October of '02 through September of
19    '05, there's no negative reporting on here;
20    correct? There's no thirty day, sixty day,
21    ninety day?
22    A. Not on that report.
23    Q. Okay. I'm not going -- I don't

Page 236

1    think I need to make this an exhibit. But
2    you have -- you've printed out a report for
3    your wife as well. And just for the record,
4    I want you to look at it.
5    Here we go. We can determine it's
6    the same information reflected, that you're
7    current. No late payments, thirty, sixty or
8    ninety days late from October of '02 through
9    September of '05; is that right?
10    A. That's correct.
11    Q. So according to this document we
12    looked at, any past negative reporting is no
13    longer reflecting on your records; right?
14    A. As to -- The X's, I mean, does not
15    show like the rest of the boxes. So if I
16    was looking at it, I'd say something was
17    wrong with that credit report if I didn't
18    understand the meaning of it.
19    Q. Right. But we looked at the table
20    of contents. And it states that if there's
21    an X, it just means that it's unknown. They
22    are not reporting. Do you agree with that?
23    A. Well, that's what that's saying.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 237

1  But what happens when someone pulls your
2  credit and they look at that and there's an
3  X and it's unknown, what are they to say
4  about it.
5     Q.  Well, I would assume if they are
6  pulling credit reports, they know how to
7  read them.
8     A.  What does unknown mean to you?
9     Q.  Well, it says that there's no
10  reporting during that time period.
11    A.  Okay.  Well, why wouldn't there
12  be?
13    Q.  It's not thirty days late, sixty
14  days late or ninety days late, is it?
15    A.  I don't know that.  But something
16  went on it.
17    Q.  Well, that's what it says; right,
18  that you're not being reported as late?
19  That's what I'm asking you.
20    A.  Right.
21    Q.  So you're saying an X means that
22  it could be negative?  Is that what you're
23  saying?

Page 238

1     A.  I don't know what these credit
2  companies look at.  Apparently, I mean,
3  we're talking about my home here.  There's
4  something went on is what I'm saying.  If I
5  was looking at it, what's the problem.
6     Q.  What credit were you denied as a
7  result of having negative reports on your
8  loan for -- I'm not sure what the period of
9  time was.  Did you apply for a loan and was
10  turned down?
11    A.  We applied for a Sears new account
12  for a different interest rate and were
13  denied it.
14    Q.  Do you have that application?
15    A.  They just -- I don't know if it's
16  in those documents.
17    Q.  I didn't see it in the documents.
18  Could you look for that if you kept an
19  application?
20    A.  I'll try to find that.
21    Q.  Any other extensions of credit
22  that you were turned down for and do you
23  know when that was, what month that would

Page 239

1  have been?
2     A.  I can't really --
3     Q.  Was it in '04, '05?
4     A.  We was in Sears that day and they
5  were running that special and we applied for
6  it.
7     Q.  Was it recently or was it in the
8  past?
9     A.  It was shortly after all that.
10    Q.  Shortly after this -- after your
11  flood issue had been resolved and the
12  insurance had been cancelled?
13    A.  No.  It was during the time that
14  that was reported on our credit, that we was
15  delinquent on the account.
16    Q.  Any other extensions or credit or
17  change of terms of credit that you were
18  denied?
19    A.  I didn't apply for anything else
20  after that.
21    Q.  Let me ask you this question.
22  This report that you have given me reflects
23  an adverse account for Citi Cards with a

Page 240

1  delinquency and then a -- let's see -- a
2  collection account from Pilgrim Management.
3     Did that have any impact in your
4  opinion on your ability to get refinancing
5  or a different interest rate with Sears?
6  Look at this right here.
7     A.  I don't know who Pilgrim Capital
8  Management is.
9     Q.  So you don't know why there is a
10  collection account for eleven thousand one
11  hundred and ninety dollars?
12    A.  I sure don't.
13    Q.  Original creditor First Omni?  I
14  believe they finance cars.  Did you have a
15  transaction or a credit or a loan from First
16  Omni?
17    A.  We had a World Omni.  That might
18  have been First Omni.
19    Q.  But you're --
20    A.  Years ago.
21    Q.  And you're not -- You have no idea
22  what this account is for, why it's in
23  collection status?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 241

1    A.  The only thing that I can say
2  there is this company apparently is taking
3  that First Omni account.  That account
4  shouldn't be on there.
5    Q.  So date placed for collection,
6  6-02.  Estimated date this item will be
7  removed, August of 2007.  Do you see that?
8    A.  That isn't even when we had the
9  account with World Omni.  That was back in
10  the '90's, wasn't it?
11    Q.  Do you have an opinion as to
12  whether this would have had an impact on
13  your ability to obtain any new finance term
14  with Sears?
15    A.  Well, it could, if it was on there
16  at the time.  I don't know if it was on
17  there at the time.
18    Q.  It doesn't state when it was put
19  on there.  It just says placed in collection
20  '02.  Will be removed in '07.
21    Here's a document that your
22  attorney provided this morning.  I'll mark
23  this as Defendant's Exhibit 22.

Page 242

1    (Whereupon, Defendant's Exhibit
2  No. 22 was marked for identification.)
3    Q.  It's an Equifax credit report
4  dated May 28, '04.  It is reflecting that
5  you're currently thirty plus days past due
6  on the mortgage loan we're here about today;
7  is that right?
8    A.  Yes.  That's the -- Yes.  Current
9  status, thirty to fifty-nine days past due.
10    Q.  But you would agree with me that
11  this is not appearing on the more recent
12  statement that you got; right?
13    A.  Not on this day you furnished.
14    Q.  And this was pulled again on May
15  28, '04, which would have been -- let's see
16  -- which would have been prior to the time
17  that AmSouth cancelled your insurance and
18  refunded certain amounts to your account;
19  correct?
20    A.  Correct.
21    Q.  Okay.
22    MR. STOTT:  Let the record reflect
23  that we've only gotten pages three and four

Page 243

1  of the twelve page document from Equifax.
2  We don't know when the credit information
3  might appear on that document.
4    Q.  The next count in your complaint
5  is Fair Debt Collection Practices Act.  I
6  just want to ask you a question.  Similar to
7  your Fair Credit Reporting Act claim, it
8  says that AmSouth, a defendant, failed to
9  timely and accurately investigate your
10  disputes.
11    Is that what you were referring to
12  earlier?  You thought that AmSouth could
13  have moved quicker to resolve your dispute
14  regarding the flood insurance?
15    A.  I believe that if Rose had of
16  gotten me the information we needed when I
17  was dealing with her and she told me she
18  would get back with me, yes, this would have
19  been resolved within weeks or even less than
20  that, days.
21    Q.  Okay.  And I ask this again just
22  for the record.  Other than that one letter
23  we've looked at, you didn't write any

Page 244

1  letters to AmSouth disputing payments,
2  disputing credit reporting or anything like
3  that, did you?
4    A.  No.
5    Q.  Okay.
6    A.  The only other thing was the
7  notation that Jacqueline King was trying to
8  help get it all resolved.
9    Q.  Okay.  And that would have been
10  after the time your insurance was cancelled
11  and you were in the process of getting it
12  all straightened out?  Do you know when you
13  went --
14    A.  Again, I need to look at the -- I
15  think when I talked with Jacqueline --
16  because the guy that she talked with, with
17  AmSouth, when he was aware of the fact that
18  there -- because of force placed insurance
19  and we was trying to resolve the amount of
20  money and everything and get all this
21  calculated, it was brought up about the
22  Polyengineering and all that, what they
23  needed to do to resolve it.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 245

1    Q. Okay. What did she say to that?
2    A. Well, ever who she talked to again
3 there, that's on that document. You've got
4 a copy of it, I'm pretty sure, we furnished
5 you from her where she wrote down the notes
6 and all the what and who she talked to.
7    Q. I don't think I have seen that
8 document. I haven't seen that document.
9 And again, since the Polyengineering
10 statement to you is dated September, it
11 would obviously be around September or after
12 of '04; right?
13    A. Approximately. I won't say. I'm
14 not for sure.
15    Q. Okay. I've asked you a lot of
16 questions about refunds. And you said, as
17 you sit here today, you just don't know one
18 way or the other whether the correct amount
19 was provided back to you after the insurance
20 was cancelled, whether all your late fees
21 were refunded, you just don't know yourself
22 because you haven't looked through all the
23 documents; right?

Page 246

1    A. Correct.
2    Q. But your mortgage is up to date
3 and current right now; right?
4    A. Correct.
5    Q. How have you been damaged, Mr.
6 Clark, in this case?
7    A. Let me rephrase that. I'm not for
8 sure that my account is up to date.
9    Q. Okay.
10    A. Because on my amortization that I
11 got from AmSouth Mortgage, it doesn't
12 correspond with what they send out each
13 month now.
14    Q. I'm not sure --
15    A. Of what's owed. In other words,
16 my principal balance. I got an amortization
17 that supposedly, you know, shows how this
18 mortgage is running out, the time I obtained
19 it --
20    Q. Right.
21    A. -- from AmSouth when they took
22 over.
23    Q. Right.

Page 247

1    A. And as of today, it's running
2 somewhere -- I haven't checked it lately.
3 But the last time I did check, it's running
4 somewhere between four and five thousand
5 behind what the principal balance is
6 supposed to be and what AmSouth shows on my
7 statements each month.
8    Q. So you're talking about paying the
9 loan off over the term. You're saying
10 you're not certain if it's going to pay off
11 over the term? Is that what you're saying?
12    A. What I'm saying is, the
13 amortization I got from AmSouth --
14    Q. Right.
15    A. -- back in '92, 3, whenever they
16 took over -- and using this as an example --
17 saying I'm -- according to that amortization
18 this month, I'm supposed to owe say eighty
19 thousand dollars.
20       On my monthly statement I'm
21 getting, it's showing like eighty-four
22 thousand or eighty-five thousand still due
23 of principal.

Page 248

1    Q. Okay. And when you received that
2 amortization, you were under a variable
3 interest rate loan; correct?
4    A. Correct.
5    Q. Have you had another amortization
6 schedule performed after you went to a fixed
7 rate?
8    A. What would be the need?
9    Q. Wouldn't that impact the payout of
10 the loan?
11    A. No.
12    Q. If you're paying --
13    A. Not according to the principal
14 because the interest wouldn't have any
15 bearing on the principal amount.
16    Q. Okay. So you think your principal
17 amount is behind schedule?
18    A. Correct.
19    Q. Do you have any documents that --
20 you're just referring to your schedule and
21 everything?
22    A. Yes. The amortization that
23 AmSouth gave me back when they took the

62 (Pages 245 to 248)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 249

1  mortgage over. Like I said, my current
2  statement.
3     Q.  And you're just saying that you're
4  not certain that there's something wrong,
5  that just drew your attention; right?
6  There's no claim in this lawsuit about that,
7  is there?
8     A.  I don't know if that's part of it
9  or not. I've shared this with my attorney,
10  that it's off. So I don't know if it's part
11  of this or -- I just know it's not where the
12  amortization says it's supposed to be.
13     Q.  And you've produced that
14  amortization right?
15     A.  Correct.
16     Q.  And do you keep your monthly
17  statements and your coupons?
18     A.  Yes.
19     MR. COLLINS: Could you produce
20  those to us, Cliff, his coupons? I don't
21  know think he's produced any of those.
22     MR. JARRETT: You produced some of
23  them. I'll go back and see and give you a

Page 250

1  supplemental.
2     MR. COLLINS: Okay.
3     Q.  Any other damages that you've
4  suffered or you're claiming in this case?
5     A.  Nothing other than just the pure
6  aggravation of it, the stress of it. As I
7  told the people at AmSouth, I'm a heart
8  patient. My blood pressure has been
9  elevated.
10     I'm having to take more blood
11  pressure medicine. I don't like trying to
12  resolve a problem and feel like I'm the only
13  one trying to get to the bottom of it.
14     It brought a lot of stress on me
15  and my wife because, I mean, it's not fun
16  when you get letters stating about to
17  foreclose and you're doing everything you
18  can to try to resolve the issue.
19     It's been a lot of mental anguish
20  in it. I've tried to be as cooperative as I
21  could with them.
22     Q.  Have you seen a doctor for stress
23  or anything like that?

Page 251

1     A.  I sure have.
2     Q.  Who's your doctor?
3     A.  Dr. Mancuso.
4     Q.  And what is his specialty?
5     A.  She's my family physician.
6     Q.  Okay. Any other doctors you have
7  seen?
8     A.  No more than my cardiologist.
9     Q.  Okay.
10     MR. STOTT: Who's that?
11     THE WITNESS: Dr. Brooks.
12     Q.  Brooks. Okay. And when did you
13  -- You had some type of heart surgery? Is
14  that what you said?
15     A.  I had bypass surgery in 2002.
16     Q.  2002? Okay. And you're saying
17  that dealing with this issue made it more
18  stressful for you? Is that what you're
19  saying?
20     A.  Yes, sir.
21     Q.  And you've been telling me about
22  how AmSouth wouldn't work quickly enough to
23  get it resolved in your opinion; correct?

Page 252

1     A.  Correct.
2     Q.  And the letters I've shown you,
3  you'll acknowledge that they state that
4  AmSouth has -- is required to obtain that
5  insurance, that certain criteria are met and
6  they are given information about where your
7  house is located vis-a-vis a flood zone;
8  correct?
9     A.  Correct.
10     Q.  And in your opinion, you wanted
11  AmSouth to not require the insurance until
12  the location of your house vis-a-vis the
13  flood zone was resolved; is that right?
14     A.  I wanted Rose to respond --
15     Q.  Right.
16     A.  -- like she told me she was.
17     Q.  In fairness, you spoke with Rose
18  in June of '03?
19     A.  Correct.
20     Q.  This problem is going -- it
21  extended until May, June of '04; right?
22     A.  Correct.
23     Q.  Were you still waiting on Rose's

63  (Pages 249 to 252)

# FREEDOM COURT REPORTING

Page 253

1  phone call?
2      A.  Well, I would have thought she
3  would have returned a call by then.
4      Q.  But you talked with ten or
5  fifteen, twenty people in the interim;
6  right?
7      A.  That's correct.  Every time I'd
8  call for Rose, either she was away from her
9  desk -- I've left her messages.
10     Q.  So you wouldn't speak with anybody
11 but Rose?
12     A.  Well, I figured she was the one
13 that told me what she was going to do and I
14 was expecting her to be the one to do it.
15     Q.  Okay.  We've been through this a
16 few times.  But didn't you consistently get
17 a response from AmSouth saying the insurance
18 has to stay in place until either a LOMA is
19 obtained or additional information is
20 provided that establishes that you're
21 outside of the flood zone?
22         Didn't AmSouth keep telling you
23 that?  We cannot take the insurance off

Page 254

1  until we receive some type of determination
2  that you're not in a flood zone?
3      A.  In answer to that, yes.  But I was
4  still asking them what did I need to do.
5      Q.  And they provided you with
6  Geotrac's information; right?
7      A.  When they finally gave me Geotrac,
8  then we got it resolved.
9      Q.  And the first letters that went to
10 you also said you can call FEMA; right?
11     A.  Correct.
12     Q.  You could have asked for a LOMA;
13 right?
14     A.  I didn't know who to ask for.
15     Q.  Okay.  Are you currently under Dr.
16 Brooks' care?
17     A.  Yes.
18     Q.  And Dr. Mancuso's care?
19     A.  Yes.
20     Q.  Any other physicians?
21     A.  They are the only two that's
22 doctoring me for my bypass surgery and blood
23 pressure.

Page 255

1      Q.  Okay.  Are you taking any --
2  Obviously you're taking blood pressure
3  medication.  Are you taking any other type
4  of medication for anxiety or stress?
5      A.  I'm prescribed an anxiety
6  medicine.  I can only take it when I'm at --
7  when I know I'm going to be at home.
8      Q.  But you're taking that now; right,
9  or you're prescribed it?
10     A.  I'm prescribed it.  I try not to
11 take it.
12     Q.  When was the first prescription
13 written for anxiety or stress?
14     A.  I can't really say.  It's been
15 several months back.
16     Q.  Okay.  Have you been doing any
17 better?
18     A.  When I take it.
19     Q.  Right.
20     A.  When my blood pressure medicine --
21 cause my blood pressure is elevated.
22     Q.  Right.
23     A.  I take it.  It brings it down.

Page 256

1      Q.  Were you taking it before your
2  2002 bypass?
3      A.  Oh, yes.
4      Q.  And who prescribed the anxiety
5  medication?
6      A.  Dr. Mancuso.
7      Q.  Okay.  Is she located here in --
8  It's a she; right?
9      A.  Yes.
10     Q.  Is she here in Dothan?
11     A.  Dothan.
12     Q.  Okay.  Do you know how to spell
13 her name?  M-A-N-C-U --
14     A.  S-O.
15     Q.  Okay.  Do you know Dr. Brooks'
16 first name?
17     A.  Roland Brooks.
18     Q.  Roland.  Okay.  We talked about
19 the two lawsuits you were involved in, the
20 prior lawsuit with AmSouth and the lawsuit
21 brought against you by Liberty National.
22 Any other lawsuits, plaintiff or defendant
23 or otherwise, that you've been involved in?

64  (Pages 253 to 256)

**FREEDOM COURT REPORTING**

Page 257

1    A.  Not that I can recall.
2    Q.  Okay.  Have you ever had a
3  creditor file an action against you?
4    A.  What do you mean?
5    Q.  A district court action or a
6  creditor trying to collect on an account?
7    A.  No.  Well, I had a disputed
8  account.  We resolved it.
9    Q.  Who was that with?
10   A.  Alltel.
11   Q.  Okay.  Cell phone?
12   A.  Correct.
13   Q.  Okay.  Has that been recently?
14   A.  That's been years ago.  Probably
15  in the '80's.
16   Q.  Had charges on there that you
17  disputed?
18   A.  Right.
19   Q.  Okay.  This is actually in '03,
20  Alltel.  Does that sound --
21   A.  Not in '03.
22   Q.  Maybe it's still reporting in '03
23  I guess.

Page 258

1    MR. STOTT:  It's probably the
2  charge off date.
3    Q.  Is that when you disputed it, in
4  '03?
5    A.  No.  I haven't been with Alltel in
6  --
7    Q.  Okay.  Any other disputes with
8  creditors?
9    A.  Not that I'm aware of.
10   Q.  Okay.  Have you ever had a home
11  foreclosed upon?
12   A.  No, sir.
13   Q.  Okay.
14   A.  Your last question.
15   Q.  Right.  Was whether you had had a
16  home foreclosed on.
17   A.  Okay.  I haven't been foreclosed,
18  but AmSouth has went through this proceeding
19  twice in the first suit and then, of course,
20  this one.
21   Q.  Well, since your letter is saying
22  that certain amounts weren't paid, your loan
23  would be referred to foreclosure?

Page 259

1    A.  Right.
2    Q.  But your house has never -- You
3  never had a home --
4    A.  No.
5    Q.  -- that was foreclosed upon and
6  sold?
7    A.  No.
8    Q.  You mentioned that you no longer
9  bank at AmSouth; is that right?  I'm sorry.
10  You said you had a checking account still
11  there?
12   A.  Right.  It's just inactive.
13   Q.  What's your active bank account?
14  What bank is that with?
15   A.  Army Aviation and Wachovia.
16   Q.  Do you have two additional
17  checking accounts or are they savings
18  accounts?
19   A.  They are checking accounts.
20   Q.  Okay.  And the AmSouth Bank is not
21  active.  What account do you pay your
22  mortgage out of?
23   A.  The Wachovia.

Page 260

1    Q.  Okay.  I'm going to ask your wife
2  these questions, but it seems to me that you
3  were the individual who was primarily
4  involved in dealing with and responding to
5  letters from AmSouth, talking with Geotrac,
6  contacting FEMA and generally the person
7  involved in trying to get the issue
8  resolved; is that right?
9    A.  Correct.
10   Q.  You mentioned earlier that your
11  wife is the financial person, I guess, since
12  she writes the check.  Explain that to me.
13  How does that work?
14     You handled the dispute aspect of
15  this and she would write the check for the
16  amount that you told her to?  How does that
17  work?
18   A.  She takes care of writing all the
19  bills and keeping all the documents in order
20  for us.
21   Q.  Okay.  But you handled the
22  communications with AmSouth?
23   A.  Right.

65  (Pages 257 to 260)

# FREEDOM COURT REPORTING

Page 261

1    Q.  And you wrote the letter we talked
2  about?
3    A.  Correct.
4    Q.  Would you discuss this issue with
5  her or did you handle it solely yourself?
6    A.  We would discuss it.
7    Q.  You would make the calls and the
8  contacts and you talked with the engineering
9  company that came out there and then you
10  would discuss it with your wife; right?
11    A.  Correct.  We talked everything --
12  with everything that was going on.
13    Q.  Okay.  But she didn't have any
14  direct communications with either AmSouth or
15  Geotrac to your knowledge?
16    A.  She has talked with them probably
17  on a few occasions.  Or maybe when they
18  would call back --
19    Q.  Right.
20    A.  -- and either direct the call back
21  to me or something.
22    Q.  Okay.  And she would say either
23  you're not here or she'll have you call them

Page 262

1  back?
2    A.  Correct.
3    Q.  Does she handle all the finances
4  as far as the cars and all that stuff?
5    A.  I try to let her to, yes.
6    Q.  Okay.
7    A.  There are some things I handle.
8        MR. COLLINS:  I think that's all I
9  have.
10  EXAMINATION BY MR. STOTT:
11    Q.  Mr. Clark, we met before your
12  deposition started.  My name is Joe Stott.
13  I represent Geotrac.  I just want to ask you
14  a handful of questions.  They have primarily
15  covered the main issues and a few things
16  that relate specifically to Geotrac.
17        I want to ask you about those.
18  First of all, I want to take you back a
19  little bit in your deposition.  There was a
20  point that you were asked when you first had
21  any contact with Geotrac and Attorney
22  Collins said could that have been as early
23  as the September, October, November area.

Page 263

1        I think you had since modified
2  that answer to say that it was around the
3  time you got that first letter in May that
4  you first had any contact with Geotrac; is
5  that right?
6    A.  Correct.
7    Q.  Okay.  So when you answered
8  earlier, you didn't have that letter in
9  front of you and that's why you were having
10  to kind of guess at those dates?
11    A.  Right.
12    Q.  You indicated that once you had
13  some communications with Geotrac, once you
14  found out who they were, that they even
15  existed, you were able to get everything
16  resolved in less than a month; right?
17    A.  Yes.
18    Q.  Was Geotrac responsive to your
19  questions when you called them and talked to
20  them?
21    A.  Yes.
22    Q.  Was everybody cooperative with you
23  and polite?

Page 264

1    A.  Yes.
2    Q.  Pretty happy with how they handled
3  things at least when you talked to them?
4    A.  Yes.
5    Q.  I want to take you back before May
6  now and while we're going through all these
7  problems.  The first thing I'd like you to
8  do is tell me when you first acquired the
9  land that your house is on.  Do you recall
10  that?
11    A.  Just approximately the year 1971.
12    Q.  You mentioned that you have lived
13  there for thirty-three years.  Did you own
14  the land without anything on it for a little
15  while?
16    A.  No.  We had a mobile home that we
17  pulled on it at the time.
18    Q.  Have you ever owned more than just
19  the parcel that you have now?
20    A.  Yes.
21    Q.  Okay.  Did you subdivide a portion
22  off of your land and sell to someone else?
23    A.  Yes.

66  (Pages 261 to 264)

# FREEDOM COURT REPORTING

Page 265

1    Q.  Would that be the portion that you
2   have told us about that you pointed to and
3   said that's my neighbor's house?
4    A.  Correct.
5    Q.  Can you tell me when that was
6   roughly?
7    A.  Probably approximately about
8   twenty-five years ago.
9    Q.  Late '70's give or take?
10   A.  Somewhere along in that time.
11   Q.  Okay.  Let me show you the map
12  that is attached to Exhibit 16.  I think
13  this is probably the easiest way to do it
14  because it's not that hard.  You have
15  Exhibit 16 there, don't you?
16   A.  Yes.
17   Q.  Turn to it and look at the map if
18  you don't mind.  It's the second page of
19  Exhibit 16.  That's all right.  We can just
20  look at this one.
21       MR. JARRETT:  Look at his and I'll
22  find it.
23   Q.  If you'll look on Exhibit 16, the

Page 266

1   second page, your parcel is marked as parcel
2   number two; correct?
3    A.  Right there.
4    Q.  And then there's a parcel right
5   next to that where I believe you were
6   talking about earlier that your neighbor
7   lives on is marked as parcel two point oh,
8   oh, one.
9        See what I'm talking about?  Right
10  here.  Two point oh, oh, one.  There's a
11  line here on the exhibit.
12   A.  Okay.
13   Q.  And the reason that's two point
14  oh, oh, one is that it used to be part of
15  parcel two.  So they named it two point oh,
16  oh, one and just broke it down.
17       And if you broke it down again, it
18  would be two point oh, oh, two, two point
19  oh, oh, three and so on.  Is that the
20  portion that you used to own that you sold?
21   A.  That's correct.
22   Q.  Is that -- If we put parcel two
23  and two point oh, oh, one together, would

Page 267

1   that be the whole thing that you originally
2   bought around 1970 -- did you say '71 or
3   '70?
4    A.  I obtained both of these at two
5   different times.
6    Q.  Okay.  Tell me when you bought
7   parcel two.
8    A.  Parcel two?
9    Q.  Well, let me ask you this.  Which
10  one did you own first, the one you live on
11  now or your neighbor's?
12   A.  Two.
13   Q.  The one you live on now?
14   A.  Yes.
15   Q.  When did you acquire the one I'll
16  just say next door?
17   A.  Approximately two or three years
18  later.
19   Q.  Did you buy it from the same --
20  both parcels from the same person?
21   A.  Yes.
22   Q.  And who was that; do you remember?
23   A.  James Hughes.  Willie Lewis.  Not

Page 268

1   James Hughes.  Willie Lewis.
2    Q.  Do you know if Mr. Lewis ever
3   actually went through the process of legally
4   subdividing those two pieces of property?
5    A.  I really don't know.  We had two
6   deeds.  We had two deeds.
7    Q.  Okay.  Do you know if at one time
8   they were considered to be a single lot or a
9   single parcel together?
10   A.  All of this land right here was
11  all together.  We bought this part and then
12  bought the second part of it.
13   Q.  I don't know if you're familiar
14  with the way that the -- that they list
15  these different pieces of property on
16  documents like this.
17       I think this is probably a tax
18  assessor's map that we're looking at that's
19  attached to the Polyengineering -- Mr.
20  Brannon's thing.
21       You see how some of them are a
22  full number, like number fourteen, number
23  one, number two, number sixteen.

67 (Pages 265 to 268)

# FREEDOM COURT REPORTING

Page 269

1     And then some of them are -- like
2  all the different thirteens, you have
3  thirteen, a thirteen point oh, oh, one, a
4  thirteen point oh, oh, two and a point oh,
5  oh, three and a point oh, oh, four.  Does
6  that mean anything to you?
7     A.  No, not really.
8     Q.  All right.  I didn't know if you
9  were familiar with how they do that on these
10  maps.  The way I understand it is that
11  parcel two used to be both your land and
12  your neighbor's land.
13     And then at some point, it was
14  broken down into two parcels so that it
15  became parcel number two and parcel number
16  two point oh, oh, one.  And the reason for
17  me saying all that stuff is to ask you
18  this.
19     Do you know when that happened,
20  when it legally became two parcels on the --
21  like this tax map?
22     A.  I have no idea.
23     Q.  That's not something that you did?

Page 270

1     A.  No, sir.
2     Q.  So you basically bought the second
3  parcel, the one where your neighbor lives,
4  and then a few years later, you sold it?
5     A.  Yes.
6     Q.  Was there a house or a structure
7  on it when you sold it?
8     A.  No.
9     Q.  Just unimproved land, a lot?
10     A.  Yes.  Just a lot.
11     Q.  Who did you sell it to?
12     A.  Webb and Ruby Exum.
13     Q.  How do you spell their last name?
14     A.  E-X-U-M.
15     Q.  Are they still the owners today?
16     A.  She is.  He's deceased.
17     Q.  All right.  And at some point,
18  they put some type of structure on that
19  property; right?
20     A.  Correct.
21     Q.  Is it a permanent house or is it a
22  mobile home or what?
23     A.  It's a brick home.

Page 271

1     Q.  Okay.  Do you know about when it
2  was that they built their home?
3     A.  It's probably been about
4  twenty-seven, twenty-eight years ago.
5     Q.  Not too far after you sold it to
6  them?
7     A.  Right.
8     Q.  We can't see it real well on the
9  maps that are in Exhibit 9.  I know you have
10  those because I saw you thumbing through
11  them just a minute ago.
12     MR. STOTT:  Is it okay if I walk
13  over there and point?
14     MR. JARRETT:  Yes.  That's fine.
15     MR. STOTT:  I don't like to hover
16  over anybody's client without asking their
17  permission.
18     Q.  You don't have to pull it out.
19  I'll bring this one over here.  I looked as
20  close as I could and I seem to recall and I
21  can sort of see where there's a line that
22  goes across.
23     And it looks like there might even

Page 272

1  be a little box shown on the darkened area
2  on the maps on Exhibit 9.  Do you remember
3  if that had a line in a different place than
4  you drew the dotted line showing that
5  property?
6     A.  I drew this line here.  But this
7  line that was coming through here -- Now,
8  the map we got -- is this the one from
9  Geotrac?
10     Q.  It's the one that you got directly
11  from FEMA.
12     A.  From FEMA.  Okay.  There's not --
13  I don't have no idea about this.  I just
14  know the one on Geotrac, this is not as dark
15  and all.  And it shows a house here and a
16  house here.
17     Q.  And it shows a property line that
18  actually incorporates both your property and
19  your neighbor's property; correct?
20     A.  Yes.
21     Q.  And it shows it as all one parcel?
22     A.  I believe so.  Now, I'm not for
23  sure.  I don't know if they had this line on

68  (Pages 269 to 272)

## FREEDOM COURT REPORTING

Page 273

1 that one from Geotrac or not. I just know
2 that they had the line drawed to this house.
3      Q. Okay.
4      A. Which that's my house there.
5      Q. I'll tell you what. I'm going to
6 just draw on this. I'm going to mark it as
7 a separate exhibit.
8      MR. STOTT: Did we leave off on
9 22? Is that the last one?
10      MR. COLLINS: Yes.
11      Q. We'll call this Exhibit 23.
12      (Whereupon, Defendant's Exhibit
13 No. 23 was marked for identification.)
14      Q. It will just be one page. When
15 you first got this -- I know it's darker now
16 -- was it drawn about like I've shown with
17 the house drawn in like that and then you
18 had to put the divided line to show where
19 the two pieces of property separate?
20      A. I think all I did was from FEMA --
21 If this one come from FEMA, it was like that
22 and I just showed a divider through it.
23 That's where my house was at, was in that

Page 274

1 area there trying to show it to AmSouth.
2      Q. But the line that I have just
3 drawn, that actually was on this -- and I
4 might not have it in the exact right place.
5      But there was a line showing -- At
6 the end of a piece of property, it just --
7 they had lined the wrong place incorporating
8 your property and your neighbor's property;
9 correct?
10      A. According to the one now that we
11 got from y'all and according to this one,
12 that's the way this map here was laid out
13 with the flood areas they call them that we
14 got from Geotrac. It lays out basically the
15 same way. But this house was sitting there.
16      Q. Okay. I just want to make sure
17 we're on the same page here. All I'm trying
18 to ask you is, when you got this map from
19 FEMA, it did show a property line, but it
20 showed it way up here on the other side of
21 your neighbor's property instead of way back
22 here where you had to draw it in; correct?
23      A. Again, I can't say because I don't

Page 275

1 know if it was showing through the dark spot
2 on the copy I got from FEMA.
3      Q. Okay. So you just don't know
4 what's underneath this dark part?
5      A. I don't.
6      Q. You said the one you got from
7 Geotrac was a little bit lighter?
8      A. What I do know -- see, this is the
9 boundary line of the city limits. And my
10 house is the first house when you cross the
11 Cottonwood city limits.
12      Q. Okay.
13      A. So that would be that house there.
14      Q. Okay. You also said you got a map
15 similar to this or almost exactly the same
16 except the dark spot was lighter?
17      A. Right.
18      Q. From Geotrac?
19      A. Right. From Geotrac.
20      Q. Now, on that one, you could see
21 your house and you could see another house
22 where I have drawn on Exhibit 23 a little
23 square; correct?

Page 276

1      A. Right.
2      Q. Was there a line on that map that
3 made it appear that this whole big triangle
4 was one parcel instead of two?
5      A. I can't say if it was divided or
6 not. I think -- I can't really say. I
7 don't know if there was a divider in it or
8 not.
9      Q. But you know on the one you got
10 from FEMA, there was no -- you actually had
11 to draw the dividing line; right?
12      A. Right. I did.
13      Q. So they did not show a dividing
14 line between your property and your
15 neighbor's property, you know that for sure,
16 the FEMA didn't, or else you wouldn't have
17 had to draw it in?
18      A. Right.
19      Q. Okay. Before May, early May,
20 probably that first week of May 2004, had
21 you ever heard of Geotrac?
22      A. No, sir.
23      Q. Did you want to say something else

69 (Pages 273 to 276)

## FREEDOM COURT REPORTING

Page 277

1  about that document? It looked like you
2  started to say something. I don't want to
3  cut you off if you do.
4      A.  I'm wanting to make sure I get
5  right on this. I don't know if I drawed
6  that or if they drawed it knowing Geotrac.
7  I drew the arrow which shows that this was
8  my house.
9      Q.  You mean the little square that's
10  inside there? You're not sure if you drew
11  it or if --
12      A.  No, no, no. I know I didn't draw
13  the square. I'm talking about the line.
14      Q.  Okay.
15      A.  Even on this map because that
16  looks like whoever's writing that is --
17  that's not my writing. This is my writing
18  there where I've got my house in the white
19  area.
20      Q.  Okay.
21      A.  But I don't know if I drawed
22  that. I think that was when FEMA sent that,
23  that they drawed that.

Page 278

1      Q.  You think the handwriting that's a
2  little bit bigger handwriting might be
3  somebody with FEMA?
4      A.  That's somebody elses. It's not
5  mine. That's mine there.
6      Q.  The one that says house?
7      A.  See there. That's my writing
8  there.
9      Q.  All right. The one that says -- I
10  can't read it from over here.
11      A.  The best I can tell is 8530. It's
12  supposed to be South County Road 55 and it's
13  got an arrow. And then it's got the lines
14  through there.
15      Q.  That's the part that's not your
16  handwriting?
17      A.  Right.
18      Q.  What is it that your handwriting
19  says?
20      A.  Mine says my house in the white
21  area. And then it says note two, arrow
22  inside. Black is neighbor's house.
23      Q.  Okay. If you could see when you

Page 279

1  first got that document that there was an
2  arrow written inside the black, it must have
3  been lighter than we see it today; right?
4      A.  Yes.
5      Q.  Because if there was an arrow
6  drawn in there today, we wouldn't be able to
7  see it because we can't see --
8      A.  You can't see it here. I don't
9  know what my documents would show.
10      Q.  We'd probably need to get your
11  original to look at it and see what you were
12  able to see and what you're talking about
13  when you say arrow inside the black?
14      A.  Correct.
15      Q.  Okay. You said the first time you
16  had even heard of Geotrac was in May of 2004
17  after this had been going on for some nine,
18  ten, eleven months; correct?
19      A.  After AmSouth had informed me that
20  Geotrac was the one that had reported this
21  to them.
22      Q.  Okay. At any time, did you pay
23  Geotrac directly to do anything for you?

Page 280

1      A.  No.
2      Q.  Anything that Geotrac would have
3  done in relation to your property was either
4  through a contract with AmSouth or some
5  agreement that they had with AmSouth or
6  Dovenmuehle that they were working under or
7  just at your oral request for free; is that
8  correct?
9      A.  More so that. It was just an oral
10  request I made from them.
11      Q.  Everything that they would have
12  done before May of 2004 would have been
13  pursuant to whatever agreement they had with
14  AmSouth or Dovenmuehle because you weren't
15  involved in it; correct?
16      A.  Correct.
17      Q.  And then after May of 2004, you
18  made an oral request of them and they just
19  did it for free without charging them
20  anything; correct?
21      A.  Correct.
22      Q.  I take it you don't know the terms
23  of any agreement that Geotrac has with

70  (Pages 277 to 280)

# FREEDOM COURT REPORTING

Page 281

1  AmSouth or Dovenmuehle?
2      A.  I do not.
3      Q.  At any time, did anyone who works
4  for Geotrac tell you anything that you
5  believed was false or untrue?
6      A.  Not that I can recall.
7      Q.  I think you indicated that they
8  explained to you how it was that they put
9  your structure or put your property in a
10  flood zone; correct?
11      A.  Correct.
12      Q.  They indicated that they thought
13  your neighbor's house was part of your
14  property; isn't that correct?
15      A.  When I got the map faxed to me,
16  this Ms. Smith I believe was the one that
17  showed an arrow and all pointing to my
18  house, which was my neighbor's house.
19          And that's, of course -- When I
20  got the fax, I called her and told her that
21  that was not my house.  And she told me to
22  show my house.  And I did.  I drawed an
23  arrow back to the house and faxed it back to

Page 282

1  her.
2      Q.  Would you agree with me that if
3  the FEMA maps showed your land and your --
4  and Ms. Exum's land as one big parcel that
5  was all together and not separated out, that
6  would be incorrect?
7      A.  Yes.  Because it should be
8  separated.
9      Q.  And by the same token, if the FEMA
10  maps showed Ms. Exum's house as being
11  located on the property you owned, that
12  would be incorrect?
13      A.  Correct.
14      Q.  Okay.  And I think you already
15  told me that the FEMA map was wrong?
16      A.  Correct.
17      Q.  Okay.  Because you don't know what
18  the contract is between Geotrac and AmSouth
19  or Dovenmeuhle, I assume you don't know what
20  is, per AmSouth or Dovenmuehle, what is an
21  acceptable method of trying to determine
22  whether something is in a flood zone under
23  that contract?

Page 283

1      A.  I would not.
2      Q.  Okay.  And you would agree with me
3  -- and I assume that there are different
4  ways to do it, just from your having to make
5  all these different phone calls.  You know
6  there's a lot of different ways to try to
7  find out whether something is in a flood
8  zone?
9      A.  Correct.  Now.
10      Q.  If somebody is only charging
11  twenty, thirty, forty dollars to find out if
12  something is in a flood zone, they are going
13  to do something substantially less than, for
14  instance, than Mr. Brannon did for you
15  because he charged you close to nine hundred
16  dollars; right?
17      A.  Yes, sir.
18      Q.  And I assume you would agree that
19  there's no way a company could do what Mr.
20  Brannon did -- and, of course, Mr. Brannon
21  still couldn't even find out if it was in a
22  flood zone based on what he did, spending
23  nine hundred dollars.

Page 284

1          If a company is only charging
2  twenty or thirty dollars to do these things,
3  there's no way they could even come out and
4  do what Mr. Brannon did and make a living
5  doing it only charging twenty or thirty
6  dollars?
7      A.  I don't think so.
8      Q.  Okay.
9      A.  Of course, I'm not the expert on
10  that.  I don't know what kind of contract
11  they have.
12      Q.  Sure.
13      A.  With whoever.
14      Q.  And whatever it says, it says;
15  right?
16      A.  Yes.
17      Q.  You have sued three different --
18  or four different companies, AmSouth,
19  Dovenmuehle, Geotrac and Empire Fire and
20  Marine Insurance Company.
21          And in your complaint -- and I
22  know you didn't draft the complaint.  Your
23  lawyer put it together based on his

71 (Pages 281 to 284)

# FREEDOM COURT REPORTING

Page 285

1  conversations and consultations with you.
2      But the complaint sort of just
3  lumps everybody together. And a lot of
4  those different allegations are in there. I
5  want to ask you if some of those are
6  actually meant to apply to Geotrac.
7      For instance, one of them is for
8  breach of contract. Do you contend that you
9  had a contract directly with Geotrac?
10     A. No, I did not have a contract with
11 Geotrac.
12     Q. And I understand you also have
13 another claim that says you're a third party
14 beneficiary. And I don't even know if you
15 know what that term means.
16     But in non-legal terms it means
17 that you should have gotten the benefit of
18 the agreement between my client Geotrac and
19 AmSouth or Dovenmuehle. And that's a
20 separate issue.
21     That doesn't mean you have a
22 direct contract with them. It just means
23 you're affected by a contract. Do you

Page 286

1  believe that you should have -- or that you
2  were affected by the way that AmSouth and
3  Geotrac conducted their contract?
4      MR. JARRETT: Object to the form.
5      A. I believe that -- again, going
6  back to Rose, knowing that -- and I'm just
7  saying I don't know if she had any knowledge
8  of this -- but she knew that AmSouth was
9  contracted with Geotrac, that I should have
10 been informed you need to contact Geotrac to
11 resolve this difference.
12     Q. Okay. Of course, you understand
13 that when AmSouth first got the information
14 about your house being in a food zone, it
15 was based on one of these exhibits we had
16 back here where Geotrac said according to
17 the map, it's in zone A?
18     A. Right.
19     Q. And that was done way back in July
20 of -- July 7 of 2003. And I think we can
21 all agree that according to the map, which
22 was wrong, it was in zone A; right?
23     A. I think it was on that -- June.

Page 287

1      Q. Exhibit 7 is what I'm looking at.
2      A. That was the standard flood hazard
3  determination?
4      Q. Right. I know you don't know.
5  You don't work at AmSouth. But assuming
6  that the reason AmSouth thought your house
7  was in a flood zone is because they received
8  this document Exhibit 7 from Geotrac in
9  response to a request to Geotrac to check it
10 out, they had reason to think your house was
11 in a flood zone; correct?
12     A. Yes. According to this document.
13     Q. Okay. And, of course, I think
14 we've already agreed that when Geotrac
15 looked at the FEMA map, the FEMA map showed
16 that there was a structure on your lot that
17 was in a flood zone and that map turned out
18 to be wrong.
19     A. If you're saying that they are
20 saying that both this property and my
21 neighbor's property was on one property,
22 yes.
23     Q. Okay.

Page 288

1      A. But I had no knowledge of that.
2      Q. That's fine. Is there -- Other
3  than initially saying, hey, according to the
4  FEMA map, your house is in zone A, is there
5  anything else that Geotrac has done that
6  you're suing them for?
7      A. Not that I'm aware of other than
8  -- however way this was reported to
9  AmSouth, you know. And I said that's
10 between you guys there, where the liability
11 falls.
12     Q. And I'm not asking you to make
13 judgments in that respect. I just want to
14 know if there's anything else that you think
15 Geotrac did wrong that affected you other
16 than first reporting that the FEMA map
17 showed that there was a structure on your
18 property in zone A?
19     A. Not that I'm aware of.
20     Q. There's a couple of other claims
21 in your complaint. I just want to make sure
22 I cover them. Some of these I asked in
23 interrogatories.

72 (Pages 285 to 288)

Page 289

1    And I think I've already got the
2  answers. But I just want to make sure. You
3  said you never paid any money to Geotrac to
4  do anything directly; correct?
5    A.  Correct.
6    Q.  Are you aware that Geotrac has in
7  any way ended up with some of your money?
8    A.  I'm not aware of any contracts
9  between y'all and anybody else that any
10 money would have went to one way or the
11 other.
12   Q.  There's a claim in your count
13 called unjust enrichment and there's also
14 one called conversion. And both of those
15 have the end result that Geotrac got money
16 that they weren't supposed to get and that
17 it came from you.
18   Are you aware of any of your money
19 -- any money that belonged to you somehow
20 ended up in Geotrac's pocket?
21   A.  Not paid directly. And again
22 there, I can't really answer that because I
23 don't know the contracts between y'all and

Page 290

1  AmSouth.
2    Q.  Now, you got mortgage statements
3  from AmSouth at first for quite a while
4  after you changed your set up to a flat rate
5  instead of a variable rate.
6    You would get a statement that
7  says here's how much your principal is and
8  here's how much your interest is. And then
9  they totalled those two things?
10   A.  Correct.
11   Q.  And then at some point, your
12 statement changed to say principal, interest
13 and an escrow amount for the flood
14 insurance?
15   A.  Correct.
16   Q.  On any of those statements did it
17 ever say here's twenty bucks or forty bucks
18 that we had to pay Geotrac and we want you
19 to pay it?
20   A.  Not that I'm aware of.
21   Q.  Okay. And nobody with Geotrac
22 ever told you anything that was untrue?
23   A.  Nothing no more than when I got

Page 291

1  the first letter that they indicated that we
2  were in a flood area. And then after that,
3  we got the documents and the maps and all
4  and got it resolved.
5    Q.  All right. The first letter is
6  this Exhibit 15, the May 4th letter. And
7  actually there's not anywhere on that May
8  4th letter that says your house is in a
9  flood zone.
10   In fact, it says occasionally the
11 map sometimes show houses in a flood zone
12 that aren't. And that's the situation you
13 thought you had?
14   A.  Right.
15   Q.  And all they did was say, here's
16 what to do to take care of that and provide
17 you information?
18   A.  Correct.
19   Q.  So now that you've had a
20 opportunity to take a look at this letter
21 again, can you think of anything at all that
22 anybody with Geotrac ever told you that was
23 not true?

Page 292

1    A.  The only two I talked to was this
2  lady here Marsha and Ms. Smith. And they
3  didn't tell me anything that they didn't do.
4    Q.  Okay. All right. I don't think
5  this applies to Geotrac, but I just want to
6  make sure. This Fair Debt Collection
7  Practices Act, Geotrac didn't ever try to
8  collect money from you, did they?
9    A.  No.
10   Q.  Or put anything on your credit
11 report?
12   A.  Not that I'm aware of.
13   Q.  We've talked about your damages
14 just a little bit. And the fact that I'm
15 already to damages means I'm almost done.
16 You should be happy.
17   I understand that you indicated
18 that you applied for a Sears card, that they
19 wouldn't change your interest rate or do
20 something like that. Which Sears was that?
21   A.  The one here in Dothan.
22   Q.  Okay. And did they tell you why
23 you didn't qualify?

73 (Pages 289 to 292)

## FREEDOM COURT REPORTING

Page 293

1    A.  They just said credit.
2    Q.  Okay.  They indicated it wasn't a
3 direct result of your credit score?
4    A.  Correct.
5    Q.  Would you agree with me that there
6 can be multiple things on your credit report
7 that can hurt your credit score?  I'm not
8 talking about you as an individual.  Just in
9 general, there can be a lot of things that
10 can affect a credit score?
11    A.  From what I understand, yes.
12    Q.  Did anybody at Sears tell you
13 specifically that here's some things on your
14 credit report that caused us not to issue
15 you credit?
16    A.  No.
17    Q.  In fact, there might be things on
18 your credit report that you didn't even know
19 were there?  You've already talked about
20 that thing from -- what was it called, Omni
21 somebody?
22    A.  Right.
23    Q.  They say you owe them eleven

Page 294

1 thousand dollars.  You didn't even know it
2 was on there; right?
3    A.  Right.
4    Q.  We've also looked at the exhibit
5 you gave us today that showed Alltel showed
6 you had a bad account with them.  And even
7 though it says -- even though you settled
8 that with them, it says in 2003, right
9 before this was happening, they had to
10 charge off six hundred and some odd dollars,
11 which means they never got it from you and
12 that's a negative credit entry, also.
13    Did you look through -- I know you
14 produced a couple of pages of that credit
15 report, that 2003 or 2004 credit report.
16 Were there other things on there that looked
17 like they were negatives?
18    We don't have it here.  I'm not
19 talking about the 2005.  I'm talking about
20 the one that you ran off in May of 2004.
21    A.  I can't recall any.
22    Q.  We'd have to know what all those
23 things were in order to determine whether

Page 295

1 your mortgage had any affect on your credit;
2 right?
3    A.  I would assume, yes.
4    Q.  We just don't know that from the
5 information we have sitting in front of us;
6 correct?
7    A.  I really can't answer that because
8 I don't know when that other appeared.
9    Q.  I don't think any of us know what
10 goes into figuring out credit scores.  But
11 we know there's a lot of different things
12 that go into them.  We'd have to look at all
13 of it to try to figure it out; right?
14    A.  Yes.
15    Q.  Is that fair?
16    A.  Yes.
17    Q.  Okay.  I know you had a time
18 period that you said was stressful to you
19 and that you were worried about your house,
20 worried about whether you were going to have
21 to pay for this flood insurance, especially
22 since you didn't believe that you had it.
23    You said you talked to somebody,

Page 296

1 Jacqueline King; is that right?
2    A.  Yes.
3    Q.  Is she here in a local branch?
4    A.  Yes.
5    Q.  So you went and talked to her
6 sometime and said, hey, what do I have to do
7 about this since you said you better go
8 ahead and pay the money just in case?
9    A.  No.  I can't remember exactly what
10 was said.  Like I said, with the notes --
11 She tried to get it resolved.
12    Q.  Okay.  You took notes of that,
13 too?
14    A.  It's on her notes.
15    Q.  Okay.
16    A.  That she had made a copy.  I mean,
17 made a copy and gave it to me.
18    Q.  All right, sir.  Do you remember
19 about when that was that you went and saw
20 her?  And you may have seen her more than
21 once at a time.  What I'm talking about is
22 when you said tell me exactly how much I
23 need to pay.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 297

1    A.  It was after I got a letter from
2  AmSouth stating that if I didn't pay an
3  amount of money or something another, that
4  they was going to foreclose.
5    Q.  That was in April?
6    A.  I can't remember.  I went down.
7  And that's when she called and found out the
8  exact amount and everything.  And that's
9  when I went ahead and paid it.
10    Q.  Exhibit 13, is that the letter
11  you're talking about?
12    A.  It was probably right along in
13  that time that we spoke.
14    Q.  Okay.  Was it before you talked to
15  anybody at Geotrac that you spoke to Ms.
16  Smith?
17    A.  Ms. Smith?
18    Q.  I'm sorry.  Ms. King.  I'm getting
19  the Geotrac's lady's name mixed up with the
20  AmSouth lady.  I'm sorry.
21    Let me ask the question again so
22  it makes sense if we ever have to look at
23  it.  Was it before you spoke to anybody at

Page 298

1  Geotrac when you talked to Ms. King?
2    A.  I really can't recall.
3    Q.  That's fine.  I'd have to look on
4  my notes.
5    Q.  Did you put dates on most of those
6  notes about conversations?
7    A.  Yes.  Pretty much on all of them.
8    Q.  That's fine.  We'll look at
9  those.  I won't hold you to dates without
10  having that in front of you.
11    I understand that there's a
12  discrepancy between your amortization
13  schedule you got back way back when AmSouth
14  first got this loan and what it shows
15  today.  Let me ask you this.
16    Do you know if when you switched
17  to a variable -- I'm sorry -- from a
18  variable rate to a fixed rate, if they
19  started your amortization over just for a
20  shorter period of time?
21    A.  They shouldn't have had no need
22  to.
23    Q.  They had to refigure how much your

Page 299

1  interest was going to be every month in
2  order to -- once they made it a fixed rate
3  because your interest -- the amount of
4  interest you would be paying would change;
5  right?
6    A.  You talking about on a fixed
7  rate?
8    Q.  It would change -- When you went
9  from a variable rate to a fixed rate, the
10  amount of interest you were paying each
11  month would change?
12    A.  From a variable, yes.  But the
13  principal doesn't.
14    MR. JARRETT:  I can clarify if you
15  want me to.
16    MR. STOTT:  You can if you're
17  familiar with it.
18    MR. JARRETT:  My understanding in
19  what he's talking about, is the amortization
20  scale.  His monthly principal amount
21  remained a constant.
22    So the amortization was based upon
23  making that principal payment amount.

Page 300

1  Interest payments were added in addition to
2  that.  So that didn't show up the
3  amortization scale.
4    Q.  Let me ask you.  I've bought a
5  couple of houses in the past and cars and
6  everything, so I have some understanding of
7  how mortgage amortization schedules work.
8    My understanding is in the very
9  beginning of your mortgage, you pay an ity
10  bitty tiny amount of principal and a lot of
11  interest.
12    As you get to the middle of the
13  term of your mortgage, you start paying
14  higher principal and your interest goes down
15  some.  So it's about the same.
16    And at the end of your mortgage,
17  you're paying a lot of principal and very
18  little interest.  So the amount of principal
19  actually does change.
20    Are you saying that you were under
21  the impression that you would continue to
22  pay the exact same amount of principal no
23  matter what?

75  (Pages 297 to 300)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 301

1    A.  My amortization that I got showed
2  the principal was a little more and a little
3  more each time.  And it just kept getting
4  bigger and bigger, you know.
5        It's like you said, until the
6  interest payment on a fixed rate, of course,
7  gets smaller.  On the variable rate, it
8  could go up and down because the payment
9  would be adjusted to the interest rate.
10    Q.  Let me ask it this way.  Maybe we
11  can short circuit this.  You're concerned
12  that you owe more principal today that you
13  thought you would?
14    A.  According to the amortization and
15  according to the statement that we get each
16  month, yes.
17    Q.  But you don't know if a new
18  amortization schedule went into effect when
19  you switched from a variable to a fixed?
20    A.  Nothing was said about it.
21    Q.  If a new amortization schedule did
22  go into effect, in other words, if they had
23  of treated it almost like a new loan to do

Page 302

1  that and it started over just for a shorter
2  time period, but you end up paying off the
3  same day or the same week, would you agree
4  you have been damaged from that standpoint?
5    A.  Yes.  Because I would feel that --
6  if it's four thousand short now, if I were
7  to pay it off, I'm out three or four
8  thousand dollars.
9    Q.  Do you know if the discrepancy had
10  anything to do with the situation that you
11  were going through with flood insurance or
12  whether it was just as a result of switching
13  from variable to fixed?
14    A.  At this point, no.
15    Q.  If it turns out that it was just
16  because you went from variable to fixed, it
17  wouldn't be part of this lawsuit; correct?
18        And that's something you did way
19  back in 2001, way before any of this stuff
20  with flood insurance came up.
21    A.  And you're saying that if -- them
22  forcing the insurance on me and what all was
23  paid during that time would affect the

Page 303

1  principal amount then?
2    Q.  Let me ask the question again.  I
3  don't think you understood or I probably
4  asked it -- that's probably why.
5        If it turns out that the reason
6  the amount of principal is different than
7  you thought it would be is not because of
8  the flood insurance, but instead because you
9  went from a variable rate to a fixed rate
10  back in 2001, then that would not be a claim
11  in this lawsuit; correct?
12    A.  A possibility.  I'm not for sure.
13    Q.  Well, you haven't sued anybody for
14  --
15    A.  It's been for -- that's been off
16  since even back then.
17    Q.  Okay.  So you noticed that your
18  principal and interest payments were off --
19    A.  Keeps getting higher.
20    Q.  -- way back in 2001, way before
21  anything ever with flood insurance came up?
22    A.  Correct.
23    Q.  All right.  I think that was the

Page 304

1  best way to ask the question.  I wish I had
2  asked that question.  That would have saved
3  us ten minutes of not understanding each
4  other.  All right.
5        I don't want to pry, but you've
6  made a claim for mental anguish and
7  emotional distress.  Have you ever seen a
8  psychiatrist for anything?
9    A.  No.
10    Q.  Or a counselor or anything like
11  that?
12    A.  No.
13    Q.  Anybody you go and sit on their
14  couch and tell them your problems other than
15  your wife?
16    A.  No.
17    Q.  You mentioned the eight hundred
18  and ninety some odd dollar bill that you had
19  with a surveyor.  Did somebody tell you you
20  had to go out and get a surveyor?
21    A.  They told me it would be my
22  responsibility.
23    Q.  If you wanted to change the FEMA

76  (Pages 301 to 304)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 305

1  map, you had to go hire somebody?
2      A.  Yes.
3      Q.  Okay.  As far as money out of your
4  pocket -- and I'm going to leave aside your
5  mortgage payments just for a minute.  We've
6  talked about those.
7          But other than mortgage payments
8  that might be owed or baggage late fees, all
9  that stuff, leaving that aside, is there
10  anything else you've spent out of your
11  pocket as a result of this situation with
12  the flood insurance?
13      A.  Not bills directly, but just time
14  lost at work trying to get this matter
15  resolved.
16      Q.  Okay.
17      A.  Which time is money, you know.
18      Q.  Sure.  Back during this time
19  period, you were not self-employed; you were
20  employed with --
21      A.  Mutual Savings.
22      Q.  -- Mutual Savings.  How were you
23  paid by Mutual Savings?

Page 306

1      A.  Weekly.
2      Q.  Was it a commission or was it
3  salary?
4      A.  Salary plus commission.
5      Q.  Okay.  Did you see any type of
6  drop in your salary during this time period?
7      A.  Probably could have been and
8  probably was.  But I just had to make up
9  more time to keep my pay check steady.
10      Q.  That's part of the stress and
11  mental anguish you've talked about?
12      A.  Yes.  The extra hours of trying to
13  resolve this and then get back out there
14  with the right attitude to get back into a
15  good frame of mind to produce and sell.
16      Q.  And if I asked you to say for a
17  fact that you would have sold more policies
18  or had more business if this would have gone
19  on, you'd just have to speculate, you
20  wouldn't be able to tell me that for sure;
21  correct?
22      A.  I could probably go on record to
23  say, that yes, I would have done a better

Page 307

1  job because my attitude would have been
2  right.
3      Q.  No matter how good your attitude
4  is and how hard you work, you can't always
5  guarantee somebody is going to buy
6  insurance; is that right?
7      A.  It sure plays a big part in it.
8      Q.  I'm sure you've worked real hard
9  and thought you had sales and they walked
10  out the door; right?  We've all --
11      A.  But your attitude has -- is the
12  number one thing they pick up on and they
13  buy according to the way that you are
14  responsive to them.
15      Q.  If we wanted to know if you had
16  any drop off in wages as a result of having
17  to deal with this flood insurance issue, how
18  would we find that out?
19          What documents would we look at
20  that would tell us for sure?  Would it be
21  just comparing your pay checks?
22      A.  Basically.
23      Q.  When I ask this question, you'll

Page 308

1  know that I'm not in the insurance
2  business.  Do you sell more during certain
3  times of the year than others?
4      A.  Not really.  I'm usually pretty
5  much consistent all year long.
6      Q.  Would it be better -- If I wanted
7  to know if you lost money during this time
8  period, would it be better to take this and
9  compare it to the previous year during the
10  exact same time period or would it be better
11  just to compare it to a few months before or
12  a few months after these issues came up?
13      A.  Again, like I said, probably -- if
14  there's any variance, it would be slightly.
15  It's just the time I had to put in extra
16  during that time.  And I would have no way
17  of producing any kind of record of time
18  because I just stayed out until I got what I
19  needed.
20      Q.  All right.  Let me see if we can
21  come to an agreement on what your claim is
22  going to be then to make sure I understand.
23          You're not saying you earned less

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 309

1  money, you're just saying you had to work
2  harder to earn the same thing?
3    A.  Under more stress you might would
4  say to accomplish the same goals.
5    Q.  So less hours at home, more hours
6  at work to earn the same money that you
7  earned previously?
8    A.  Yes.
9    Q.  All right.  Now, even though I
10 made the question about the amortization
11 schedule complicated, I'm going to try to
12 make the question about whether or not
13 AmSouth charged you anything extra
14 concerning late fees and everything, I'm
15 going to try to make that very simple.
16     We know that your principal and
17 interest payment was a steady seven
18 eighty-three point ninety-one per month?
19   A.  I believe that's right.  Whatever
20 that document shows.
21   Q.  Here you go.
22   A.  Seven eighty-three ninety-one.
23   Q.  Okay.  What I have done is pulled

Page 310

1  in a couple of months on each side to make
2  sure we cover a big enough time period.
3      If I take from June 1st, 2003,
4  which is before you got the first notice
5  that they were even looking at flood
6  insurance, and we went all the way to July
7  1st, 2004, which would be a fourteen month
8  period, and that's after everything was
9  resolved and everything was refunded as much
10 as -- whatever they refunded, it had been
11 refunded by that date and you were back just
12 paying your normal principal, interest, if
13 we just multiply seven eighty-three point
14 ninety-one times that fourteen months and
15 come up with a number -- and I went ahead
16 and did the math.  It's ten thousand nine
17 hundred and seventy-four dollars and
18 seventy-four cents -- if we compare that to
19 what you actually paid during that fourteen
20 month period and it turns out to be the
21 same, would that be all we'd have to do to
22 find out if you had to pay anything extra?
23   A.  I don't believe that would come up

Page 311

1  to the same.
2    Q.  Okay.  But that's how we can find
3  out; right?  We can take that fourteen
4  months to find out what you actually paid
5  and we're credited.  We go look at payments
6  and credits and then we compare that to that
7  ten thousand nine hundred and seventy-four
8  dollars and seventy-four cent figure, we'll
9  know if you overpaid anything that you
10 weren't reimbursed for; correct?  That's how
11 much you were supposed to pay during that
12 fourteen months; right.
13   A.  Correct.  Maybe more.
14   Q.  So if you did pay more, all we'd
15 have to do is add up all your payments and
16 then subtract off any credits that AmSouth
17 gave you and see if it's more than that
18 number and we'll know?
19   A.  That should be right.
20   Q.  I noticed on the documents that
21 your attorney gave us today, on your 2005
22 mortgage interest statement, it does show
23 that there was nine cents in late charges.

Page 312

1  So there may have been a nine cent
2  oversight.
3      But we can take care of that I
4  think pretty easy.  Other than that nine
5  cents, are you aware of anything that was
6  not refunded back to you as you sit here
7  today?
8    A.  I don't have any of the money that
9  I've already paid back in my pocket.  Either
10 AmSouth has still got it or whatever they
11 did with it.
12   Q.  Is it possible that they credited
13 it to your account and you didn't have to
14 make payments during certain time periods?
15   A.  I don't know.  When they sent the
16 check to us, we sent it back because they
17 already said I owed it.  And then we got a
18 check and we -- I don't know how much.
19   Q.  We'll just have to do that math we
20 just talked about and just compare them and
21 see and we'll know if you overpaid them.
22 We'll do that.  Is that fair?
23   A.  I assume that's the right thing to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 313

1 do.
2 Q. Other than what we've already
3 talked about, is there any other item of
4 damages that you're claiming in this lawsuit
5 that we have not discussed? I want to make
6 sure I cover them all.
7 I always ask this question. But
8 before -- I always qualify the question with
9 this statement. Unless we come back to talk
10 about your handwritten notes, this is going
11 to be the only chance I ever get to talk to
12 you directly.
13 So if you're going to sit in front
14 of the jury and say I need to be compensated
15 for X, Y or Z, I've got to know that now
16 because I don't get another chance to ask
17 you about it.
18 So is there anything else that you
19 think you should be compensated for that we
20 have not already talked about?
21 A. Back to your question about the
22 time I put in. And it will attest this.
23 When I get through talking with AmSouth on

Page 314

1 the phone and knowing I could not resolve
2 this problem, I would have like a mental
3 shutdown, like why can't we get this
4 resolved.
5 And then I'd have to get pumped
6 back up to go back there and do my work.
7 And you just don't know what kind of mental
8 capacity you can get in when you've just
9 talked to someone and hanging up from the
10 phone, having to go to work and nothing is
11 resolved.
12 Chances are they are going to
13 foreclose on the house. And here I am
14 trying to go back out to bust my butt just
15 to make money to pay for the thing.
16 So that was pretty hard and stiff,
17 to have to get back out and go to work. I
18 felt like just going back and crawling in my
19 bed and just go to sleep.
20 Q. Is it fair to say that once you
21 got involved directly with Geotrac, that
22 weight was kind of lifted off of you?
23 A. Well, when I knew I had gotten

Page 315

1 this thing out of foreclosure and gotten
2 that resolved, I felt that a lot of the
3 pressure was being relieved.
4 Q. And once you started talking
5 directly with Geotrac, that happened right
6 away?
7 A. Quickly. Within the month.
8 Q. Anything else? Any other items of
9 damages that you want to tell the jury that
10 you are entitled to?
11 A. That's all I can think of at this
12 time.
13 MR. STOTT: That's all the
14 questions I have at this time. Thank you.
15 I apologize for taking so long.
16 EXAMINATION BY MR. MARTIN:
17 Q. Mr. Clark, my name is David
18 Martin. I represent Empire Fire and Marine
19 Insurance. I'm going to try to be very
20 quick based on your testimony. Did you ever
21 have any conversations with anybody at
22 Empire Fire and Marine?
23 A. No, sir.

Page 316

1 Q. Did you write any letters to them?
2 A. The only thing is when I got the
3 policy --
4 Q. Yes, sir.
5 A. -- I called the eight hundred
6 number on there.
7 Q. Yes, sir.
8 A. And, of course, the words were
9 welcome to AmSouth Mortgage.
10 Q. When you called the one hundred
11 number on the policy that was provided to
12 you --
13 A. Correct.
14 Q. -- did you ever speak with
15 anybody?
16 A. No, sir.
17 Q. Did you just hang up the phone at
18 that point?
19 A. Well, at that point, you start
20 getting all these if you are this, put your
21 account number and all that. And after I
22 realized that either it was a subsidiary of
23 AmSouth, that there wasn't no need of going

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 317

1  no further until I could get the issue
2  resolved.
3      Q.  Do you know the connection between
4  -- if there is one -- between Empire Fire
5  and Marine and AmSouth?
6      A.  Nothing no more than a telephone
7  number.
8      Q.  Sir?
9      A.  Nothing no more than a telephone
10  number.
11     Q.  Simply the fact that you called
12  the number on the insurance policy --
13     A.  Right.
14     Q.  -- and an answering service said
15  AmSouth?
16     A.  Yes, sir.
17     Q.  Other than that, you have no idea
18  if they are connected or if they are not; is
19  that fair?
20     A.  Not that I'm aware.
21     Q.  Are you aware of any connection
22  between Empire Fire and Marine and
23  Dovenmuehle?

Page 318

1      A.  Not that I'm aware of.
2      Q.  Are you aware of any connection
3  between Empire Fire and Marine and Geotrac?
4      A.  Not that I'm aware of.
5      Q.  Back to my question.  You never
6  wrote any letters to Empire Fire and Marine
7  Insurance Company; correct?
8      A.  Not that I can recall.
9      Q.  Did you ever receive any
10  correspondence from them?
11     A.  Nothing no more than the policy.
12     Q.  Okay.  And actually that --
13     A.  I reckon that come from y'all or
14  either from AmSouth.  I don't know.  I don't
15  remember what it come in.
16     Q.  Let's look at that.  If we can
17  pull out Exhibit 6.  If you would turn to
18  the third page, I think you'll see the
19  policy; is that correct?
20     A.  Correct.
21     Q.  And the policy was actually -- it
22  looks to me like there's a cover letter from
23  AmSouth to you that attaches the policy;

Page 319

1  correct?
2      A.  According to this, it is, yes,
3  sir.
4      Q.  And do you have any reason to
5  dispute that?
6      A.  I'm just -- based on what?
7      Q.  Based on what you have produced.
8  There's a cover letter from AmSouth that
9  encloses the policy?
10     A.  Yes.
11     Q.  And so the policy was actually
12  sent to you by AmSouth; is that correct?
13     A.  According to this, yes.
14     Q.  And since you didn't have any
15  conversations with Empire Fire and Marine or
16  any correspondence with them, they never
17  made any misrepresentations to you?
18     A.  Correct.  Because it was not my
19  issue.
20     Q.  That's right.  Any
21  misrepresentations that may have been made,
22  were made by other entities, AmSouth and/or
23  Geotrac; is that correct?

Page 320

1      A.  And my main concern was not
2  needing the insurance to begin with.
3      Q.  I understand.  But back to my
4  question.  Any misrepresentations that were
5  made to you, would have been made by either
6  AmSouth or Geotrac?
7      A.  I really can't answer that
8  question.  I don't feel that -- you're
9  asking me if Empire -- I've never had any
10  dealings with Empire.
11     Q.  I'm just trying to ask -- I think
12  it's an obvious question.  But I understand
13  we're struggling with it.  You never had any
14  dealings with them, so you never made any
15  misrepresentations to you?
16     A.  Correct.
17     Q.  They are just the insurance
18  company that issued the policy; correct?
19     A.  Correct.
20     Q.  As far as you know, AmSouth
21  contacted Empire and said we want flood
22  insurance and here's the premium; is that
23  right?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 321

1    A.  I assume that.
2    Q.  Okay.  And they issued the policy
3  at AmSouth's request; correct?
4    A.  That's what I would assume.
5    Q.  You certainly didn't request it?
6    A.  I didn't request it, no.
7    Q.  You certainly didn't pay the
8  premium; correct?
9    A.  No.
10    Q.  That money came from AmSouth?
11    A.  Not right then.
12    Q.  Well, you never paid any money to
13  Empire?
14    A.  No, not to Empire.
15    Q.  Ultimately, under threat of
16  foreclosure, you wrote a check to AmSouth;
17  correct?
18    A.  For all of it, right.
19    Q.  And you don't know what AmSouth
20  did with that money?
21    A.  No.
22    Q.  And the late charges and the fees
23  and things that were assessed, those were

Page 322

1  fees and charges from AmSouth as opposed to
2  the insurance company?
3    A.  Correct.
4    Q.  Now, you ultimately proved your
5  point that the property was not in a flood
6  zone; correct?
7    A.  Correct.
8    Q.  And the policy was cancelled?
9    A.  Correct.
10    Q.  You were notified of that fact?
11    A.  Correct.
12    Q.  Do you have any idea of what
13  happened to the premium that AmSouth had
14  paid for that policy?
15    A.  To my knowledge at this time, no.
16    Q.  You have no -- It may have been
17  refunded by Empire to AmSouth?
18    A.  I have no knowledge of it.
19    Q.  Okay.  Now, there's a breach of
20  contract claim in the lawsuit.  And correct
21  me if I'm wrong, but the only contract with
22  Empire is this insurance policy; is that
23  correct?

Page 323

1    A.  Yes.
2    Q.  And you didn't make any claims
3  under that policy?
4    A.  No.
5    Q.  You're not claiming we breached
6  it, we being Empire, breached it by not
7  making a claim for some flood damage?
8    A.  No.
9    Q.  Do you have any evidence of a
10  conspiracy between Empire and any of the
11  other defendants in this lawsuit?
12    A.  Not that I'm aware of.
13    Q.  And as far as your damages, one of
14  the main components of your damages is the
15  stress and the anxiety and the worry that
16  you experienced through this process;
17  correct?
18    A.  That's correct.
19    Q.  And that concern started when you
20  were first notified that there may be some
21  need for flood insurance; correct?
22    A.  That was the beginning, correct.
23    Q.  And it spanned through the time

Page 324

1  that you ultimately got it resolved;
2  correct?
3    A.  Correct.
4    Q.  It may have intensified later, but
5  it began when you were first told about the
6  need for flood insurance?
7    A.  That's correct.
8    Q.  And we looked at this earlier.
9  But Exhibit 3, you testified that that may
10  or may not have been the first indication
11  that you received about the flood
12  insurance.  But it would have been around
13  that time; correct?
14    A.  Approximately, yes.
15    Q.  And it's your understanding that
16  as far as the entity that placed your
17  property in the flood zone, that was
18  Geotrac; correct?
19    A.  Well, I was told that it was
20  FEMA.  And then later on I learned that it
21  was Geotrac.
22    Q.  As between the folks that are in
23  the lawsuit, the defendants in the lawsuit,

81  (Pages 321 to 324)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 325

1  it would be Geotrac as compared to Empire
2  Fire and Marine, for example; is that
3  correct?
4      A.  Yes.
5      Q.  And again, as between the
6  defendants, AmSouth is the entity that
7  placed the insurance on the property;
8  correct?
9      A.  According to the records, yes.
10     Q.  Okay.  Now, the Sears card, did
11  y'all have a balance at Sears that you were
12  trying to refinance at a lower interest
13  rate?
14     A.  We was in there one night and they
15  were running -- you know how you'll purchase
16  something and they'll have a new card out,
17  that it was at a lesser interest rate and
18  all that and you just applied for it right
19  there on the spot.
20     Q.  Was there something that y'all
21  were wanting to purchase in the store with
22  the card?
23     A.  Not at the time really.  I mean,

Page 326

1  we have just been a member with them for
2  years and just wanted to update it if we
3  could get a better interest rate.
4      MR. MARTIN:  I think that's all
5  the questions I have.
6  EXAMINATION BY MR. COLLINS:
7      Q.  I've got just a couple of
8  follow-up questions, Mr. Clark, and I'll be
9  done.  Earlier you were testifying -- Well,
10  let me back up.
11     There's the standard flood hazard
12  determination form.  And there's been a few
13  that have been attached as exhibits to your
14  deposition.  The first one being the
15  document dated 7-7, 2003.
16     And that's a document that you
17  produced in this litigation; correct?
18     A.  Yes.  I think that's correct.
19     Q.  And you testified earlier that you
20  -- it was your understanding that that
21  document had been provided by AmSouth;
22  right, or your belief that it had been
23  provided to you by AmSouth?

Page 327

1      A.  That's where I believe that it
2  came from.  Like I said, I'm not sure.  I
3  don't have my notes and all here on who it
4  came from.  But I assume that's where it
5  come from after I requested it.
6      Q.  Okay.  And at first, you said you
7  talked to someone at AmSouth and they said
8  that FEMA had informed them that your
9  property was in a flood zone; correct?
10     A.  Correct.  AmSouth had said that
11  FEMA was the ones that reported to them.
12  And after I contacted FEMA, FEMA said they
13  didn't do that.
14     Q.  Okay.
15     A.  They just did the mapping.
16     Q.  And at some point in time, though,
17  AmSouth sent you a copy of this standard
18  flood determination; correct?
19     A.  Correct.
20     Q.  I'm looking at my contact notes to
21  see if this refreshes your memory.  There's
22  a note in September 22, '03 -- let's see.
23  Excuse me, sir.  September 25, 2003, a

Page 328

1  letter sent to the homeowner along with a
2  copy of flood determination.
3      Does that help you refresh your
4  memory as to when you may have received that
5  determination letter, September of '03?
6      A.  I really couldn't answer.
7      Q.  Okay.  But you had asked AmSouth
8  for some documentation as to why they were
9  concluding that you were in a flood zone;
10  right?
11     A.  Right.
12     Q.  And they indicated that Geotrac --
13  initially you said that someone reported
14  erroneously that FEMA had said you were in a
15  flood zone?
16     A.  Yes.
17     Q.  Later they said Geotrac provided
18  us with that information?
19     A.  Correct.
20     Q.  And they provided you with this
21  document; correct?
22     A.  I believe that was correct.
23     Q.  And you don't recall exactly at

82  (Pages 325 to 328)

# FREEDOM COURT REPORTING

Page 329

1 what point in time that was provided?
2    A. Without looking at my notes, I
3 couldn't say.
4    Q. Okay. Was it September 25, '03?
5    A. I can't really say.
6    Q. And the second exhibit we looked
7 at was a revised standard flood
8 determination which is dated -- let's see --
9 we've got these in reverse order.
10    Exhibit 7 is the initial
11 determination. And then Exhibit 11 we've
12 looked at, which you also produced, is a
13 determination stating it's been --
14 reevaluation done with no change. And
15 that's dated 12-26-03; correct?
16    A. That's what the document says.
17    Q. Okay. So wouldn't you agree that
18 AmSouth is communicating with Geotrac to try
19 to resolve your problem in determining
20 whether you are, in fact, in a flood zone?
21    A. Are you asking was AmSouth trying
22 to --
23    Q. Right.

Page 330

1    A. -- resolve with --
2    Q. You weren't privy to all the
3 communications going on between AmSouth and
4 Geotrac; correct?
5    A. Right.
6    Q. But you had an initial
7 determination that said you were in a flood
8 zone that you were provided; correct? And
9 then you had a reevaluation which again
10 states you're in a flood zone; correct?
11    A. Correct.
12    Q. And then AmSouth reported to you
13 that we have been informed that you are in a
14 flood zone and we're going to keep the
15 insurance in place until either a LOMA has
16 been issued or some other type of exception
17 has been made; correct?
18    A. Correct.
19    Q. Okay. And does that -- let's
20 see. When you first contacted Geotrac, was
21 it based on one of these documents or do you
22 recall how you first got their contact
23 information?

Page 331

1    A. Their contact information was when
2 I got the letter.
3    Q. Okay.
4    A. From Geo.
5    Q. Okay. But you don't recall when
6 you got this document?
7    A. Not really.
8    Q. Could it have been before you
9 received the letter from Geo?
10    A. I'm pretty sure it was.
11    Q. Okay. And you mentioned -- in
12 your complaint, you have a claim for
13 misrepresentation. And I asked you earlier
14 today what had been misrepresented to you.
15    You said that someone at AmSouth
16 when you called initially said FEMA has
17 advised us or informed us that your property
18 was in a flood zone. We know that was
19 erroneous, that Geotrac actually informed
20 AmSouth that your property was in a flood
21 zone.
22    Other than that statement by
23 someone at AmSouth that FEMA reported the

Page 332

1 status of your property as being in a flood
2 zone, any other statement made by anyone at
3 AmSouth that's untrue?
4    A. Well, we've got the statement of
5 Jacqueline King where she talked to the guy
6 with AmSouth where he admitted to her that
7 they had forced placed the insurance on me.
8    Q. Right.
9    A. And it wasn't in a flood area.
10    Q. Well, I think we've talked about
11 that today. AmSouth received information
12 that you were in a flood area and they
13 placed insurance based upon that
14 information; correct?
15    A. Based on the information, yes.
16    Q. You're not saying that AmSouth
17 knew all along that you weren't in a flood
18 zone? That's not what you're saying, is it?
19    A. Repeat that question.
20    Q. So you're not saying that AmSouth
21 knew you were not in a flood zone and
22 purchased insurance anyway?
23    A. I don't think they was aware of

83 (Pages 329 to 332)

# FREEDOM COURT REPORTING

Page 333

1 the fact that we wasn't in it. They was
2 just --
3    Q. Basing their decision off the
4 information they had been provided; correct?
5    A. Correct.
6    Q. Jacqueline King, she's at the
7 local branch here?
8    A. Yes.
9    Q. And I'm a little bit confused.
10 There were notes that she made herself and
11 gave you a copy of those?
12    A. Right.
13    Q. And those are at your file at
14 home; correct?
15    A. We've should have them here, too,
16 because all of it was --
17    Q. Okay. We need to --
18    A. That's what we made and gave to
19 y'all.
20    Q. I haven't seen that document. You
21 don't recall the date; right?
22    A. It's on that document.
23    Q. That was towards the end of the

Page 334

1 process, towards the -- Was that before or
2 after you had actually received information
3 that you're not in a flood zone, you're in
4 zone C? Was it after that or before?
5    A. It was around the time that we got
6 the letter whereabouts y'all were fixing to
7 foreclose on us. And I went to get the --
8 find out the amount of money I needed to
9 send to clear it all up. And then that's
10 when she was trying to get it resolved, too.
11    Q. And did you write a check here at
12 the local branch? How did you make that
13 payment?
14    A. I believe that's correct. I think
15 we went ahead and -- I can't remember if it
16 was that or did we send a -- I can't really
17 say. I don't know if I wrote a check or got
18 a cashier's check for it.
19    Q. But that would be reflected in
20 your account?
21    A. That would be in my statements.
22    Q. Would that have been drawn on an
23 AmSouth account if you went to AmSouth Bank

Page 335

1 to talk with Ms. King?
2    A. I can't attest to that either
3 because we had both accounts at that time.
4    Q. Would you write checks to AmSouth
5 out of different accounts from your AmSouth
6 account? You might write a check to AmSouth
7 from your Wachovia account?
8    A. It would have been where I
9 deposited my paycheck or something.
10    Q. Okay. And you may have answered
11 this question. But other than someone
12 telling you that FEMA required -- or FEMA
13 indicated that you were in a flood zone, any
14 other statement made by anyone at AmSouth
15 that you believe as we sit here today that
16 was not true?
17    A. Not that I can recall at this
18 time.
19    Q. Okay. And you did say that you
20 have copies of checks that you have written
21 to AmSouth to cover the mortgage payment?
22    A. Yes.
23    Q. Okay.

Page 336

1    MR. COLLINS: If you've given
2 those to me, I must have misplaced them.
3    Q. I think that would be the best
4 way, as Mr. Stott pointed out, is to figure
5 out how much -- how many payments you
6 submitted during the relevant time period
7 and then deduct or add any credits or
8 refunds that you were provided to determine
9 how much money you actually paid versus how
10 much money you should have paid.
11    A. One statement that was made to me
12 that was not correct and that was -- and
13 I've got a record of this, notes of it on
14 two or three and I think they are on the
15 tape -- whereabouts they told me that if I
16 mailed my payments, that they were just
17 going to send them back to me.
18    That was really disturbing
19 because, you know, until we resolved it, I
20 don't see why they would have been turning
21 down my payments.
22    Q. They were telling you that you
23 were submitting less than the amount due;

84 (Pages 333 to 336)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 337

1  right? Under their records, you were
2  submitting less than the amount that was
3  currently owing?
4      A.  Well, I was telling them I was
5  sending my principal and interest.
6      Q.  Right. And they were saying
7  that's not a full payment based on the
8  escrow; correct?
9      A.  And they was going -- I told them,
10  I said, are you sure now, that if I send it,
11  y'all will send it back to me and they said
12  yes.
13      Q.  Did they send it back?
14      A.  No. Because I sent it onto them.
15      Q.  And they deposited it and didn't
16  send the check back to you?
17      A.  Right. Wasn't no need of
18  misleading me like that.
19      Q.  But you weren't harmed by that,
20  were you? I mean, were you happy that -- I
21  mean, you sent the check in obviously for
22  the purpose that they would accept it, even
23  though it was a short payment according to

Page 338

1  their records; right?
2      A.  Well, it was my regular principal
3  and interest payment.
4      Q.  Right. But you --
5      A.  Until we got this other resolved,
6  it had nothing to do with my house payment.
7      Q.  Right. But they had already
8  advanced -- AmSouth had already advanced
9  eight hundred and eight dollars in insurance
10  on your behalf; correct?
11      A.  But still we're at the point they
12  weren't trying to help me resolve the
13  problem.
14      Q.  Right. And you would have --
15  You'd rather have AmSouth go ahead and just
16  advance that payment and not credit it to
17  your account until this issue was resolved
18  or you would rather hold off on the flood
19  insurance until a determination was made as
20  to where your house was vis-a-vis the hazard
21  zone; correct?
22      A.  I think that would have been the
23  right thing to have done.

Page 339

1      Q.  That would have been the right
2  thing to do, is to not require insurance
3  until your issue was resolved and then make
4  the insurance determination?
5      A.  I think the right thing to have
6  done would have been to have got with me
7  sooner to resolve it quicker. I think
8  that's whereabouts in public relations that
9  maybe AmSouth is lacking when you've got
10  some of us stick to our word or concern
11  about what we're doing.
12          And I know that when they was
13  ready to foreclose they could send someone
14  out to evaluate the property. Why couldn't
15  they have sent someone out to evaluate
16  whether or not what I was saying was the
17  truth and try to resolve it.
18      Q.  But you don't know whether AmSouth
19  Bank has surveyors and engineers that make
20  determinations regarding flood zones, do
21  you?
22      A.  No. But they had Geotrac --
23      Q.  Right.

Page 340

1      A.  -- apparently contracted.
2      Q.  And that's the reason they hired
3  Geotrac; right, to make that determination
4  for them?
5      A.  That's what I would assume y'all
6  would be doing.
7      Q.  And we've looked at two letters
8  where you were in flood zone A in July of
9  '03. And then in December of '03, it was
10  reaffirmed that you were in flood zone A;
11  correct?
12      A.  Correct.
13      Q.  And AmSouth sent those documents
14  to you; correct?
15      A.  Correct.
16      Q.  To provide you with documentation
17  as to the reason why they had placed the
18  insurance; correct?
19      A.  That's correct. But the
20  information was probably just compiled again
21  off of maps and documents. No one made an
22  actual visit to my home.
23      Q.  And you're saying AmSouth should

85 (Pages 337 to 340)

# FREEDOM COURT REPORTING

Page 341

1  have done that?
2      A.  Well, y'all are the ones that's
3  got the mortgage.  It would be your
4  responsibility and we'd like to try to
5  assist me in this.
6      Q.  So you would have liked someone to
7  come out from AmSouth and physically assess
8  your property?
9      A.  I'm not going to say exactly
10  AmSouth.  But whoever their experts would be
11  in this area to come out and assist.  Like I
12  said, they had someone to come out to assist
13  it when they was getting ready to foreclose
14  to evaluate and the property was still
15  intact and everything.
16      So, I mean, this was a major issue
17  to me.  It was just fair business that they
18  would have come out there and at least try
19  to accommodate their customer to resolve the
20  situation.
21      Q.  But you don't know whether those
22  determinations are made based on maps,
23  whether they are based on surveys?

Page 342

1      A.  I have no knowledge.
2      Q.  Okay.
3      MR. COLLINS:  I believe that's all
4  I have.  Thank you very much.
5      MR. STOTT:  I don't have anything
6  else.
7  EXAMINATION BY MR. JARRETT:
8      Q.  Mr. Clark, you were asked earlier
9  about when you received notice from AmSouth
10  that you needed flood hazard insurance.  Did
11  you ever talk to your homeowner's insurance
12  agent to get flood insurance?
13      A.  I did.
14      Q.  And what did he tell you?
15      A.  Well, he first told me that it
16  would have to be established that I was in a
17  flood area, and that he couldn't sell me any
18  flood insurance until that happened.
19      And then they had a formula.  If I
20  was, then how it would be figured, that I
21  could certainly get it cheaper than what
22  they would obtain it at.  But there was not
23  any indication that I was even in a flood

Page 343

1  area.
2      Q.  Do you have any other credit being
3  secured by that property?
4      A.  I do.
5      Q.  Through who?
6      A.  AmSouth Mortgage.
7      Q.  And who is the principal agent at
8  AmSouth that you deal with on that one?
9      A.  Jacqueline King.
10      Q.  Did Jacqueline King or anybody on
11  her behalf on that second line of credit
12  ever ask for any type of flood hazard
13  insurance?
14      A.  No, they didn't.
15      Q.  And we are talking about the exact
16  same property?
17      A.  That's correct.
18      Q.  Just so I understand, you have
19  sent extra payments in other than just your
20  monthly principal and interest payments to
21  AmSouth?
22      A.  Through all this?
23      Q.  Yes, sir.

Page 344

1      A.  Yes.
2      Q.  Okay.  Was one of the checks that
3  you sent in marked under protest in response
4  to a foreclosure threat?
5      A.  That's correct.
6      Q.  As a result of all the stress,
7  anxiety that you've had to endure throughout
8  this, have --
9      MR. COLLINS:  Object to the form.
10      A.  -- have you had any increase in
11  medical or prescription expenses?
12      A.  I've had to double up and take
13  more blood pressure medication and two
14  different kinds.  And I go to the doctor
15  more regular for blood pressure checks.
16      Q.  Have you ever had any flood
17  insurance?
18      A.  No, sir.
19      Q.  Other than the forced placed?
20      A.  That's correct.
21      Q.  Defendant's Exhibit No. 4 is a
22  letter dated 6-17-03, the first sentence
23  which states, we have received notice that

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 345

1  your flood insurance has been cancelled or
2  expired. Do you remember that statement?
3    A.  Yes.
4    Q.  Could they have received notice
5  that your flood insurance had been cancelled
6  or expired?
7    A.  I never had any. Other than what
8  they put on there now.
9    Q.  Did AmSouth routinely in their
10  letters to you state that the Federal law
11  required you to have insurance, flood
12  insurance?
13    A.  When I started receiving these
14  notices, yes.
15    Q.  Is it your contention that you did
16  not breach your contract with AmSouth, that
17  you did make your monthly payments as you
18  agreed?
19      MR. COLLINS: Object to the form.
20    A.  I did.
21      MR. JARRETT: That's all I've got.
22  EXAMINATION BY MR. COLLINS:
23    Q.  I just have a couple of quick

Page 346

1  questions. Who was your homeowner's
2  insurance agent I guess?
3    A.  Eddie Lundy.
4    Q.  Eddie Lundy?
5    A.  That's correct.
6    Q.  And he's with Allstate?
7    A.  Alfa.
8    Q.  Okay. And he advised you that you
9  could not get a personal policy of flood
10  insurance on your home? He wouldn't sell it
11  to you?
12    A.  He said I had to have
13  documentation that I was in a flood area
14  before I could purchase it. And I never
15  received any documentation that I was in a
16  flood area.
17    Q.  What sort of documentation did he
18  ask for? Did he ask for a FEMA map or
19  anything specific?
20    A.  I didn't go into it.
21    Q.  Did you give him the
22  correspondence from AmSouth or any letters
23  identifying the map and the zone that you

Page 347

1  were zoned in?
2    A.  I told him about the letter I got
3  from AmSouth and that we was trying to
4  resolve it.
5    Q.  Did you give him the map number
6  and the zone?
7    A.  No.
8    Q.  Any reason why you didn't do that?
9    A.  Because, like I said, I was trying
10  to get it resolved with Rose.
11    Q.  Do you think he could have sold
12  you that insurance if you gave him a map
13  number and the zone and the location of your
14  property?
15    A.  I don't know.
16    Q.  Okay. You mentioned your home
17  equity -- Is it a home equity line; is that
18  right?
19    A.  Home equity line.
20    Q.  What's the credit line on that?
21    A.  I think it's ninety-eight or
22  either a hundred thousand. I'm not for sure
23  what they approved it at.

Page 348

1    Q.  Is there a security interest on
2  that line? Is it a home equity line or is
3  it just a line of credit?
4    A.  It's a home equity line that's
5  through AmSouth. They had to I think secure
6  it with the house.
7    Q.  Okay.
8      MR. COLLINS: I think that's all
9  I've got.
10  EXAMINATION BY MR. STOTT:
11    Q.  One very quick thing. Your
12  medications and doctors' visits, is that
13  covered by insurance, health insurance?
14    A.  Back then, they were. We had to
15  pay the twenty percent.
16    Q.  Who is it with, what insurance?
17    A.  Blue Cross Blue Shield.
18    Q.  I assume you could get me that
19  policy number by looking at your documents?
20  Do you have it with you?
21    A.  I've just recently changed.
22    Q.  If you've got it, we'll make a
23  copy of it and mark it as Exhibit 26. If

87 (Pages 345 to 348)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 349

1  you don't have it, get it to your attorney.
2  He'll get it to us.  I just need to know the
3  group number policy.
4      MR. JARRETT:  Just get it to me
5  later and I'll send it to the three of you.
6      MR. STOTT:  Okay.
7  EXAMINATION BY MR. MARTIN:
8      Q.  Back to your insurance agent Mr.
9  Lundy.  Did you ever share with him this
10  flood determination from Geotrac?
11      A.  No, I didn't.
12      Q.  And you said you were doubling up
13  on your blood pressure medicine and having
14  to go back more often.  Would the increased
15  prescription be from Dr. Mancuso?
16      A.  Yes.
17      Q.  And going back more often would be
18  going back to Dr. Mancuso?
19      A.  Well, it's still in control.
20      Q.  Sure.  But when you said you had
21  to go back more often, you were going back
22  to Dr. Mancuso more often?
23      A.  Right.

Page 350

1      MR. MARTIN:  That's all I've got.
2  Thank you.
3      MR. STOTT:  Thank you, Mr. Clark.
4      MR. COLLINS:  Thank you so much.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 351

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6      I hereby certify that the above
7  and foregoing deposition was taken down by
8  me in stenotype, and the questions and
9  answers thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14      I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in any wise
17  interested in the result of said cause.
18
19
20      ----------------
21      CINDY WELDON
22
23

88  (Pages 349 to 351)

# ADJUSTABLE RATE NOTE
### (1 Year Treasury Index—Rate Caps—Fixed Rate Conversion Option)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALSO CONTAINS THE OPTION TO CONVERT MY ADJUSTABLE RATE TO A FIXED RATE.**

August 24            , 1988        Dothan                    ,        Alabama
                                   [City]                              [State]

Route 2, Box 156 B, Cottonwood, Alabama    36320
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 114,800.00                (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is American Federal Savings Bank of Duval County.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of    7.5             %. The interest rate I will pay may change in accordance with Sections 4 or 5 of this Note.
The interest rate required by this Section 2 and Sections 4 or 5 of this Note is the rate I will pay both before and after any default described in Section 8(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on    October 1              ,
19 88      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on    September 1 A.EC. B.EC., 20 18        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."
I will make my monthly payments at    6320 Old St. Augustine Road, Jacksonville, Florida
32217                                                                      or at a different
place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $    802.70              . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The adjustable interest rate I will pay may change on the first day of    September            ,
19 89      , and on that day every 12th month thereafter. Each date on which my adjustable interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding    Two and Three Quarters            percentage points (    2.75          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

DEFENDANT'S EXHIBIT

MULTISTATE ADJUSTABLE RATE NOTE—ARM PLAN 57—Single Family—Fannie Ma        Form 3508 12/87
VMP 845 (8712)        VMP MORTGAGE FORMS • (313)293-8100 • (800        Dovenmuehle Mortgage/Clark

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.5** % or less than **5.5** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **13.5** %, which is called the "Maximum Rate."

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my adjustable interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. FIXED INTEREST RATE CONVERSION OPTION

**(A) Option to Convert to Fixed Rate**

I have a Conversion Option that I can exercise unless I am in default or this Section 5(A) will not permit me to do so. The "Conversion Option" is my option to convert the interest rate I am required to pay by this Note from an adjustable rate with interest rate limits to the fixed rate calculated under Section 5(B) below.

The conversion can only take place on a date(s) specified by the Note Holder during the period beginning on the first Change Date and ending on the fifth Change Date. Each date on which my adjustable interest rate can convert to the new fixed rate is called the "Conversion Date."

If I want to exercise the Conversion Option, I must first meet certain conditions. Those conditions are that: (i) I must give the Note Holder notice that I want to do so; (ii) on the Conversion Date, I must not be in default under the Note or the Security Instrument; (iii) by a date specified by the Note Holder, I must pay the Note Holder a conversion fee of U.S. $ **100 00** ; and (iv) I must sign and give the Note Holder any documents the Note Holder requires to effect the conversion.

**(B) Calculation of Fixed Rate**

My new, fixed interest rate will be equal to the Federal National Mortgage Association's required net yield as of a date and time of day specified by the Note Holder for (i) if the original term of this Note is greater than 15 years, 30-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus five-eighths of one percentage point (0.625%), rounded to the nearest one-eighth of one percentage point (0.125%), or (ii) if the original term of this Note is 15 years or less, 15-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus five-eighths of one percentage point (0.625%), rounded to the nearest one-eighth of one percentage point (0.125%). If this required net yield cannot be determined because the applicable commitments are not available, the Note Holder will determine my interest rate by using comparable information. My new rate calculated under this Section 5(B) will not be greater than the Maximum Rate stated in Section 4(D) above.

**(C) New Payment Amount and Effective Date**

If I choose to exercise the Conversion Option, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe on the Conversion Date in full on the maturity date at my new fixed interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Beginning with my first monthly payment after the Conversion Date, I will pay the new amount as my monthly payment until the maturity date.

## 6. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 7. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 8. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **Five (5)** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

Dovenmuehle Mortgage/Clark
AmSouth
00021

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

## 9. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 10. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 11. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 12. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until I exercise my Conversion Option under the conditions stated in Section 5 of this Adjustable Rate Note, Uniform Covenant 17 of the Security Instrument is described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) If I exercise my Conversion Option under the conditions stated in Section 5 of this Adjustable Rate Note, Uniform Covenant 17 of the Security Instrument described in Section 12(A) above shall then cease to be in effect, and Uniform Covenant 17 of the Security Instrument shall instead be described as follows:

Dovenmuehle Mortgage/Clark
AmSouth

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Arthur Earl Clark_ _____ (Seal)
Arthur Earl Clark                   Borrower

_Barbara Ellen Clark_ _____ (Seal)
Barbara Ellen Clark                 Borrower

_____ (Seal)
                                    Borrower

_____ (Seal)
                                    Borrower

[Sign Original Only]

# ADJUSTABLE RATE RIDER
### (1 Year Treasury Index—Rate Caps—Fixed Rate Conversion Option)

THIS ADJUSTABLE RATE RIDER is made this 24th day of August 19 88 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to American Federal Savings Bank of Duval County (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

Route 2, Box 156B, Cottonwood, Alabama 36320
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY. THE NOTE ALSO CONTAINS THE OPTION TO CONVERT THE ADJUSTABLE RATE TO A FIXED RATE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 7.5 %. The Note provides for changes in the adjustable interest rate and the monthly payments, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates
The adjustable interest rate I will pay may change on the first day of September 1989 , and on that day every 12th month thereafter. Each date on which my adjustable interest rate could change is called a "Change Date."

### (B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and three quarters percentage points ( 2.75 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 9.5 % or less than 5.5 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 13.5 %, which is called the "Maximum Rate".

### (E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my adjustable interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. FIXED INTEREST RATE OPTION

The Note provides for the Borrower's option to convert from an adjustable interest rate with interest rate limits to a fixed interest rate, as follows:

## 5. FIXED INTEREST RATE CONVERSION OPTION

### (A) Option to Convert to Fixed Rate
I have a Conversion Option that I can exercise unless I am in default or this Section 5(A) will not permit me to do so. The "Conversion Option" is my option to convert the interest rate I am required to pay by this Note from an adjustable rate with interest rate limits to the fixed rate calculated under Section 5(B) below.

The conversion can only take place on a date(s) specified by the Note Holder during the period beginning on the first Change Date and ending on the fifth Change Date. Each date on which my adjustable interest rate can convert to the new fixed rate is called the "Conversion Date."

MULTISTATE ADJUSTABLE RATE RIDER—ARM PLAN 57—Single Family—Fannie Mae Uniform Instrument    Form 3118 12/87

VMP -845A (8712)    VMP MORTGAGE FORMS • (313)293-8100 • (800)521-7291

Doventmuehle Mortgage/Clark
AmSouth
00024

BOOK 0829 PAGE 242

If I want to exercise the Conversion Option, I must first meet certain conditions. Those conditions are that: (i) I must give the Note Holder notice that I want to do so; (ii) on the Conversion Date, I must not be in default under the Note or the Security Instrument; (iii) by a date specified by the Note Holder, I must pay the Note Holder a conversion fee of U.S. $ 100.00 ; and (iv) I must sign and give the Note Holder any documents the Note Holder requires to effect the conversion.

**(B) Calculation of Fixed Rate**

My new, fixed interest rate will be equal to the Federal National Mortgage Association's required net yield as of a date and time of day specified by the Note Holder for (i) if the original term of this Note is greater than 15 years, 30-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus five-eighths of one percentage point (0.625%), rounded to the nearest one-eighth of one percentage point (0.125%), or (ii) if the original term of this Note is 15 years or less, 15-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments, plus five-eighths of one percentage point (0.625%), rounded to the nearest one-eighth of one percentage point (0.125%). If this required net yield cannot be determined because the applicable commitments are not available, the Note Holder will determine my interest rate by using comparable information. My new rate calculated under this Section 5(B) will not be greater than the Maximum Rate stated in Section 4(D) above.

**(C) New Payment Amount and Effective Date**

If I choose to exercise the Conversion Option, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe on the Conversion Date in full on the maturity date at my new fixed interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Beginning with my first monthly payment after the Conversion Date, I will pay the new amount as my monthly payment until the maturity date.

**C. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower exercises the Conversion Option under the conditions stated in Section B of this Adjustable Rate Rider, Uniform Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. If Borrower exercises the Conversion Option under the conditions stated in Section B of this Adjustable Rate Rider, the amendment to Uniform Covenant 17 of the Security Instrument contained in Section C 1 above shall then cease to be in effect, and the provisions of Uniform Covenant 17 of the Security Instrument shall instead be in effect, as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

Aug 30  11 26 AM '88

FILED-STATE OF ALA.
HOUSTON COUNTY
R.J. STENBRIDGE
JUDGE OF PROBATE

this 30 day of Aug 1988 at 11:26 AM
M. $172.20  Mtg. Tax.
Deed Tax Paid, Recorded 2day Book 829 Page 257
R.J. Stenbridge Judge of Probate No. 7644
HOUSTON COUNTY, ALABAMA

_____Arthur Earl Clark_____ (Seal)
Arthur Earl Clark                Borrower

_____Barbara Ellen Clark_____ (Seal)
Barbara Ellen Clark              Borrower

_____ (Seal)
                                 Borrower    200
                                             1500
_____ (Seal)
                                 Borrower    172.20
                                             100.20

Dovenmuehle Mortgage/Clark
AmSouth
00025

[Space Above This Line For Recording Data]

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on   August 24
19 88   The grantor is   Arthur Earl Clark and wife, Barbara Ellen Clark

("Borrower"). This Security Instrument is given to
American Federal Savings Bank of Duval County
, which is organized and existing
under the laws of   The United States of America
and whose address is 6320 Old St. Augustine Road, Jacksonville, Florida  32217
("Lender").
Borrower owes Lender the principal sum of   One Hundred Fourteen Thousand Eight Hundred Dollars

and/oo——————————————Dollars (U.S. $ 114,800.00              ). This debt is evidenced by Borrower's note
dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not
paid earlier, due and payable on     September 1, 2018                          This Security Instrument
secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and
modifications; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this
Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and
the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and
assigns, with power of sale, the following described property located in     Houston                County, Alabama:

A lot or parcel of land in Houston County, Alabama, and being
more particularly described as follows: Beginning at the
intersection of the West line of the E 1/2 of the NE 1/4 of
Section 12, T1N, R27E and the Westerly side of a Paved County
Road (Houston Co. Rd. No. 55) and thence N1°-00'W along said West
line, 450.01 feet; thence S59°-58'E, 232.0 feet to the Westerly
side of said road; thence S30°-02'W, along said Road, 385.6 feet
to the Point of Beginning. Said parcel being in the E 1/2 of the
NE 1/4 of Section 12, T1N, R27E, and containing 1.026 acres, more
or less.

Aug 30 11 26 AM '88
FILED-STATE OF ALA.
HOUSTON COUNTY
R.J. STEHMBRIDGE
JUDGE OF PROBATE

which has the address of        Route 2, Box 156 B                              Cottonwood
                                    [Street]                                      [City]

Alabama       36320                ("Property Address");
              [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all
the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties,
mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All
replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this
Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to
mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any
encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

ALABAMA—Single Family—FNMA/FHLMC UNIFORM INSTRUMENT        52112        Form 3001 12/83

Dovenmuehle Mortgage/Clark
AmSouth
00026

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") equal to one-twelfth of: (a) yearly taxes and assessments which may attain priority over this Security Instrument; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; and (d) yearly mortgage insurance premiums, if any. These items are called "escrow items." Lender may estimate the Funds due on the basis of current data and reasonable estimates of future escrow items.

The Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay the escrow items. Lender may not charge for holding and applying the Funds, analyzing the account or verifying the escrow items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing that interest shall be paid on the Funds. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Security Instrument.

If the amount of the Funds held by Lender, together with the future monthly payments of Funds payable prior to the due dates of the escrow items, shall exceed the amount required to pay the escrow items when due, the excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly payments of Funds. If the amount of the Funds held by Lender is not sufficient to pay the escrow items when due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as required by Lender.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 19 the Property is sold or acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to late charges due under the Note; second, to prepayment charges due under the Note; third, to amounts payable under paragraph 2; fourth, to interest due; and last, to principal due.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Preservation and Maintenance of Property; Leaseholds.** Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property; Mortgage Insurance.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Dovenmuehle Mortgage/Clark
AmSouth

BOOK **0829** PAGE 239

If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect until such time as the requirement for the insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

**8. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**12. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**13. Legislation Affecting Lender's Rights.** If enactment or expiration of applicable laws has the effect of rendering any provision of the Note or this Security Instrument unenforceable according to its terms, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument and may invoke any remedies permitted by paragraph 19. If Lender exercises this option, Lender shall take the steps specified in the second paragraph of paragraph 17.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note had no acceleration occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraphs 13 or 17.

Downmuehle Mortgage/Clark
AmSouth
00028

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraphs 13 and 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in Houston                    County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**20. Lender in Possession.** Upon acceleration under paragraph 19 or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Security Instrument.

**21. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

**22. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

**23. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

[X] Adjustable Rate Rider          [ ] Condominium Rider          [ ] 2-4 Family Rider

[ ] Graduated Payment Rider        [ ] Planned Unit Development Rider

[ ] Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____          _Arthur Earl Clark_____(Seal)
                                           Arthur Earl Clark                —Borrower

_____          _Barbara Ellen Clark_____(Seal)
                                           Barbara Ellen Clark             —Borrower

[Space Below This Line For Acknowledgment]

STATE OF ALABAMA,                         Houston                         County ss:

On this    24th    day of    August    , 19 88 , I,  the undersigned authority

a Notary Public in and for said county and in said state, hereby certify that  Arthur Earl Clark and wife,

Barbara Ellen Clark                                      , whose name(s)    are        signed to the foregoing conveyance, and who    are        known to me, acknowledged before me that, being informed of the contents of the conveyance,  t he y  executed the same voluntarily and as    their    act on the day the same bears date.

Given under my hand and seal of office this the    24th    day of    August        19 88

My Commission expires: 2/19/90

_____
                Notary Public

This instrument was prepared by    Johnson, Hornsby, Etheredge & Dowling

*307209*

Loan # 3003072091

PRO____
APR____

# LOAN MODIFICATION AGREEMENT
## (Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 10th day of December , 2001, Between _____ Arthur & Barbara Clark _____ ("Borrower")and ____ AmSouth Bank _____ ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust or Deed to Secure Debt (the "Security Instrument"), dated August 24, 1988 and recorded in Book or Liber at page(s) of the _____ , AL and (2) the Note bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at:

8530 S. County Rd. 55
Cottonwood, AL 36320

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as Follows (notwithstanding anything to the contrary in the Note or Security Instrument):

1. As of December 10, 2001 , the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $93,428.42 consisting of the amount(s) loaned to the Borrower by the Lender and any interest capitalized to date.

2. The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of The Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of 6.875%, from December 1, 2001 . The Borrower promises to make monthly payments of principal and interest of U.S. $783.91 beginning on the 1st day of January 2002, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on September 1, 2018 (the "Maturity Date"), the Borrower still owes amounts under the Note and the Security Instrument, as amended by this agreement, the Borrower will pay these amounts in full on the Maturity Date.

   The Borrower will make such payments at 1501 Woodfield Rd. Schaumburg, IL 60173 or at such other place as the Lender may require.

3. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in the Borrower is sold or transferred and the Borrower is not a natural person) without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.

   If the Lender exercises this option, the Lender shall give the borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If the Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on the Borrower.

**DEFENDANT'S EXHIBIT**

2

Dovenmuehle Mortgage/Clark
AmSouth

4.  The Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

a)  all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

b)  all terms and provisions of any adjustable rate rider or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

5.  Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

_____ (Seal)          _____ (Seal)
                                          Arthur Clark

By _____               _____ (Seal)
   Leonora Robinson                       Barbara Clark
   Assistant Vice President

(Single Acknowledgement)

Individual:

STATE OF Alabama
COUNTY OF Houston

On 12-18-2001 before me, the undersigned, a Notary Public in and for said State, personally
appeared Alissa Hammons _____,
known to me to be the person(s) whose name(s) is/are subscribed to the within Instrument and
acknowledged that Arthur E. Clark + Barbara Clark executed the same.

WITNESS my hand and official seal.

Signature Alissa Hammons

DATE 12/18/2001 _____

My Commission
Expires July 2, 2005

(Corporate Acknowledgement)

Corporation:

STATE OF _____
COUNTY OF _____

On __1/2/02__ before me, the undersigned, a Notary Public in and for said State, personally appeared _Leonora Robinson_____, known to me to be the _____ _Assistant Vice_____ President of the Corporation that executed the within Instrument, known to me to be the person who executed the within Instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within Instrument pursuant to its by-laws or a resolution of its Board of Directors.

WITNESS my hand and official seal.

Signature _Dani Michele Guthrie_

DATE _My Commission Expires_ 11/08/03

Dovenmuehle Mortgage/Clark
AmSouth

AmSouth Bank
Mortgage Banking
Post Office Box 59720
Schaumburg, IL 60159-0720

# AmSouth®

June 10, 2003

Arthur E Clark
Barbara E Clark
8530 S County Rd 55
Cottonwood AL 36320

RE:  Loan Number:        3003072091
     Property Address:   8530 S County Rd 55
                         Cottonwood AL 36320

     Annual Insurance Renewal Information

Dear Mortgagor(s):

We are in the process of updating your flood insurance files
and we are in need of your help.

Please forward us your current flood insurance policy (or copy).
If this property is a condominium, please provide a copy of your
associations master policy.

In light of the potential for a partial or total loss of the property
indicated, it is important that you respond to our request within 10
days.

Mail To:              AmSouth Bank
                      P. O. Box 57046
                      Irvine, CA  92619-7046

Fax To:               949-465-7253

You may also visit our website at www.updatemyinsurance.com/mortgage
to update your insurance online.

Thank you very much for your assistance in this matter.

Sincerely,

AM847/TKH

DEFENDANT'S
EXHIBIT

3

**AmSouth**

AmSouth Bank
P.O. Box 57046
Irvine, CA 92619-7046

**FLOOD INSURANCE WARNING NOTICE**

06/17/03

Loan # 3003072091
Property Location:
8530 S COUNTY RD 55
COTTONWOOD AL 36320

ARTHUR E CLARK
BARBARA E CLARK
8530 S COUNTY RD 55
COTTONWOOD AL 36320

Flood Zone: A
FEMA Map Panel: 01069C0335E



Dear Arthur E Clark:

We have received notice that your flood insurance has been cancelled or expired. We have not received a new or renewal flood insurance policy covering the property location shown above. The Flood Disaster Protection Act of 1973, a Federal Law, requires that flood insurance be purchased and maintained on certain mortgage loans. The law applies to loans securing buildings which, at any time during the term of the loan, are (1) located in Special Flood Hazard Areas (SFHA), as shown on maps published by the Federal Emergency Management Agency (FEMA), and (2) are in a community which participates in the National Flood Insurance Program. We previously determined that your property is located in a SFHA. You are required by the terms of your mortgage and Federal Law to maintain flood insurance on the property address shown above.

You may purchase flood insurance from the agent or carrier of your choice. Please forward a copy of your policy or request that your agent or insurance company provide a copy of the policy, including the loan number indicated above, to:

> AMSOUTH BANK
> ITS SUCCESSORS AND/OR ASSIGNS
> P O BOX 57046
> IRVINE, CA 92619-7046
> Or you may FAX to: 1-949-465-7253

If you prefer, you may visit our website at www.updatemyinsurance.com/mortgage and update your insurance online.

If you do not provide the necessary flood insurance information for this property we have the right to purchase flood insurance coverage to protect our interest. If we obtain flood insurance coverage, the insurance premium may be considerably higher than insurance you can purchase. Insurance we obtain will protect the dwelling only. No coverage will be provided for your contents (personal property), personal liability, additional living expense, or medical payments. The amount of insurance we obtain may not adequately protect your interest in the property. You will be responsible to pay the premium and applicable fees which result from us purchasing this insurance. If there is a lapse in coverage between the required date of insurance and the date you obtain flood insurance, you will be charged for this lapse.

Refer To Back Page For Additional Information.



DMWR1F01   11/11/02

The lender placed coverage amount will be based on your last known coverage amount. If you disagree with the amount of insurance coverage we have placed on your dwelling, please provide us with documentation for the current replacement value of your property. Documentation may be in the form of a Certified Market Analysis (CMA) from a real estate agent, a property tax assessment, or a property appraisal. Any costs you incur to obtain this information will be your responsibility. Please send the appropriate documentation confirming the replacement value of your property to the address shown above and make sure that you include your name and loan number on all correspondence.

Any premium charges for flood insurance may be added to your escrow account. If you do not have an escrow account, we may establish an escrow account, in accordance with the terms of your loan documents. You will be responsible to pay the premium and any fees which result from our purchase of this flood insurance.

We thank you for your assistance. If you have any questions, please feel free to call the customer service number listed below. We invite you to contact us during our nonpeak hours of 9 AM to 12 PM or 3 PM to 5 PM (Central Time) Wednesday through Friday. For your convenience, we are also available Monday through Friday, 7 AM to 7 PM (Central Time). Your call may be monitored for quality assurance.

Sincerely,

Customer Service
800-333-4471



Back

**AmSouth**

AmSouth Bank
P.O. Box 57046
Irvine, CA 92619-7046

FLOOD INSURANCE REMINDER

07/17/03

ARTHUR E CLARK
BARBARA E CLARK
8530 S COUNTY RD 55
COTTONWOOD AL 36320

Loan # 3003072091
Property Location:
8530 S COUNTY RD 55
COTTONWOOD AL 36320



Flood Zone: A
FEMA Map Panel: 01069C0335E

Dear Arthur E Clark:

You were previously notified that we had not received proof of flood insurance for the property location shown above. As of the date of this letter, we have still not received proof of insurance. We have an obligation to protect our interest in the property and to comply with Federal Law. If we do not receive proof of insurance we will obtain lender placed flood insurance to protect our interest. Please IMMEDIATELY forward a copy of your policy or request that your agent or insurance company forward a copy of your policy, referencing the loan number shown above. You may purchase flood insurance from the agent or carrier of your choice. The policy should be forwarded to:

AMSOUTH BANK
ITS SUCCESSORS AND/OR ASSIGNS
P O BOX 57046
IRVINE, CA 92619-7046
Or you may FAX to: 1-949-465-7253

The Flood Disaster Protection Act of 1973, a Federal Law, requires that flood insurance be purchased and maintained on certain mortgage loans. The law applies to loans securing buildings which, at any time during the term of the loan, are (1) located in Special Flood Hazard Areas (SFHA), as shown on maps published by the Federal Emergency Management Agency (FEMA), and (2) are in a community which participates in the National Flood Insurance Program. We previously determined that your property is located in a SFHA. You are required by the terms of your mortgage and Federal Law to maintain flood insurance on the property address shown above.

If you do not provide the necessary flood insurance information for this property we have the right to purchase flood insurance coverage to protect our interest. If we obtain flood insurance coverage, the insurance premium may be considerably higher than insurance you can purchase. Insurance we obtain will protect the dwelling only. No coverage will be provided for your contents (personal property), personal liability, additional living expense, or medical payments. The amount of insurance we obtain may not adequately protect your interest in the property. You will be responsible to pay the premium and applicable fees which result from us purchasing this insurance. If there is a lapse in coverage between the required date of insurance and the date you obtain flood insurance, you will be charged for this lapse.

Refer To Back Page For Additional Information.





DEFENDANT'S EXHIBIT

5

The lender placed coverage amount will be based on your last known coverage amount. If you disagree with the amount of insurance coverage we have placed on your dwelling, please provide us with documentation for the current replacement value of your property. Documentation may be in the form of a Certified Market Analysis (CMA) from a real estate agent, a property tax assessment, or a property appraisal. Any costs you incur to obtain this information will be your responsibility. Please send the appropriate documentation confirming the replacement value of your property to the address shown above and make sure that you include your name and loan number on all correspondence.

Any premium charges for flood insurance may be added to your escrow account. If you do not have an escrow account, we may establish an escrow account, in accordance with the terms of your loan documents. You will be responsible to pay the premium and any fees which result from our purchase of this flood insurance.

We thank you for your assistance. If you have any questions, please feel free to call the customer service number listed below. We invite you to contact us during our nonpeak hours of 9 AM to 12 PM or 3 PM to 5 PM (Central Time) Wednesday through Friday. For your convenience, we are also available Monday through Friday, 7 AM to 7 PM (Central Time). Your call may be monitored for quality assurance.

Sincerely,

Customer Service
800-333-4471

# AMSOUTH

AmSouth Bank
P.O. Box 57046
Irvine, CA 92619-7046

**FLOOD POLICY NOTICE**

08/05/03

Loan # 3003072091
Property Location:
8530 S COUNTY RD 55
COTTONWOOD AL 36320



ARTHUR E CLARK
BARBARA E CLARK
8530 S COUNTY RD 55
COTTONWOOD AL 36320

Flood Zone: A
FEMA Map Panel: 01069C0335E

Dear Arthur E Clark:

We have not received the proof of flood insurance we previously requested for the property location shown above. At your expense, we have purchased insurance to protect our interest in the property. The premium cost for obtaining this insurance is shown on the attached policy declaration. You are solely responsible for the repayment of this cost.

The Flood Disaster Protection Act of 1973, a Federal Law, requires that flood insurance be purchased and maintained on certain mortgage loans. The law applies to loans securing buildings which, at any time during the term of the loan, are (1) located in Special Flood Hazard Areas (SFHA), as shown on maps published by the Federal Emergency Management Agency (FEMA), and (2) are in a community which participates in the National Flood Insurance Program. We previously determined that your property is located in a SFHA. You are required by the terms of your mortgage and Federal Law to maintain flood insurance on the property address shown above.

If you purchase or have purchased a flood insurance policy for the property location shown above, we will cancel the policy we obtained, as of the effective date of the insurance you provide. If the effective date on the insurance policy you purchase is not the same or prior to the effective date of the policy we have purchased, you will be charged the earned premium for this lapse in coverage.

If you have purchased insurance, please **IMMEDIATELY** forward a copy of the policy or request that your agent or insurance company forward a copy of the policy to:

> AMSOUTH BANK
> ITS SUCCESSORS AND/OR ASSIGNS
> P O BOX 57046
> IRVINE, CA 92619-7046
> Or you may FAX to: 1-949-465-7253

The premium for the insurance we have obtained may be considerably higher than insurance you can purchase. This policy will protect the dwelling only. No coverage is provided for your contents (personal property), personal liability, additional living expense, or medical payments. The amount of insurance we have obtained may not adequately protect your interest in the property. You will be responsible to pay any premium and applicable fees which result from us purchasing this insurance. If there is a lapse in coverage between the old policy and the policy you obtain, you will be charged a premium to protect our interest during this lapse.

Refer To Back Page For Additional Information.


DEFENDANT'S
EXHIBIT

6

. The lender placed coverage amount will be based on your last known coverage amount. If you disagree with the amount of insurance coverage we have placed on your dwelling, please provide us with documentation for the current replacement value of your property. Documentation may be in the form of a Certified Market Analysis (CMA) from a real estate agent, a property tax assessment, or a property appraisal. Any costs you incur to obtain this information will be your responsibility. Please send the appropriate documentation confirming the replacement value of your property to the address shown above and make sure that you include your name and loan number on all correspondence.

The premium for the attached policy may be charged to your escrow account. If you do not have an escrow account, we may establish an escrow account, in accordance with the terms of your loan documents. You will be responsible to pay the premium and any fees which result from our purchase of this insurance.

We encourage you to contact your agent or insurance company and obtain your own insurance policy. If you have any questions, concerning the policy we have purchased, please feel free to call the customer service number listed below. We invite you to contact us during our nonpeak hours of 9 AM to 12 PM or 3 PM to 5 PM (Central Time) Wednesday through Friday. For your convenience, we are also available Monday through Friday, 7 AM to 7 PM (Central Time). Your call may be monitored for quality assurance.

Sincerely,

Customer Service
800-333-4471



Back